

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**06 CV 5279**

JUDGE SWAIN

RICHARD LASKY, Derivatively On Behalf of )
TAKE-TWO INTERACTIVE SOFTWARE, )
INC., )
                Plaintiff, )
    vs. )
PAUL EIBELER, RICHARD W. ROEDEL, )
JEFFREY C. LAPIN, KELLY SUMNER, )
RYAN A. BRANT, KARL H. WINTERS, )
JAMES H. DAVID, JR., LARRY MULLER, )
GARY LEWIS, BARBARA A. RAS, )
ROBERT FLUG, OLIVER R. GRACE, JR., )
MARK LEWIS, TODD EMMEL AND )
STEVEN TISCH, )
                Defendants, )
    -and- )
TAKE-TWO INTERACTIVE SOFTWARE, )
INC., a Delaware corporation, )
           Nominal Defendant.)
_____ )

Civil Action No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF
CONTROL, GROSS MISMANAGEMENT,
WASTE OF CORPORATE ASSETS,
UNJUST ENRICHMENT, VIOLATIONS OF
THE SARBANES-OXLEY ACT OF 2002
AND VIOLATIONS OF THE SECURITIES
EXCHANGE ACT OF 1934

RECEIVED
JUL 1 2 2006
U.S.D.C. S.D. N.Y.
CASHIERS

DEMAND FOR JURY TRIAL

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of federal and state law including, violations of the Sarbanes-Oxley Act of 2002, the Securities Exchange Act of 1934, breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between January 2000 and the present (the "Relevant Period") and that have caused substantial losses to Take-Two and other damages, such as to its reputation and goodwill. This action also concerns defendants' breaches of fiduciary duty in connection with the

manipulation of grant dates of stock options granted to Take-Two's officers and directors between 1997 and the present.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Sarbanes-Oxley Act of 2002 and the Securities Exchange Act of 1934.

3.      This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.      This Court retains general jurisdiction over each named defendant who is a resident of New York.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Take-Two maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of Take-Two, defendants' conduct was purposefully directed at New York.  Defendants' conduct arose out of New York, where Take-Two maintains its corporate headquarters.  Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Take-Two occurred in this District.  Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here that had an effect in this District.

- 2 -

## SUMMARY OF THE ACTION

6.      Take-Two publishes, develops, and distributes interactive entertainment software, hardware, and accessories.   The Company's main source of net sales is its publication and distribution of interactive software games for personal computers ("PC"), video game consoles, and handheld gaming units that are published internally and by third parties.   In addition, Take-Two manufactures and markets video games and video game accessories in Europe, North America and the Asia Pacific region.   Take-Two sells its software titles in retail outlets in North America and Europe through direct relationships with retail customers and third-party distributors.

**Defendants' Improper Financial Reporting**

7.      During the Relevant Period, defendants caused or allowed the issuance of false and misleading financial information to investors, which directly caused Take-Two to reduce its revenue, lose valuable sales and record increased costs due to federal and state agency investigations. Beginning as early as 2000, defendants caused or allowed the Company to engage in improper accounting treatment of the Company's transactions, including sales, costs and revenue loss from returned goods. On December 17, 2001, amid an Securities and Exchange Commission ("SEC") investigation, Take-Two announced its intention to restate the Company's financial statements for FY:00 and the first three quarters of FY:01. In an attempt to head-off the SEC investigation, Take-Two hired outside legal counsel and conducted an internal investigation into the accounting matters at issue. Ultimately, in February 2002, defendants announced that the Company was restating FY:00 and FY:01 to reflect a reduction in revenue of over $20 million.

8.      Following this initial restatement, the SEC continued to investigate Take-Two's financial reporting and internal controls. As a result, on December 18, 2003, Take-Two announced that the SEC had issued Wells Notices to the Company and defendant Ryan A. Brant ("Brant"), informing them of the SEC's intention to bring a civil action seeking an injunction and monetary damages against the Company for violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. Immediately thereafter, Take-Two announced that, due to improper revenue recognition policies, it would be restating its previously issued financial statements for FY:02 and

- 3 -

FY:03. After further evaluation, however, the Company ultimately restated financial results for FY:99 through FY:02 and the first three quarters of the FY:03.

9.    In June 2005, Take-Two agreed to settle charges brought by the SEC that the Company had engaged in fraudulent accounting practices, which resulted in inflated revenues and undeserved bonus increases to certain of the Company's executive officers. As part of the settlement agreement Take-Two paid a penalty fee of $7.5 million to the SEC. Finally, on January 18, 2006, Take-Two filed a Form 12b-25 with the SEC announcing that the Company would be unable to timely file its form 10-K for FY:05. Take-Two's Form 12b-25 also indicated that the Company did not maintain effective controls over the its accounts payable, amortization of capitalized software, and that such deficiencies were determined to be material weaknesses.

10.    On September 7, 2005, defendants, in an attempt to raise the value of Take-Two's stock initiated the Company's stock repurchase program. During the 3Q:05, defendants caused or allowed the Company to repurchase $25 million in shares, approximately 925,0000 shares at a price of $26.96 per share. Take-Two's stock price, however, had already begun to decline at the end of 3Q:05 and has since plummeted as low as $14.69. As a result, defendants' buyback cost the Company over $876.5 million over the true value of Take-Two's stock.

11.    As a result of defendants' false and misleading press releases and SEC filings, Take-Two has lost over $1 billion in market capitalization and is the subject of several class action lawsuits. The defendants, however, fared much better by selling their personally owned Take-Two stock for profits of over $31 million.

12.    In addition to its financial woes, Take-Two has come under fire over its star game series, Grand Theft Auto ("GTA"). Take-Two's publishing label, Rockstar Games, distributes several successful franchise gaming series including, GTA. Each game in the GTA series is an action and driving game where players control the actions and adventures of the main character of the story. The original GTA was released in 1998 and has since become legendary in the gaming world. Grand Theft Auto III, released in 2001, marked the beginning of the series' entrance into the 3D gaming world viewed from a third-person perspective. As a result of GTA III's advanced graphics and technology, it sold over ten million copies world wide and during FY:02, FY:03, FY:04

- 4 -

and FY:05, was responsible for generating 34.9%, 34.3%, 40.5% and 37.3%, respectively, of Take-Two's net sales.

13.     Following the successful release of GTA III, Rockstar Games and Take-Two published two sequels: GTA: Vice City and GTA: San Andreas. Sales of GTA: San Andreas commenced on October 25, 2004, and approximately 3.6 million units were sold in a single month. Defendants caused or allowed Take-Two to tout that GTA: San Andreas was the "top performing product in Take-Two's publishing business," the largest videogame launch in Take-Two's history and in 2004, the "top selling PlayStation 2 title in the United States in October and November." By the end of Take-Two's 2Q:05, GTA: San Andreas had generated over $306,000 or 42.3% of the Company's net sales for the six months ended April 30, 2005.

14.     Unknown to the Company's commercial distributors and customers alike, however, GTA: San Andreas was about to be yanked off the shelves due to undisclosed and illicit pornographic content programmed into the game. Rumors of risqué content embedded into GTA: San Andreas began to circulate after Take-Two released the PC version of the game in June 2005. Although the scenes were a part of the game's original programming, a modification or "mod" had to be downloaded and installed onto the customers PC to unlock the hidden programming. In addition, the sexually graphic scenes are also imbedded into the PlayStation 2 edition of GTA: San Andreas. "Since the PS2 version comes on an unmoddable DVD, it cannot have any content added to it, although cheat codes—created either by the publisher or third parties—can unlock preexisting code on the disc." Once installed, the "Hot Coffee" mod would unlock the preexisting code inside the game's memory and allow players to view and control a sexually graphic minigame. The modification was nicknamed "Hot Coffee" because when the games central character, CJ, won over his would-be girlfriend, she would invite him inside her house for "coffee."

15.     As a result of the "Hot Coffee" mod's explicit content, the Entertainment Software Rating Board ("ESRB") announced that it had launched an inquiry in GTA: San Andreas and the games marketed user rating. Originally designated Mature or "M," GTA: San Andreas was considered suitable for playing by ages 17 and older. This rating, however, did not take into account any sexually explicit or pornographic content. Under ESRB's rating system a game that included

- 5 -

such content would be designated "Adults Only" or "AO." ESRB's investigation caused an immediate stir because several of Take-Two's major retailers including, Best Buy, Target and Wal-Mart refused to carry games with an "AO" rating. Thus, if GTA: San Andreas received a revised rating of "AO," several of Take-Two's distributors would pull the game from their shelves causing a significant loss in net sales.

16.     On July 13, 2005, in an attempt to shift the responsibility to third parties, defendants caused or allowed Take-Two issued a press release, wherein a spokesperson for the Company stated that the explicit scenes were "the work of a determined group of hackers who have gone to significant trouble to alter scenes in the official version of the game." Take-Two described the process as "disassembling and then combining, recompiling and altering the game's code." Despite evidence by videogame enthusiasts and the ESRB's own investigation to the contrary, defendants continued to claim that the sexually graphic minigame was not an original part of the game, but rather the work of hackers. Even after the Company was forced to accept thousands of returns of GTA: San Andreas from retailers, manufacture a new version of the game that prevented access to the modification and re-labeling the existing copies of the game, Take-Two continued to deny that the Company was responsible for the for the included scenes.

17.     On July 20, 2005, the ESRB finished its investigation into GTA: San Andreas and, as a result, changed the rating of the game from "M" to "AO" because the ESRB determined that the illicit scenes were considered graphic and part of the game's original programming code. Patricia Vance, president of the ESRB stated "[c]learly the rating was incorrect, and it needed to be corrected." As feared by Take-Two, retailers such as Best Buy, Target and Wal-Mart immediately pulled all existing copies of GTA: San Andreas from their shelves, forcing defendants to dramatically reduce their earnings projections for 4Q:05 and to reflect a loss of 40 cents to 45 cents per share on sales ranging from $160 million to $170 million. In addition, Take-Two was forced to record a net loss for 3Q:05 in anticipation of product returns of GTA: San Andreas. This adjustment represented a 99.4% increase in net loss over the Company's prior quarter.

18.     On July 26, 2005, Take-Two announced that the Federal Trade Commission ("FTC") had notified the Company that its Division of Advertising Practices was conducting a formal inquiry

- 6 -

into the advertising claims made by the Company in regard to GTA: San Andreas. In fact, on July 25, 2006, the House of Representatives had voted in favor of an FTC investigation into whether or not defendants had caused Take-Two to deceive the ESRB and the public.

19. In addition, Australia's Office of Film and Literature Classification, the Australian equivalent to the ESRB, revoked GTA: San Andreas' classification, which halted all sales, advertising and distribution of the game throughout Australia. Take-Two was also forced to reduce its earnings guidance for FY:05 and FY:06, delay the filing of the Company's form 10-K for FY:05 and the Company became the subject of a lawsuit headed by the city of Los Angeles. By early September 2005, the value of Take-Two had plummeted 13% as a result of the ESRB's change in GTA: San Andreas' rating.

20. On April 6, 2006, the Company announced that the Audit Committee had approved the dismissal of PriceWaterhouseCoopers, LLP ("PWC") as Take-Two's independent registered public accounting firm. The Audit Committee further approved the appointment of Ernst & Young, LLP as the Company's new independent registered public accounting firm.

21. On June 26, 2006, the Company announced that on June 19, 2006, the District Attorney of the County of New York had issued grand jury subpoenas requesting the production of documents relating to the "hot coffee" modification, the termination of PWC and compensation of former officers and directors. The Company's value declined 15.7% in reaction to this announcement.

**Defendants' Manipulation of Stock Option Grants**

22. The Company's executives and its non-employee directors are compensated in large part though the issuance of stock options. A stock option granted to an employee and/or director of a corporation allows the employee and/or director to purchase company stock at a specified price - referred to as the "exercise price" - for a specified period of time. Stock options are granted as part of employee and/or director compensation packages as a means to create incentives to boost profitability and stock value. When the employee and/or director exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time

- 7 -

the option is exercised. If the exercise price is lower than it should be, the employee and/or director pays less and the company gets less when the stock option is exercised.

23.    Dating back to at least 1997, defendants have caused or allowed Take-Two insiders to manipulate their stock option grant dates so as to secretly maximize their stock profits. Specifically, certain Take-Two insiders changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of Take-Two shares on the reported option-grant date therefore was lower than the share price on the actual day options were issued. This provided the insiders with more favorably priced options than they were entitled to. Defendants' backdating practices yielded stock option grants to the Company's insiders which contributed to defendants' ability to sell over $31.7 million worth of their Take-Two stock.

24.    Further, the backdating of these stock options brought an instant paper gain to these insiders because the options were priced below the stock's fair market value when they were actually awarded. Under the Generally Accepted Accounting Principles ("GAAP"), this instant paper gain was equivalent to paying extra compensation and was thus a cost to Take-Two. These costs were also not properly recorded. In turn, since these costs were not properly recorded, Take-Two's profits were overstated. Thus, a restatement of Take-Two's past financial results will be necessary to correct for these improprieties.

25.    As alleged above, Take-Two's financial results for FY:99 to FY:03 had already been restated due to other accounting improprieties, thus, the Company will be restating a restatement. This continuing decline in the quality and accuracy of Take-Two's financials is further indicative of the defendants' conscious disregard for the Company's welfare. Indeed, defendants appear to be more interested in looting the Company via the illegal repricing of stock options, rather than issuing accurate and truthful financials.

26.    In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock option backdating "*represents the ultimate in Greed*." Further, Levitt stated, "*It is stealing, in effect. It is ripping off shareholders in an unconscionable way*."

- 8 -

27.     On May 5, 2006, President George W. Bush stated in an interview on the Kudlow &
Company show airing on CNBC that "overcompensating or trying to backdate things is bad for
America, and there ought to be consequences when people don't tell the truth and are not
transparent."

28.     On July 10, 2006, the Company announced that it had received notice that the SEC
was conducting an investigation into Take-Two's stock option grants from January 1997 to the
present. The July 2006 press release also belatedly announced that the Company had initiated an
internal investigation—on an unspecified date—into prior stock option grants.

29.     As a result of the defendants' improprieties, the Company will need to expend
significant sums of money including the following:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to
outside counsel, accounting firms and consultants;

(b)     Costs incurred from responding to subpoenas and requests for information
from government agencies including the SEC;

(c)     Costs incurred from potential fines in connection with governmental
investigations;

(d)     Costs incurred from increased Directors and Officer's Insurance ("D&O
Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)     Costs incurred from directing manpower to correct Take-Two's defective
internal controls; and

(f)     Costs incurred from directing manpower to potentially restate Take-Two's
prior financial results to correct for the improperly dated stock option grants.

## THE PARTIES

30.     Plaintiff Richard Lasky is, and was at times relevant hereto, an owner and holder of
Take-Two common stock. Plaintiff is a citizen of Washington.

31.     Nominal defendant Take-Two is a corporation organized and existing under the laws
of the state of Delaware with its headquarters located at 622 Broadway, New York, New York.
Take-Two is a leading global publisher of interactive software games designed for personal

computers, video game consoles and handheld platforms manufactured by Sony, Microsoft and Nintendo. The Company's growth strategy capitalizes on the widespread market acceptance of video game consoles, as well as the growing popularity of innovative action games. Rockstar Games, a Take-Two publishing label, creates new proprietary brands and sequels to existing brands with broad consumer appeal. Rockstar Games releases popular game titles including: GTA: San Andreas, a sequel in the blockbuster GTA franchise; Midnight Club 3: DUB Edition for Sony's PlayStation 2, Microsoft's Xbox and Sony's PlayStation Portable ("PSP"); The Warriors, a title based on Paramount Pictures' classic 1979 gang drama, for the PlayStation 2 and Xbox; and Grand Theft Auto: Liberty City Stories for the PSP. GTA: San Andreas is Rockstar Games' best selling and most well-known game to date.

32.   Defendant Paul Eibeler ("Eibeler") is the Chief Executive Officer ("CEO") of Take-Two and has been since January 2005. Defendant Eibeler served as President of the Company from July 2000 to June 2003 and a director from December 2000 to February 2003. Eibeler became President and a director once again in April 2004. Because of Eibeler's positions, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' (the "Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. Eibeler also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Eibeler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid defendant Eibeler the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|---|---|---|---|---|
| Eibeler | 2004 | $330,000 | $300,000 | 450,000 |
| | 2003 | $296,153 | $650,000 | 75,000 |

- 10 -

| | 2002 | $430,385 | $112,500 | 75,000 |
| | 2001 | $353,819 | $95,000 | 170,000 |
| | 2000 | $80,208 | $70,000 | 275,000 |

Additionally, Eibeler's employment agreement provides that he will receive $750,000 in compensation and is eligible to receive a performance-based bonus equal to 100% of his salary during FY:05. Defendant Eibeler is a citizen of New York.

33. Defendant Richard W. Roedel ("Roedel") was CEO of Take-Two from June 2004 to January 2005 and was Chairman of the Board of Take-Two from April 2004, until an undisclosed date in 2005. Roedel also served as a consultant to the Company from January 2005 through January 2006. Because of Roedel's positions, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Roedel also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Roedel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:05, Roedel's employment agreement provides that he will receive $665,000 in compensation for serving as Chairman of the Board and as a consultant for the Company, and he will receive a bonus of $162,500 upon execution of his employment agreement. For FY:04, Take-Two paid defendant Roedel $360,000 in salary and other compensation, and granted him 72,000 options to purchase Take-Two stock. Defendant Roedel is a citizen of Connecticut.

34. Defendant Jeffrey C. Lapin ("Lapin") was CEO of Take-Two from January 2003 to April 2004. Because of Lapin's position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made

- 11 -

by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Lapin also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Lapin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid defendant Lapin the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|--------|-------|---------------|
| Lapin | 2004 | $290,000 | $470,000 | - |
|  | 2003 | $542,500 | $200,000 | 600,000 |

Defendant Lapin is a citizen of California.

35.     Defendant Kelly Sumner ("Sumner") was CEO of Take-Two from February 2001 through January 2003. Sumner was a director of Take-Two at all times relevant hereto, until January 2003. Because of Sumner's positions, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Sumner also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Sumner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sumner received at least 205,000 options that were dated at the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Sumner backdated these stock options and received illegal compensation from Take-Two that was not disclosed to the

- 12 -

Company's shareholders. During the Relevant Period, Take-Two paid defendant Sumner the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|---|---|---|---|---|
| Sumner | 2004 | $625,000 | - | - |
| | 2003 | $607,019 | $1,862,500 | 150,000 |
| | 2002 | $473,910 | $450,000 | 150,000 |
| | 2001 | $359,519 | $19,317 | 480,000 |
| | 2000 | $255,702 | $147,862 | 180,000 |

Defendant Sumner is a citizen of New York.

36.    Defendant Brant was Chairman of the Board of Take-Two at all times relevant hereto, until March 2004. Brant was CEO of Take-Two at all relevant times hereto, until February 2001. In addition, defendant Brant is the founder of the Company and remains employed by Take-Two as Publishing Director of Take-Two's subsidiary, 2K Games. Because of Brant's positions, he knew or should have known the adverse non-public information about the business of Take-Two as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Brant also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. Brant received at least 25,000 options that were dated at the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Brant backdated these stock options and received illegal compensation from Take-Two that was not disclosed to the Company's shareholders. During the Relevant Period, Brant participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid Brant the following compensation:

- 13 -

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | Restricted Stock Awards |
|-----------|-------------|--------|-------|---------------|-------------------------|
| Brant | 2004 | $750,000 | $1,600,000 | - | 1,808,000 |
| | 2003 | $752,884 | $2,909,500 | 450,000 | 3,432,750 |
| | 2002 | $641,058 | $1,993,330 | 300,000 | |
| | 2001 | $575,000 | $790,000 | 479,560 | |
| | 2000 | $344,365 | $705,812 | 200,000 | |

During the Relevant Period, Brant sold 229,495 shares of Take-Two stock for proceeds of $8,092,961.75. Defendant Brant is a citizen of New York.

37.    Defendant Karl H. Winters ("Winters") is, and at all times relevant hereto was, Chief Financial Officer ("CFO") of Take-Two. Because of Winters' position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Winters also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Winters participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid Winters the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|--------|-------|---------------|
| Winters | 2004 | $325,000 | $15,000 | - |
| | 2003 | $326,250 | $265,000 | - |
| | 2002 | $222,115 | $207,500 | 300,000 |

For FY:05, Winters' employment agreement provides that he will receive $325,000 in compensation and is eligible to receive a performance-based bonus. During the Relevant Period, Winters sold 184,500 shares of Take-Two stock for proceeds of $6,688,390. Defendant Winters is a citizen of New Jersey.

38.    Defendant James H. David, Jr. ("David") was CFO of Take-Two from April 2000 until February 2002. Because of David's position, he knew or should have known the adverse non-

public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. David also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. David received at least 65,000 options that were dated at the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that David backdated these stock options and received illegal compensation from Take-Two that was not disclosed to the Company's shareholders. During the Relevant Period, David participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid defendant David the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options |
|-----------|-------------|--------|-------|---------------|
| David | 2001 | $233,000 | $230,915 | 85,000 |
| | 2000 | $105,000 | $15,000 | 50,000 |

Defendant David is a citizen of New York.

39. Defendant Larry Muller ("Muller") was CFO of Take-Two at all relevant times hereto, until April 2000. Because of Muller's position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Muller also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. Muller received at least 70,000

- 15 -

options that were dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Muller backdated these stock options and received illegal compensation from Take-Two that was not disclosed to the Company's shareholders. During the Relevant Period, Muller participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:00, Take-Two paid defendant Muller $389,706 in salary, bonus and other compensation and granted him 165,000 options to purchase Take-Two stock. Defendant Muller is a citizen of New York.

40. Defendant Gary Lewis ("G. Lewis") was Global Operating Officer of Take-Two from April 2004 until January 3, 2006. Because of G. Lewis' position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. G. Lewis also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, G. Lewis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Take-Two paid defendant G. Lewis the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Stock Options | Restricted Stock Awards |
|---|---|---|---|---|---|
| G. Lewis | 2004 | $450,883 | $500,000 | 217,500 | 638,000 |
| | 2003 | $258,027 | $503,580 | 30,000 | - |
| | 2002 | $182,705 | $132,923 | - | - |

During the Relevant Period, G. Lewis sold 49,000 shares of Take-Two stock for proceeds of $1,604,780. Defendant G. Lewis is a citizen of England.

41. Defendant Barbara A. Ras ("Ras") was Chief Administrative Officer of Take-Two from October 1997 to 1999. Ras was the Secretary of Take-Two from April 1997 until August 2002.

Ras was the Controller of Take-Two from October 1994 to October 1998. Because of Ras' positions, she knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. Ras also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. Ras received at least 50,000 options that were dated at or very close to the lowest stock price for the month during which options were granted or before significant share price increases. Accordingly, on information and belief, plaintiff alleges that Ras backdated these stock options and received illegal compensation from Take-Two that was not disclosed to the Company's shareholders. During the Relevant Period, Ras participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Ras is a citizen of New York.

42.     Defendant Robert Flug ("Flug") is, and at all times relevant hereto was, a director of Take-Two. On February 1, 2006, Flug became the new Chairman of the Board for Take-Two. Because of Flug's position, he knew or should have known the adverse non-public information about the business of Take-Two as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Flug also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Flug participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and

SEC filings. During the Relevant Period, Flug sold 54,648 shares of Take-Two stock for proceeds of $1,642,053.59. Defendant Flug is a citizen of New York.

43. Defendant Oliver R. Grace, Jr. ("Grace") is, and at all times relevant hereto was, a director of Take-Two. Because of Grace's position, he knew or should have known the adverse non-public information about the business of Take-Two as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Grace also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Grace participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Grace sold 400,000 shares of Take-Two stock for proceeds of $12,131,493.86. Defendant Grace is a citizen of New York.

44. Defendant Mark Lewis ("M. Lewis") is a director of Take-Two and has been since May 2001. Because of M. Lewis' position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. M. Lewis also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, M. Lewis participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant M. Lewis is a citizen of California.

- 18 -

45.    Defendant Todd Emmel ("Emmel") is a director of Take-Two and has been since February 2002. Because of Emmel's position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Emmel also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Emmel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Emmel sold 22,220 shares of Take-Two stock for proceeds of $839,512. Defendant Emmel is a citizen of Massachusetts.

46.    Defendant Steven Tisch ("Tisch") is a director of Take-Two and has been since April 2002. Because of Tisch's position, he knew or should have known the adverse non-public information about the business of Take-Two, as well as the source of and regulatory policies about the sexually explicit programming content of GTA: San Andreas, the false advertising claims made by the Company in regard to GTA: San Andreas, the Company's sales, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Tisch also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. Tisch also knew or should have known that Take-Two executives were improperly backdating stock option grants to maximize their personal profit. During the Relevant Period, Tisch participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the

- 19 -

Relevant Period, Tisch sold 27,000 shares of Take-Two stock for proceeds of $766,786. Defendant Tisch is a citizen of California.

47.     The defendants identified in ¶¶32, 33, 35, 36, 42-46 are referred to herein as the "Director Defendants." The defendants identified in ¶¶32-41 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶36, 37, 40, 42, 43, 45, 46 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

48.     By reason of their positions as officers, directors and/or fiduciaries of Take-Two and because of their ability to control the business and corporate affairs of Take-Two, the Individual Defendants owed Take-Two and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Take-Two in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Take-Two and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

49.     Each director and officer of the Company owes to Take-Two and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's products, sales, revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

50.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Take-Two, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial

- 20 -

positions with Take-Two, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Take-Two.

51. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Take-Two, and was at all times acting within the course and scope of such agency.

52. To discharge their duties, the officers and directors of Take-Two were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company's products, as well as its financial affairs of the Company. By virtue of such duties, the officers and directors of Take-Two were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) provide accurate descriptions of the Company's products including, the programming content of the Company's interactive software games;

(c) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(d) conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(f) remain informed as to how Take-Two conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

- 21 -

(g)     ensure that Take-Two's internal controls are sufficient to prevent backdating or other manipulations of stock options granted to Take-Two executives; and

(h)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Take-Two, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Take-Two's Board during the Relevant Period.

54.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws and a lawsuit that alleges breaches of consumer protection laws. As a result, Take-Two has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b)     $7.5 million in fines paid to the SEC for improper financial reporting and inadequate internal controls;

(c)     Over $876.5 million paid by the Company during its stock buyback;

- 22 -

(d)     Costs incurred from increased D&O Insurance premiums as a result of the illegally manipulated stock option grants;

(e)     Costs incurred to cooperate and comply with both federal and state investigations;

(f)     Costs incurred from directing manpower to correct Take-Two's defective internal controls; and

(g)     Costs incurred in investigating and defending Take-Two and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

55.     Moreover, these actions have irreparably damaged Take-Two's corporate image and goodwill. For at least the foreseeable future, Take-Two will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Take-Two's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

57.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the programming content of its star game, GTA: San Andreas, from the ESRB and consumers in order to artificially inflate the price of Take-Two's shares; (ii) conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares; (iii) maintain the Individual Defendants' executive and directorial positions at Take-Two and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iv) deceive the investing public, including shareholders of Take-Two, regarding

the Individual Defendants' management of Take-Two's operations, the Company's financial health and stability, and future business prospects related to the Company's GTA series and its financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

58.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 2000 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Take-Two was misrepresenting its financial results and business prospects. In addition, defendants also made other specific, false statements about Take-Two's financial performance and future business prospects, as alleged herein.

59.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the programming content of the Company's games, the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Take-Two common stock so they could: (i) dispose of over $31 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

60.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresenting the content of its video game GTA: San Andreas, as well as the Company's financial results and future guidance. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with

- 24 -

· knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

62.    Take-Two publishes, develops, and distributes interactive entertainment software, hardware and accessories. Take-Two's niche market involves the publication of interactive software games for PCs, video game consoles, and handheld gaming devices that are developed internally and by third parties. Take-Two also manufactures and markets video game accessories in Europe, North America and the Asia Pacific region and sells its software titles to retail outlets in North America and Europe through direct relationships with retail customers and third-party distributors.

63.    Take-Two's wholly-owned subsidiary, Rockstar Games, creates and develops several popular gaming series including its most popular and lucrative series, GTA. The Rockstar Games publishing label continues to successfully create new proprietary brands and sequels to existing brands with broad consumer appeal. Grand Theft Auto: San Andreas, a sequel in the blockbuster GTA franchise, was, like its predecessors, a top selling video game across each of its multiple platforms, with sales through December 2005 in excess of 7 million units in North America. Recently, Rockstar Games released Midnight Club 3: DUB Edition for Sony's PlayStation 2, Microsoft's Xbox and Sony's PSP; The Warriors, a title based on Paramount Pictures' classic 1979 gang drama, for the PlayStation 2 and Xbox; and GTA: Liberty City Stories for the PSP.

64.    Take-Two's subsidiaries distribute products as well as third-party software, hardware and accessories to retail outlets in North America including, Best Buy, Blockbuster, Circuit City, GameStop, Target, Toys "R" Us, Wal-Mart, and other leading national and regional drug store, supermarket and discount store chains and specialty retailers. Take-Two also has worldwide sales, marketing and publishing operations in Australia, Austria, Canada, France, Germany, the Netherlands, Italy, New Zealand, Spain, Japan and the United Kingdom.

65.    Since 2000, Take-Two has been plagued with improper financial reporting and endless SEC investigations. Take-Two's troubles began in November 2001, when the SEC launched an informal investigation into the Company's revenue recognition policies and practices. To head-off the SEC investigation, Take-Two hired outside legal counsel and conducted an internal

- 25 -

investigation into the accounting matters at issue. Despite their efforts, defendants were required to restate the Company's financials.

66.    On February 12, 2002, defendants Eibeler, Sumner, Brant, Flug, Grace and M. Lewis caused or allowed the Company to file a form 10-K with the SEC wherein, Take-Two revealed the effects of financial restatements for FY:00 and the first three quarters of FY:01. The restatements were based on the Company's improper accounting for: (i) products that had not been shipped during the reported time period; (ii) product returns; and (iii) for improper acquisitions of various companies. As a result of the investigation and financial restatements, the Company was forced to reduce its net income for FY:00 by over $18.5 million. For the nine months ended July 31, 2001, the Company was forced to reduce its net income to show a loss of approximately $3.9 million. Take-Two also disclosed that the SEC had issued a formal order of investigation into the Company's accounting practices and internal controls.

67.    In late November 2002, Take-Two announced the election of defendant Roedel to the Company's Board and announced the appointment of defendant Lapin as the Company's new CEO, effective January 2, 2003.

68.    On December 18, 2003, the Individual Defendants caused or allowed the Company to issue a press release, wherein the Company revealed that the SEC had issued Wells Notices to Take-Two and defendant Brant. The Wells Notice revealed to the Individual Defendants that the SEC intended to "bring a civil action seeking injunction and monetary damages against the Company alleging that the Company violated certain provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934."

69.    Take-Two's publishing label, Rockstar Games, distributes several successful franchise gaming series including, GTA. Each game in the GTA series is an action and driving game where players control the actions and adventures of the main character of the story.

70.    In the midst of financial havoc, the Individual Defendants caused or allowed the Company and its subsidiary, Rockstar Games, to divert their resources to a new chapter in the Company's star gaming series, GTA. Grand Theft Auto is one of the most successful gaming series in Take-Two history. The original GTA was released in 1998 and has since become legendary in the

- 26 -

gaming world. Grand Theft Auto III, released in 2001, marked the beginning of the series' entrance into the 3D gaming world and sold over ten million copies world wide and during FY:02, FY:03, FY:04 and FY:05, was responsible for generating 34.9%, 34.3%, 40.5% and 37.3%, respectively, of Take-Two's net sales. Take-Two's media attention and resources were quickly diverted to the introduction of GTA: San Andreas, which was released in the fall of 2004 with high market expectations and substantial forecasted profits for the Company. Given the unsurpassed success of the Company's previous GTA games, the Individual Defendants attempted to boost the Company's revenue by marketing the publication of GTA: San Andreas and issuing guidance for increased revenue due to the release of GTA: San Andreas.

71.    Before its release, however, GTA: San Andreas was submitted to the ESRB to receive a rating label. The ESRB is a self-regulatory body established in 1994 to provide consumers and retailers a rating based on an individual game's content. The ESRB independently applies and enforces ratings, advertising guidelines, and online privacy principles adopted by the computer and video game industry. Ratings provided by the ESRB have two parts: (i) rating symbols that suggest age appropriateness of a game; and (ii) content descriptions that reveal the characteristics in a game that influenced a particular rating or that may be of concern. The ESRB's standards influence video game publishers to control the content of their games in order to attain a rating that permits the widest range of distribution coupled with the highest sales. In fact, certain retailers including, Target, Wal-Mart and Best Buy have formed a partnership with the ESRB to create a uniform system of ratings.

72.    When GTA: San Andreas was submitted to the ESRB, Take-Two did not reveal that the game had sexually explicit content. Instead, Take-Two allowed the true content of the game to remain hidden. Since the ESRB was not provided with complete and accurate information about GTA: San Andreas, the game received a Mature or "M" rating. Under the ESRB's Game Rating & Descriptor Guide an "M" rating indicates that the game is suitable for persons ages 17 and older.

## IMPROPER STATEMENTS

73.    The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to Take-Two a duty to insure that the Company's public statements, advertising

- 27 -

representations, and the Company's financial reporting fairly presented, in all material respects, the true programming content of the Company's video games which is the most important aspect of Take-Two's business, as well as all other issues material to the Company's operations such as the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included the source of and regulatory policies on the sexually explicit programming content of GTA: San Andreas, as well as its financial reporting and practices and internal controls. Furthermore, defendants Flug, Grace and Emmel, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides for: (i) reviewing and discussing with management and the independent auditor the Company's annual and quarterly financial statements prior to the public release of such information; (ii) reviewing reports prepared by management or by the independent auditor relating to significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; (iii) discussing earnings press releases with management, as well as financial information and earnings guidance provided to analysts; and (iv) discussing with the CEO and the CFO the processes involved in and any material required as a result of the Form 10-K and 10-Q certification process concerning deficiencies in design or operation of internal controls or any fraud involving management or employees with a significant role in the Company's internal controls. Defendants Eibeler, Roedel, Lapin, Sumner, Brant, David, Muller, Ras, Winters and G. Lewis, as officers of Take-Two, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Eibeler, Roedel, Sumner, Flug, Emmel, Grace, M. Lewis, Tisch and Brant, as directors of Take-Two had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of Committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or

- 28 -

inactions, the following improper statements to be disseminated by Take-Two to the investing public and the Company's shareholders during the Relevant Period.

74.     Soon after Take-Two released GTA: San Andreas for the PC, the "Hot Coffee" mod began to circulate throughout the gaming world. It was soon revealed that GTA: San Andreas contained a hidden minigame with graphic sexual content. The "Hot Coffee" mod was widely-known among gamers and was easily accessible by downloading and installing the modification on the users PC. After only a month on the market, GTA: San Andreas fell under scrutiny and the ESRB announced that it would conduct an investigation into the "Hot Coffee" mod. On July 20, 2005, less than a week after it initiated its investigation, the ESRB announced that it was changing the rating on GTA: San Andreas to "Adults Only" or "AO." Immediately thereafter, Best Buy, Target and Wal-Mart pulled GTA: San Andreas from their shelves.

75.     As a result of the ESRB's rating change, the value of Take-Two dropped by 13% in just a few days. In addition, the Company was forced to reduce its sales guidance for 3Q:05, from $170 million to $160 million in net sales and for FY:05, from $1.31 billion to $1.26 billion. The Company, however, refused to assume any responsibility for the "Hot Coffee" mod and blamed the content on third parties who created and offered the mod for download.

76.     Following the ESRB's investigation, the FTC launched an investigation into advertising claims made by Take-Two for GTA: San Andreas, consumer class actions were filed, Australia' Office of Film and Literature Classification revoked GTA: San Andreas from its ratings, causing the game to be removed for sale in Australia, and several shareholder class actions were filed against the Company.

A.      **Improper Financial Statements for Fiscal Year 2000 Through Fiscal Year 2002**

77.     On March 16, 2000, the Individual Defendants caused or allowed the Company to file a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Brant and Muller and provided the following financial report:

> Net sales increased by $54,609,073 or 80.0 %, to $122,889,726 for the three months ended January 31, 2000 from $68,280,653 for the three months ended January 31, 1999. ...

* * *

As a result of the foregoing, the Company achieved net income of $4,786,658 for the three months ended January 31, 2000, as compared to net income of $2,894,836 for the three months ended January 31, 1999.

78.     On June 14, 2000, the Individual Defendants caused or allowed the Company to file a

Form 10-Q with the SEC. The Form 10-Q was signed by defendants Brant and Muller and provided

the following financial report:

Net sales increased by $17,870,741 or 34.3%, to $70,036,073 for the three months ended April 30, 2000 from $52,165,332 for the three months ended April 30, 1999. ...

* * *

As a result of the foregoing, the Company achieved net income of $3,354,211 for the three months ended April 30, 2000, as compared to net income of $1,561,172 for the three months ended April 30, 1999.

79.     On September 14, 2000, the Individual Defendants caused or allowed the Company to

file a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Brant and David and

provided the following financial report:

Net sales increased by $7,910,117 or 12.4%, to $71,472,587 for the three months ended July 31, 2000 from $63,562,470 for the three months ended July 31, 1999. ...

* * *

As a result of the foregoing, the Company achieved net income of $3,448,971 for the three months ended July 31, 2000, as compared to net income of $2,707,824 for the three months ended July 31, 1999.

80.     On January 29, 2001, the Individual Defendants caused or allowed the Company to

file a Form 10-K with the SEC for FY:00. The Form 10-K was signed by defendants Brant, Eibeler,

David, Flug, Grace, Leeds, Rutcofsky and Sumner, and provided the following financial report:

Net sales increased by $81,074,000, or 26.5%, to $387,006,000 for fiscal 2000 from $305,932,000 for fiscal 1999. ...

* * *

As a result of the foregoing, we achieved net income of $24,963,000 for fiscal 2000, as compared to net income of $16,332,000 for fiscal 1999. ...

81.     On March 19, 2001, the Individual Defendants caused or allowed the Company to file

a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Brant and David and

provided the following financial report:

- 30 -

· Net sales increased by $8,336,000, or 6.8%, to $131,226,000 for the three months ended January 31, 2001 from $122,890,000 for the three months ended January 31, 2000. ...

\* \* \*

As a result of the foregoing, the Company achieved net income of $7,750,000 for the three months ended January 31, 2001, as compared to net income of $4,787,000 for the three months ended January 31, 2000.

82. On June 8, 2001, the Individual Defendants caused or allowed the Company to file a

Form 10-Q with the SEC. The Form 10-Q was signed by defendants Sumner and David and

provided the following financial report:

Net sales increased by $23,284,000, or 33.3%, to $93,320,000 for the three months ended April 30, 2001 from $70,036,000 for the three months ended April 30, 2000. ...

\* \* \*

Excluding the non-recurring non-cash impairment charges described above, the Company achieved net income of $3,872,000 for the three months ended April 30, 2001, as compared to net income of $3,354,000 for the three months ended April 30, 2000. Including the impairment charges, the Company incurred a net loss of $11,924,000.

83. On September 14, 2001, the Individual Defendants caused or allowed the Company to

file a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Sumner and David and

provided the following financial report:

Net sales increased by $13,030,000, or 18.2%, to $84,502,000 for the three months ended July 31, 2001 from $71,472,000 for the three months ended July 31, 2000. ...

\* \* \*

For the three months ended July 31, 2001, the Company achieved net income of $409,000 as compared to net income of $3,449,000 for the three months ended July 31, 2000. Excluding the extraordinary charge and the gain on sale described above, the Company achieved net income of $1,268,000 for the three months ended July 31, 2001.

84. On January 30, 2002, the Individual Defendants caused or allowed the Company to

file a Form 12b-25 with the SEC, indicating that the Company would be unable to timely file its

Form 10-K for FY:01. The Form 12b-25 stated in relevant part:

As disclosed in its December 17, 2001 press release, the registrant intends to restate its financial statements for the fiscal year ended October 31, 2000 ("Fiscal 2000") and the quarters ended January 31, April 30 and July 31, 2001.

*The restatement of the Fiscal 2000 financial statements is expected to result in a decrease in net sales and net income from previously reported amounts.* As

. ' previously announced, the registrant also expects that its results of operations for the fiscal year ended October 31, 2001 ("Fiscal 2001"), which will be reflected in its consolidated statements of operations to be included on Form 10-K, will reflect an increase in net sales when compared to Fiscal 2000 both as previously reported and as expected to be restated.

In addition, as previously announced, the registrant also expects that net income for Fiscal 2001 will decrease when compared to net income for Fiscal 2000, both as reported and as expected to be restated.

85.    On February 12, 2002, the Individual Defendants caused or allowed the Company to

file a Form 10-K with the SEC that contained restatements of the Company's FY:00 and FY:01

financial results. The Form 10-K was signed by defendants Brant, Eibeler, Tay, Flug, Grace, Leeds,

Tay and Sumner, and provided the following restatement information:

In connection with an informal and voluntary request from the SEC to provide documents, *we engaged counsel to conduct an investigation into our accounting treatment of certain transactions in fiscal 200 and 2001.* Counsel retained advisors to perform a forensic accounting investigation. As a result of the investigation, *we restated our previously issued consolidated financial statements for fiscal 2000 to eliminate $15,367,000 of net sales made to certain independent third-party distributors and related cost of sales of $8,702,000, which were improperly recognized as revenue and later returned or repurchased by us.*

In addition, we reviewed our revenue recognition policy, reserve policies and our accounting for certain other transactions. As a result of this review, we restated our previously issued consolidated financial statements for fiscal 2000 for the following transactions:

- The *elimination of $3,780,000 of net sales* and related cost of sales of $2,236,000 that were previously recognized for products that had not been shipped within the period;

- *A charge of $19,206,000* to record our portion of the losses incurred by an affiliate accounted for under the equity method in accordance with the provisions of EITF Issue No. 99-10, and a net reduction for post acquisition amortization of $710,000 after we acquired the remaining 80% interest in this entity. See note 5 of Notes to Consolidated Financial Statements; and

- The *elimination of $2,563,000* of license revenue in connection with a business combination.

Our financial statements for fiscal 2000 have been restated as follows...:

|  | Year Ended October 31, 2000 | | Nine Months Ended July 31 | |
|---|---|---|---|---|
|  | Reported | Adjusted | Reported | Adjusted |
| Net Sales | $387,006 | $364,001 | $309,048 | $327,797 |
| Net Income (Loss) | $24,963 | $6,417 | $(3,765) | $(3,275) |
| Income Per Share | $0.88 | $0.23 | $(.11) | $(.10) |

- 32 -

86.    On March 18, 2002, the Individual Defendants caused or allowed the Company to file

a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Sumner and Winters and

provided the following financial report:

> Net sales increased by $125,335,000 or 79.5%, to $282,926,000 for the three months
> ended January 31, 2002 from $157,591,000 for the three months ended January 31,
> 2002. ...

* * *

> For the three months ended January 31, 2002, the Company achieved net income of
> $34,829,000, as compared to net income of $8,232,000 for the three months ended
> January 31, 2001.

87.    On June 14, 2002, the Individual Defendants caused or allowed the Company to file a

Form 10-Q with the SEC. The Form 10-Q was signed by defendants Sumner and Winters and

provided the following financial report:

> Net sales increased by $82,151 or 93.2%, to $170,330 for the three months ended
> April 30, 2002 from $88,179 for the three months ended April 30, 2001. ...

* * *

> Class Action Settlement Costs. During the three months ended April 30,
> 2002, *the Company recorded $1,468 of class action settlement costs, which
> represents a settlement of $7,500* and related legal fees, net of $6,145 of insurance
> proceeds.

* * *

> For the three months ended April 30, 2002, the Company achieved net income of
> $9,637, as compared to net loss of $11,467 for the three months ended April 30,
> 2001.

88.    On September 16, 2002, the Individual Defendants caused or allowed the Company to

file a Form 10-Q with the SEC. The Form 10-Q was signed by defendants Sumner and Winters and

provided the following financial report:

> Net sales increased by $41,134 or 50.6%, to $122,461 for the three months ended
> July 31, 2002 from $81,327 for the three months ended July 31, 2001. The increase
> was primarily attributable to growth in publishing operations.

* * *

> For the three months ended July 31, 2002, the Company achieved net income of
> $4,766, as compared to net loss of $665 for the three months ended July 31, 2001.

89.    On December 23, 2002, the Individual Defendants caused or allowed the Company to

file a Form 10-K with the SEC for FY:02. The Form 10-K was signed by defendants Brant, Eibeler,

Roedel, Lapin, Winters, Flug, Emmel, Grace, M. Lewis, Tisch and Sumner, and provided the following financial report:

> Net sales increased by $345,175, or 76.9%, to $793,976 for fiscal 2002 from $448,801 for fiscal 2001. The increase was primarily attributable to growth in publishing operations. ...
>
> \* \* \*
>
> For fiscal 2002, we achieved net income of $71,565, as compared to net loss of $8,580 for fiscal 2001.

Take-Two's annual report also contained certifications signed by defendants Sumner and Winters on December 20, 2002, which stated in relevant part:

> Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
>
> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures ...
>
> \* \* \*
>
> The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):
>
>> a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and
>>
>> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls;

**B.    Improper Financial Statements for Fiscal Year 2003 Through Second Quarter 2005**

90.    On January 23, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Announces $25 Million Stock Repurchase Program." The press release stated in relevant part:

> Take-Two Interactive Software, Inc. today announced that its Board of Directors has authorized a stock buyback program under which the Company may repurchase up to $25 million of its common stock.

Under the program, shares may be purchased as determined by the Company from time to time in the open market or in privately negotiated transactions.

Karl Winters, Chief Financial Officer, commented, "At current market levels, we believe our stock represents an attractive investment opportunity. The plan to repurchase Take-Two stock reflects our ongoing commitment to enhance shareholder value."

91.    On February 18, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Rockstar Games Announces Grand Theft Auto: Vice City for PC."

The press release stated in relevant part:

Rockstar Games, the world-renowned publishing division of Take-Two Interactive Software, Inc. (Nasdaq:TTWO), announced today that the PC version of the global blockbuster, Grand Theft Auto: Vice City, is set to hit retail shelves in North America on May 13th and in Europe on May 16th. The PC version will have enhanced features including improved graphics and sound, additional PC controls, as well as several options for players to customize the game.

Grand Theft Auto: Vice City, the sequel to last year's best-selling Grand Theft Auto 3, has once again received universal critical acclaim, a multitude of awards and financial success by becoming the fastest selling, highest grossing PlayStation® game released to date, outdoing its predecessor, Grand Theft Auto 3. Released for the PlayStation®2 computer entertainment system last October, Grand Theft Auto: Vice City had the distinct honor of becoming the undisputed number-one selling video game of 2002. The Grand Theft Auto franchise has now achieved the unimaginable feat of ruling the video game sales charts two years in a row.

"We felt that we had to truly outdo ourselves when it came to developing Grand Theft Auto: Vice City and felt that we owed it to the fans to continue to keep enhancing and delivering the gameplay, cinematic graphics, production values and audio experience that have become synonymous with the Grand Theft Auto franchise," said Sam Houser, president of Rockstar Games. "We are truly humbled by the response that the game has received so far and are extremely excited to showcase Grand Theft Auto: Vice City on the PC."

92.    On February 27, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Take-Two Interactive Software, Inc. Reports Record First Quarter

Fiscal 2003 Financial Results." The press release stated in relevant part:

Net sales for the first quarter ended January 31, 2003 were $408.8 million, a 45% increase over net sales of $282.9 million for the same period a year ago. Net income of $50.5 million represented an increase of 45% over net income of $34.8 million last year, with diluted net income per share of $1.20, a 30% increase over $0.92 last year.

*  *  *

**Guidance**

Take-Two is increasing its financial guidance for the fiscal year ending October 31, 2003 to $970 million in net sales and $2.26 of diluted net income per share. The Company is reiterating its guidance for the second quarter ending April 30, 2003 of $190 million in net sales and $0.34 of diluted net income per share.

- 35 -

Factored into the Company's financial guidance is the anticipated reduction of approximately $30 million in net sales in fiscal 2003 from the consolidation of the distribution business mentioned above.

\* \* \*

Karl Winters, Chief Financial Officer, commented, "Take-Two's position as a top-tier publisher and distributor continues to be reflected in our financial results. We achieved record operating margins of 20.8% this quarter and generated significant levels of cash flow, which resulted in the further strengthening of our balance sheet. ***With record levels of cash, no debt, and earnings per share projected to grow 25% in fiscal 2003, our financial position is solid.*** We remain highly confident in our business and financial performance going forward."

\* \* \*

Paul Eibeler, President, said, "The strength of our business during the critical holiday period demonstrates the success of our publishing strategy…. Our Grand Theft Auto franchise dominated the video game industry this holiday season, and continues to generate significant cash flow for Take-Two, which is being reinvested into the development of new brands, the extension of existing brands and the selective introduction of licensed properties."

93.    Take-Two's financial results for 1Q:03, the period ended January 31, 2003, were

repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about March 14,

2003. Take-Two's report also contained certifications signed by defendants Lapin and Winters, on

March 14, 2003, using language that was virtually identical to the certifications filed in the previous

quarter.

94.    On May 29, 2003, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Take-Two Interactive Software, Inc. Reports Record Second Quarter Fiscal

2003 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced record financial results for its second quarter and six months ended April 30, 2003.

Net sales for the second quarter ended April 30, 2003 were $194.2 million, a 14% increase over $170.3 million for the same period a year ago. Net income of $15.2 million represented an increase of 58% compared to $9.6 million last year, with diluted net income per share of $0.36, a 44% increase over $0.25 last year.

\* \* \*

**Guidance**

Take-Two is raising its financial guidance for the fiscal year ending October 31, 2003 to $975 million in net sales and $2.28 of diluted net income per share. The Company is reiterating its guidance for the second half of fiscal 2003 and issuing guidance for the third quarter ending July 31, 2003 of $142 million in net sales and $0.16 of diluted net income per share.

* * *

Jeffrey Lapin, Chief Executive Officer, commented, "Our second quarter results reflect Take-Two's continued success as a leading independent publisher and distributor in the interactive entertainment industry, and our ability to capitalize on our strategically balanced business model in a challenging retail environment. Top-selling products from our world-renowned Rockstar Games label once again drove our publishing revenue. We also benefited from the significant investments we have made over the past year in building Jack of All Games into the leading North American distributor of interactive entertainment software, hardware and accessories, as the business realized considerable revenue growth during the quarter and showed significantly improved profitability."

* * *

Take-Two is also pleased to announce that Rockstar's Grand Theft Auto: Vice City for PlayStation(R)2 was named Game of the Year and Best Adventure Game by Sony Computer Entertainment America at their E3 Publisher's Choice Awards.

95.    Take-Two's financial results for 2Q:03, the period ended April 30, 2003, were

repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about June 6,

2003. Take-Two's report also contained certifications signed by defendants Lapin and Winters, on

June 6, 2003, using language that was virtually identical to the certifications filed in the previous

quarter.

96.    On September 3, 2003, the Individual Defendants caused or allowed the Company to

issue a press releases entitled "Take-Two Interactive Software, Inc. Reports Record Third Quarter

Fiscal 2003 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced *record financial results for its third quarter and nine months ended July 31, 2003*.

Net sales for the third quarter ended July 31, 2003 were $155.6 million, a 27% increase over $122.5 million for the same period a year ago. Net income of $7.7 million represented an increase of 60% compared to $4.8 million last year, with diluted net income per share of $0.18, a 50% increase over $0.12 last year.

* * *

**Guidance**

*Take-Two is raising its financial guidance for the fiscal year ending October 31, 2003 to $1.015 billion in net sales and $2.30 of diluted net income per share*.

For the fiscal year ending October 31, 2004, the Company's initial guidance is $1.18 billion in net sales and $2.68 of diluted net income per share. The Company's guidance for the first quarter ending January 31, 2004 is $412 million in net sales and $1.21 of diluted net income per share.

- 37 -

\* \* \*

In its third quarter of fiscal 2003, Take-Two's Rockstar Games introduced additional extensions to its blockbuster Grand Theft Auto franchise, which has sold over 25 million units worldwide since the introduction of the brand. Rockstar shipped Grand Theft Auto: Vice City for the PC and the PlayStation(R)2 Greatest Hits version of Grand Theft Auto 3. ...

97.    Take-Two's financial results for 3Q:03, the period ended April 30, 2003, were

repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about September

12, 2003. Take-Two's Form 10-Q contained certifications submitted pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002, signed by defendants Lapin and Winters, on September 12, 2003,

which stated in relevant part:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures ...

\* \* \*

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

98.    On December 18, 2003, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Take-Two Interactive Software, Inc. Reports Fourth Quarter and Fiscal

2003 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced record financial results for its fourth quarter and fiscal year ended October 31, 2003.

- 38 -

Net sales for the fourth quarter ended October 31, 2003 were $278.5 million, a 28% increase over $218.4 million for the same period a year ago. Net income for the quarter of $26.6 million represented an increase of 19% compared to $22.3 million last year, with diluted net income per share of $0.59, a 9% increase over $0.54 last year.

Net sales for the fiscal year ended October 31, 2003 were $1.04 billion, a 31% increase over $795.0 million in fiscal 2002. Net income of $100.0 million represented an increase of 40% compared to $71.6 million last year, with diluted net income per share of $2.31, compared to $1.81, an increase of 28%.

**Guidance**

For the first quarter ending January 31, 2004, Take-Two is reiterating its net sales guidance of $412 million, *but is reducing its diluted net income per share guidance from $1.21 to $1.10*. For the fiscal year ending October 31, 2004, Take-Two is reiterating its net sales guidance of $1.18 billion, *but is reducing its diluted net income per share guidance from $2.68 to $2.60*. Take-Two is issuing initial guidance for the second quarter ending April 30, 2004 of $218 million in net sales and $0.41 of diluted net income per share.

\* \* \*

Rockstar extended the success of its blockbuster Grand Theft Auto franchise by releasing the Grand Theft Auto Double Pack for the PlayStation®2, consisting of Grand Theft Auto 3 and Grand Theft Auto: Vice City, in both North America and Europe. In addition, under a license agreement with Rockstar, Capcom Co., Ltd. released Grand Theft Auto 3 for the PlayStation®2 and PC in Japan. According to Enterbrain Inc., the parent company of Weekly Famitsu, Grand Theft Auto 3 has sold approximately 300,000 copies as of the week ending December 7, 2003, making it one of the most successful debuts of a Western video game in Japan.

\* \* \*

**Update on Securities and Exchange Commission Investigation**

Take-Two is providing an update in regard to its previously announced Securities and Exchange Commission investigation. *The Company has received a Wells Notice from the staff of the SEC stating the staff's intention to recommend that the SEC bring a civil action seeking an injunction and monetary damages against the Company alleging that the Company violated certain provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934*. The proposed allegations stem from the Company's previously disclosed SEC investigation into, among other things, *certain accounting matters related to the Company's financial statements, periodic reporting and internal accounting control provisions. The Company's Chairman, an employee and two former officers of the Company also received Wells Notices*.

The SEC has also raised certain issues regarding the Company's application of SFAS 48 "Revenue Recognition When Right of Return Exists" and its impact on the Company's revenue recognition policies as set forth in the Company's current and historical financial statements, as well as guidance. *The Company's guidance does not include any potential monetary penalties associated with the investigation*. The Company believes that its revenue recognition policies, including the application of SFAS 48, as set forth in such financial statements are in accordance with generally accepted accounting principles. If the Company is unable to satisfactorily resolve

- 39 -

this issue with the SEC, it would result in a change in the timing of the recording of revenue in historical, current and future financial statements.

The Company has initiated discussions with the Commission to address the issues raised in the Wells Notice.

99.      On January 30, 2004, the Individual Defendants caused or allowed the Company to

file a Form 12b-25 with the SEC, indicating that the Company would be unable to timely file its

Form 10-K for FY:03. Once again, the Individual Defendants were set to restate the Company's

financial statements due to improper accounting techniques and faulty internal controls. The Form

12b-25 stated in relevant part:

Take-Two Interactive Software, Inc. (the "Company") could not complete its Annual Report on Form 10-K for the fiscal year ended October 31, 2003 on a timely basis due to issues raised in the previously disclosed investigation by the staff of the SEC's Division of Enforcement into certain accounting matters relating to the Company's financial statements. Among other things, the SEC's staff has raised issues with respect to the Company's revenue recognition policies and its impact on the Company's current and historical financial statements.

The Company intends to amend its revenue recognition policies by adopting a new methodology for recording reserves for price concessions. *The revision in the Company's revenue recognition policies will result in a restatement of previously issued financial statements, generally reflecting an earlier recognition of reserves for price concessions.* The restatement will affect changes in reported revenue and earnings, and related balance sheet amounts, on both a current and historical basis.

*The restatement will affect the Company's financial results for each of the four fiscal years ended October 31, 2002, the four quarters of fiscal 2002 and the interim quarters of fiscal 2003.* In addition, this change in methodology will affect the Company's fourth quarter fiscal 2003 financial results previously announced on December 18, 2003, as well as the Company's previously announced guidance for fiscal 2004.

The anticipated effect of the adoption of the revised recognition policy on the Company's net sales, net income and diluted net income per share for fiscal 2003 and fiscal 2002 are as follows (in thousands, except per share data):

|  | Year Ended Oct. 31, 2003 | | Year Ended Oct. 31, 2002 | |
|---|---|---|---|---|
|  | Reported | Adjusted | Reported | Adjusted |
| Net Sales | $1,037,112 | $1,033,000-$1,036,000 | $795,018 | $795,000-$798,000 |
| Net Income | $99,972 | $98,250-$99,750 | $71,500 | $71,500-$73,000 |
| Net Income Per Share (Diluted) | $2.31 | $2.27-$2.30 | $1.81 | $1.81-$1.84 |

\* \* \*

The Company is also reviewing certain transactions involving sales of products to retailers in fiscal 2000 and the first three quarters of fiscal 2001. If the review of these additional transactions requires a restatement, it will result in a shift in the timing of the recognition of revenue and product costs, with a corresponding

effect on the Company's financial position and results of operations. The amounts and timing of the revenue recognition are not determinable at this time.

100.   On February 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Provides Financial Update: Company to Revise its Revenue Recognition Policies and Restate Financial Statements; Revises Guidance." The press release stated in relevant part:

> Take-Two Interactive Software, Inc. as previously announced, is revising its revenue recognition policies by adopting a new methodology for recording reserves for price concessions. The revision in Take-Two's revenue recognition policies *will result in a restatement of previously issued financial statements*, generally reflecting an earlier recognition of reserves for price concessions. The restatement will effect changes in reported revenue and earnings, and related balance sheet amounts, on both a current and historical basis.

> Under the Company's revised revenue recognition policy, Take-Two will recognize as a reduction of net sales a reserve for estimated future price concessions at the time of sale. Measurement of the reserve will be based on an historical analysis of price concessions, an assessment of field inventory levels and sell-through for each product, current industry conditions and other factors affecting the estimated timing and amount of price concessions management believes will be granted. This methodology contrasts with the previous policy, which generally recognized reserves in the period in which the Company communicated price concessions to its customers.

> The restatement will affect the Company's financial results for each of the fiscal years ended October 31, 1999, 2000, 2001, 2002, the four quarters of fiscal 2002 and the first three quarters of fiscal 2003. In addition, this change in revenue recognition policy will affect the Company's fourth quarter and full fiscal year 2003 financial results previously announced on December 18, 2003, as well as the Company's previously announced guidance for fiscal 2004.

101.   Take-Two's restated financial results for FY:03, were reported in the Company's annual report on Form 10-K, filed with the SEC on or about February 12, 2004. Take-Two's report contained certifications submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Lapin and Winters, on February 12, 2004, using language that was virtually identical to the certifications filed in the previous quarter. In addition, Take-Two's Form 10-K was signed by defendants Roedel, Lapin, Winters, Flug, Emmel, Grace, M. Lewis, Tisch and Brant. The Form 10-K revealed that for the fiscal year ended October 31, 2003, restated net sales were $1.03 billion and $2.27 in diluted earnings per share.

102.   On March 1, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Rockstar Announces Grand Theft Auto: San Andreas." The press

release stated in relevant part:

> Rockstar Games, the world-renowned publishing division of Take-Two Interactive
> Software, Inc. is pleased to announce Grand Theft Auto: San Andreas, the next
> iteration in the globally successful Grand Theft Auto franchise. Developed by
> world-class designers Rockstar North, Grand Theft Auto: San Andreas will be
> available exclusively for the PlayStation®2 computer entertainment system and is
> expected to be in stores in North America on October 19, 2004 and in Europe on
> October 22, 2004.

> \* \* \*

> Leslie Benzies, President of Rockstar North, stated, "We are extremely
> humbled by the success of the Grand Theft Auto series and it has made us push
> ourselves further than ever to create a title in Grand Theft Auto: San Andreas that
> will hopefully redefine the Grand Theft Auto series and revolutionize open-ended
> gameplay and video game production values."

> Over 30 million units of the Grand Theft Auto franchise have been shipped to
> date, including over 11.5 million units of Grand Theft Auto: Vice City and over 10.5
> million units of Grand Theft Auto 3.

103.   Despite the Company's financial restatement, the Individual Defendants caused or

allowed the Take-Two to conduct its affairs in a business as usual manner. On March 1, 2004, the

Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two

Interactive Software, Inc. Reports First Quarter Fiscal 2004 Financial Results." The press release

reported lower than expected sales for the first quarter and stated in relevant part:

> Take-Two Interactive Software, Inc. today announced financial results for its first
> quarter ended January 31, 2004.

> Net sales for the first quarter ended January 31, 2004 were $375.5 million,
> compared to $411.0 million for last year's first quarter, a period which included
> holiday sales of the then newly released blockbuster title Grand Theft Auto: Vice
> City for PlayStation®2. Net income for the quarter was $31.8 million, compared to
> $51.5 million last year, with diluted net income per share of $0.70 compared to $1.22
> last year.

**Guidance**

> For the fiscal year ending October 31, 2004, Take-Two is reiterating its net
> sales guidance of $1.22 billion and diluted net income per share guidance of $2.45.
> For the second quarter ending April 30, 2004, Take-Two is reiterating its guidance of
> $220 million in net sales, but reducing its diluted net income per share guidance to
> $0.33 from its previous guidance of $0.39. The reduction in earnings is due primarily
> to the shift in the release of Grand Theft Auto: Vice City for PlayStation 2 and PC in
> Japan from the second fiscal quarter to the third fiscal quarter. Net sales guidance has
> remained the same due to the strength of the Company's distribution business. Take-
> Two is issuing initial guidance for its third quarter ending July 31, 2004 of net sales

between $180 and $200 million and diluted net income per share between $0.12 and $0.17.

* * *

Earlier this week Rockstar announced Grand Theft Auto: San Andreas, the next iteration in the globally successful franchise. Over 30 million units of the Grand Theft Auto franchise have been shipped to date, including over 11.5 million units of Grand Theft Auto: Vice City and over 10.5 million units of Grand Theft Auto 3. Developed by world-class designers Rockstar North, Grand Theft Auto: San Andreas will be available exclusively for the PlayStation 2 computer entertainment system and is expected to be in stores in North America on October 19, 2004 and in Europe on October 22, 2004.

104. Take-Two's financial results for 1Q:04, the period ended January 31, 2004, were

repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about March 16,

2004. Take-Two's report also contained certifications submitted pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002, signed by defendants Lapin and Winters, on March 16, 2004, using

language that was virtually identical to the certifications filed in the previous quarter.

105. Also, on March 16, 2004, the Individual Defendants issued a press release entitled

"Take-Two Interactive Software, Inc. Appoints Richard W. Roedel as Chairman of the Board of

Directors." The press release also indicated that defendant Brant had resigned from his positions as

Chairman and a director of the Company and instead, had become Vice President of Publishing for

the Company. The press release stated in relevant part:

Mr. Roedel commented, "Since founding Take-Two in 1993, Mr. Brant has built the Company into one of the premier global interactive entertainment companies today. Under his leadership, Take-Two has reached over billion in revenue and market capitalization, and has created some of the top-selling entertainment franchises of all time. The Board of Directors praises Ryan for his leadership, vision and dedication to the Company. Additionally, I am pleased to have the opportunity to work more closely with Take-Two's Board of Directors in my new role as Chairman, and remain committed to providing additional shareholder value."

Mr. Brant stated, "Take-Two's continued success was paramount in my decision. I am passionate about our business and deeply committed to the Company. I believe this is the right time to make a management transition to position Take-Two for the future. My new role will allow me to focus on all aspects of our publishing and product development efforts. Our Board and management are exceptionally strong, and have the vision and abilities to take the Company to the next level."

106. On April 14, 2004, the Individual Defendants caused or allowed the Company to file

a press release entitled "Take-Two Announces Management Changes; Company Revises Financial

Guidance." From the Company's inception in 1993, until his resignation, defendant Brant had served

- 43 -

as Chairman of Take-Two's Board and as a director of the Company. Despite defendant Brant's obvious involvement with the Company and his lengthy history as its Chairman, defendants did not provide an explanation for defendant Brant's rapid disappearance as an active member of the Company's Board. The press release indicated the Company was reducing its guidance for 2Q:04 and FY:04 stated in relevant part:

> Take-Two Interactive Software, Inc. announced today that Richard W. Roedel has been named Executive Chairman and Interim Chief Executive Officer, following the resignation of Jeffrey C. Lapin as the Company's Chief Executive Officer and a director.
>
> Take-Two also announced the appointment of Paul Eibeler as President and a director. Mr. Eibeler previously served as President and a director of Take-Two from December 2000 to June 2003.
>
> Gary Lewis has been named Global Chief Operating Officer of the Company. Mr. Lewis, who will relocate to the Company's headquarters in New York City, had been Take-Two's International Managing Director since February 2001, and has served in various senior management positions at the Company since 1997....
>
> Mr. Roedel said, "The addition of Paul and Gary provides further depth to our management team as we continue to build on our solid foundation and explore new opportunities to grow our business."
>
> ***Take-Two also announced today that it is reducing its guidance for the second quarter ending April 30, 2004 and the fiscal year ending October 31, 2004.*** The reduction in second quarter guidance is due primarily to the shift in the launch dates of Red Dead Revolver from the second quarter to the third quarter. Red Dead Revolver for PlayStation®2 and Xbox™ is now expected to be in North American retail stores the first weekend in May and is scheduled to be in European retail stores on May 28th. The Company has also experienced lower than anticipated sales of catalog products, despite added sales support and promotional spending. The shortfall in Take-Two's publishing revenue is expected to be partially offset by the strength of the Company's Jack of All Games distribution business, which carries lower margins than the publishing business. Finally, the Company will incur severance charges during the quarter due to Mr. Lapin's resignation.
>
> Take-Two is reiterating its guidance for the third quarter ending July 31, 2004. However, it is moving the launch date of The Warriors™ for PlayStation®2 from the third quarter of fiscal 2004 to the first quarter of fiscal 2005. Rockstar Games believes that this shift will benefit the product and will allow additional resources to be devoted to Grand Theft Auto: San Andreas, scheduled to be in stores in North America on October 19th and in Europe on October 22nd. Rockstar plans to begin previewing Grand Theft Auto: San Andreas to key retailers and industry trade publications in June.
>
> The following is Take-Two's revised fiscal 2004 guidance:
>
> * For the second quarter ending April 30, 2004, Take-Two's revised guidance is $170 million in net sales and a net loss of $(0.15) per share, compared to prior guidance of $220 million in net sales and $0.33 in diluted net income per share.

- For the third quarter ending July 31, 2004, Take-Two reiterates its guidance of $180 to $200 million in net sales and $0.12 to $0.17 in diluted net income per share.

- For the fiscal year ending October 31, 2004, Take-Two's revised guidance is $1.17 billion in net sales and $2.00 in diluted net income per share, compared to prior guidance of $1.22 billion in net sales and $2.45 in diluted net income per share.

Mr. Roedel concluded, "Clearly, we are disappointed with our current performance. However, we believe the senior management additions we announced today are a significant step forward in strengthening our operational focus, which should lead to improved financial results going forward."

107.   On June 8, 2004, the Individual Defendants caused or allowed the Company to issue a

press release entitled "Take-Two Reports Second Quarter Fiscal 2004 Financial Results." The press

release announced another reduction in the Company's guidance for FY:04 and stated in relevant

part:

Take-Two Interactive Software, Inc. today announced financial results for its second quarter and six months ended April 30, 2004.

Net sales for the second quarter ended April 30, 2004 were $153.4 million, compared to $193.0 million for last year's second quarter, a period which included significant sales of the blockbuster title Grand Theft Auto: Vice City for PlayStation®2 and the then newly released title Midnight Club 2 for PlayStation 2. Net loss for the quarter was $14.6 million, compared to net income of $14.6 million last year, with a net loss of $(0.33) per share compared to diluted net income per share of $0.35 last year.

Net sales for the six months ended April 30, 2004 were $528.9 million, compared to $604.0 million for the same period a year ago. Net income of $17.2 million compared to $66.2 million in the comparable period last year, with diluted net income per share of $0.38 compared to $1.56.

Guidance

*Take-Two is reducing its guidance for the third quarter ending July 31, 2004 and for the fiscal year ending October 31, 2004 to reflect lower than anticipated sales* of the Company's catalog products, as well as changes in the Company's product release schedule (although there is no change in the release date for the highly anticipated Grand Theft Auto: San Andreas). In Take-Two's revised guidance, the reductions in publishing revenue are being partially offset by operating expense reductions.

*The following is Take-Two's revised fiscal 2004 guidance*:

For the third quarter ending July 31, 2004, Take-Two's revised guidance is $130 to $140 million in net sales and a net loss of $(0.28) to $(0.33) per share, compared to prior guidance of $180 to $200 million in net sales and $0.12 to $0.17 in diluted net income per share. For the fiscal year ending October 31, 2004, Take-Two's revised guidance is $1.125 to $1.145 billion in net sales and $1.60 to $1.65 in diluted net income per share, compared to prior guidance of $1.17 billion in net sales and $2.00 in diluted net income per share.

- 45 -

* * *

Take-Two has an extensive product lineup planned this holiday season. Rockstar will introduce Grand Theft Auto: San Andreas, the next iteration in the globally successful franchise. Developed by world-class designers Rockstar North, Grand Theft Auto: San Andreas will be available exclusively for the PlayStation 2 and is expected to be in stores in North America on October 19, 2004 and in Europe on October 22, 2004. ***Rockstar has begun previewing the game to key trade publications and the title has already graced the cover of the June 2004 issue of Game Informer magazine in which the first information and screenshots were revealed to the public at this year's E3 in the magazine's feature story***.

108. Take-Two's financial results for 2Q:04, the period ended April 30, 2004, were

repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about June14,

2004. Take-Two's report also contained certifications submitted pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002, signed by defendants Roedel and Winters on June 14, 2004, using

language that was virtually identical to the certifications filed in the previous quarter.

109. On July 27, 2004, the Individual Defendants caused or allowed the Company to

announce that it had appointed Barbara Kaczynski ("Kaczynski") to Take-Two's Board of Directors.

110. On September 9, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Take-Two Interactive Software, Inc. Reports Third Quarter Fiscal

2004 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced financial results for its third quarter and nine months ended July 31, 2004.

Net sales for the third quarter ended July 31, 2004 were $160.9 million, compared to $152.1 million for last year's third quarter. Net loss for the quarter was $14.4 million, compared to net income of $5.7 million last year, with a net loss of $0.32 per share compared to net income per share of $0.13 last year.

Net sales for the nine months ended July 31, 2004 were $689.7 million, compared to $756.1 million for the same period a year ago, a period which included significant sales of the blockbuster title Grand Theft Auto: Vice City for PlayStation®2 and the then newly released titles Midnight Club 2 for PlayStation 2 and Grand Theft Auto: Vice City for PC. Net income of $2.7 million compared to $71.9 million in the comparable period last year, with diluted net income per share of $0.06 compared to $1.68.

Guidance

Take-Two is updating its guidance for fiscal 2004 as follows:

• For the fiscal year ending October 31, 2004, Take-Two's guidance is $1.145 to $1.160 billion in net sales and $1.60 to $1.62 in diluted net income per share.

- 46 -

Take-Two is issuing initial guidance for fiscal 2005 as follows:

- For the fiscal year ending October 31, 2005, $1.2 to $1.3 billion in net sales and $2.00 to $2.20 in diluted net income per share.

- For the first quarter ending January 31, 2005, $420 to $460 million in net sales and $1.00 to $1.10 in diluted net income per share.

\* \* \*

Take-Two has an extensive product lineup planned this holiday season, beginning in the fourth quarter. Rockstar will introduce Grand Theft Auto: San Andreas, the next iteration in the globally successful franchise which has sold over 32 million units. Developed by world-class designers Rockstar North, Grand Theft Auto: San Andreas will be available exclusively for the PlayStation 2 and is expected to be in stores in North America on October 26, 2004 and in Europe on October 29, 2004. *The title's launch date was moved to allow additional time for final testing of the game*, which exceeds the size, depth and scope of traditional videogames. Rockstar has been extensively previewing the game to the trade press, and the title has appeared on the cover of several key trade publications since it was revealed to the public at this year's E3 industry tradeshow. Rockstar also plans to release an extension of the Grand Theft Auto franchise for the Game Boy Advance in late October.

111.    Take-Two's financial results for 3Q:04, the period ended July 31, 2004, were repeated in the Company's quarterly report on Form 10-Q, filed with the SEC on or about September 14, 2004. Take-Two's report also contained certifications submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Roedel and Winters on September 14, 2004, using language that was virtually identical to the certifications filed in the previous quarter.

112.    On October 25, 2004, the Individual Defendants caused or allowed the Company to announce that Grand Theft Auto: San Andreas had been "shipped to retail stores in North America." The Individual Defendants also caused or allowed the Company to state "Grand Theft Auto: San Andreas is the next installment in the gaming franchise that has sold over 32 million units to date, including over 13 million units of Grand Theft Auto: Vice City and over 11 million units of Grand Theft Auto 3."

113.    On December 16, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Reports Fourth Quarter and Fiscal 2004 Financial Results." In the press release, the Individual Defendants indicated that the Company had set aside $7.5 million related to the ongoing SEC investigation, contrary to the Individual

Defendants' assertion on December 18, 2003 that the Company did not anticipate any monetary

penalties associated with the investigation. The press release stated in relevant part:

> Take-Two Interactive Software, Inc. today announced financial results for its fourth quarter and fiscal year ended October 31, 2004.
>
> Net sales for the fourth quarter ended October 31, 2004, which *included the launch of the blockbuster title Grand Theft Auto: San Andreas for the PlayStation®2 computer entertainment system, were $438.0 million compared to $277.6 million for the same period a year ago*. Net income for the quarter was $62.6 million, which included a $7.5 million accrual to establish a reserve in connection with the Company's SEC investigation as discussed below. Fourth quarter 2004 net income of $62.6 million and diluted net income per share of $1.36 compared to net income of $26.3 million and diluted net income per share of $0.58 the prior year.
>
> Net sales for the fiscal year ended October 31, 2004 were $1.13 billion compared to $1.03 billion for fiscal 2003. Net income of $65.4 million, including the $7.5 million accrual related to the Company's SEC investigation, compared to $98.1 million in net income last year, with diluted net income per share of $1.43 compared to $2.27 last year.
>
> Take-Two has accrued a $7.5 million expense in the fourth quarter associated with the Company's previously disclosed SEC investigation into certain accounting matters related to the Company's financial statements, periodic reporting and internal accounting controls. This accrual, which was not previously included in the Company's guidance, is based on a settlement offer the Company made to the staff of the SEC in November 2004, which the staff has agreed to recommend to the SEC. If approved, the proposed settlement would fully resolve all claims relating to the investigation by the SEC that began in December 2001. Pursuant to the offer of settlement, under which the Company would neither admit nor deny the allegations of the complaint, Take-Two would agree to pay a non-tax deductible civil penalty of $7.5 million and would be enjoined from future violations of the federal securities laws.
>
> Guidance
>
> Take-Two is updating its guidance for fiscal 2005 as follows:
>
> - For the fiscal year ending October 31, 2005, $1.2 to $1.25 billion in net sales and $2.00 to $2.20 in diluted net income per share.
>
> - For the first quarter ending January 31, 2005, $440 to $460 million in net sales and $1.00 to $1.10 in diluted net income per share.
>
> Take-Two is issuing initial guidance for its second quarter of fiscal 2005 as follows:
>
> - For the second quarter ending April 30, 2005, $170 to $190 million in net sales and a net loss of $(0.10) to $(0.20) per share.
>
> * * *
>
> *Rockstar's Grand Theft Auto: San Andreas, released in late October for PlayStation 2, was a significant contributor to fourth quarter and fiscal year results. Created by the world-class developers Rockstar North, Grand Theft Auto:*

*San Andreas was the top performing product in Take-Two's publishing business this quarter and fiscal year.* According to NPDFunworldSM, Grand Theft Auto: San Andreas was the top selling PlayStation® 2 title in the United States in October and November.

* * *

As announced today, Rockstar is introducing Grand Theft Auto: San Andreas for Xbox in the third quarter of fiscal 2005, along with a simultaneous release of the PC version of the title.

* * *

Management Comments

Richard Roedel, Chairman and Chief Executive Officer, stated, "Fiscal 2004 was a rebuilding year for us, as we made key management additions and improved certain areas of our distribution and publishing businesses. We achieved a number of important accomplishments in 2004 which make Take-Two a much stronger company going into 2005:

- Grand Theft Auto: San Andreas was the largest videogame launch in Take-Two's history, further strengthening both our Rockstar label and the Company's financial position…."

Paul Eibeler, President, added, "We are entering fiscal 2005 in a strong, competitive position. With the tremendous success of Grand Theft Auto: San Andreas, Rockstar Games has magnified the power of the Grand Theft Auto brand, and they will continue to build on the franchise with the launch of Xbox and PC versions of Grand Theft Auto: San Andreas in June. Our product portfolio going into 2005, which includes titles based on a combination of proven franchises, new brands and licensed properties, is the strongest in the Company's history. Combined with the expansion of our management team and the strengthening of our internal operations, we believe we are building the foundation for long term, sustained growth in the interactive entertainment industry."

114.   Take-Two's financial results for FY:04, for the fiscal year ended October 31, 2004, were repeated in the Company's annual report on Form 10-K filed with the SEC on or about December 22, 2004. Take-Two's report also contained certifications submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Roedel and Winters on December 20, 2004, using language that was virtually identical to the certifications filed in the previous quarter. In addition, Take-Two's Form 10-K was signed by defendants Eibeler, Flug, Emmel, Grace, M. Lewis and Tisch.

115.   On February 1, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software President, Paul Eibeler, Adds CEO Role; Richard Roedel to Remain Chairman." The press release stated in relevant part:

Take-Two Interactive Software, Inc. announced today that Company President and Board member Paul Eibeler has been named to the additional role of Chief Executive Officer. Mr. Eibeler assumes the CEO responsibilities from Richard Roedel, who remains Chairman of the Board of Directors.

116.   On March 3, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Take-Two Interactive Software, Inc. Reports First Quarter Fiscal 2005

Financial Results; Company Reports Record Quarterly Revenue of $502.5 Million; Grand Theft

Auto: San Andreas Sales Exceed 12 Million Units Since Launch." The press release stated in part:

Take-Two Interactive Software, Inc. today announced financial results for its first quarter ended January 31, 2005.

Net sales for the first quarter were $502.5 million compared to $375.5 million for the first quarter of fiscal 2004, an increase of 34%. Net income for the quarter rose to $55.2 million, a 74% increase from net income of $31.8 million during the same period last year. Diluted earnings per share of $1.19 increased 70% from $0.70 per diluted share in the prior year's first quarter.

Take-Two generated approximately $185 million in cash flow from operations in the quarter, bringing the Company's cash position to approximately $303 million as of January 31, 2005.

*Take-Two attributed the sharply higher first quarter results primarily to continued strong consumer demand for its Grand Theft Auto: San Andreas title,* as well as robust sales of the 2K Sports line of products and improved performance of the Company's Jack of All Games distribution business.

Guidance

*Take-Two is updating its guidance for fiscal 2005 as follows*:

- For the fiscal year ending October 31, 2005, $1.3 to $1.35 billion in net sales and $2.10 to $2.20 in diluted earnings per share.

- For the second quarter ending April 30, 2005, $200 to $210 million in net sales and a net loss per share of $(0.20).

*   *   *

Rockstar Games

*Rockstar's Grand Theft Auto: San Andreas, released in late October for the PlayStation®2 computer entertainment system, was a significant contributor to the first quarter results.* Created by the world-class developers Rockstar North, Grand Theft Auto: San Andreas was the top performing product in Take-Two's publishing business in the quarter. According to NPDFunworldSM, Grand Theft Auto: San Andreas was the top selling PlayStation® 2 title in the United States in each of the four months since its release. *The Company's life to date sales of Grand Theft Auto: San Andreas through the end of the first quarter have exceeded 12 million units.*

*   *   *

Management Comments

Paul Eibeler, President and Chief Executive Officer, stated, "Fiscal 2005 is off to a great start. *We are extremely pleased with the continued success of Grand Theft Auto: San Andreas and Rockstar's plans to extend the reach of this blockbuster title to multiple platforms and the Asian market later this year.* Additionally, we have made significant progress in diversifying our business, building our product pipeline and adding to our sports game development capabilities. We will continue to leverage our internal resources and invest in new opportunities, including extending our content to new hardware platforms. With our strong performance in the first quarter and our rapidly expanding portfolio of proven franchises, new brands and licensed properties, *Take-Two is positioned for significant annual growth.*"

117.    Take-Two's financial results for 1Q:05, the period ended January 31, 2005, were

repeated in the Company's quarterly report on Form 10-Q filed with the SEC on or about March 10,

2005. Take-Two's report also contained certifications submitted pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002, signed by defendants Eibeler and Winters on March 10, 2005, using

language that was virtually identical to the certifications filed in the previous quarter.

118.    On June 2, 2005, the Individual Defendants caused or allowed the Company to issue a

press release entitled "Take-Two Interactive Software, Inc. Reports Second Quarter Fiscal 2005

Financial Results; Sales Increase 45% Year Over Year." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced financial results for its second quarter and six months ended April 30, 2005. The Company's results reflect the three-for-two stock split completed in April 2005.

Net sales in the second quarter increased 45% to $222.1 million, compared to $153.4 million in the second quarter of fiscal 2004. Net loss for the quarter was $8.2 million, compared to a net loss of $14.6 million last year, with a net loss of $(0.12) per share compared to a net loss per share of $(0.22) last year.

Net sales for the six months ended April 30, 2005 increased 37% to $724.5 million, compared to $528.9 million for the same period a year ago. Net income for the first six months more than doubled to $47.1 million from net income of $17.2 million in the comparable period last year. Diluted earnings per share of $0.67 increased 168% from $0.25 per diluted share in the prior year's first six months.

Take-Two attributed its increased second quarter sales to the launch of Midnight Club 3: DUB Edition for PlayStation®2 and Xbox® and Major League Baseball 2K5 for PlayStation® 2 and Xbox, as well as continued consumer demand for its Grand Theft Auto: San Andreas title for PlayStation® 2.

Guidance

Take-Two is reiterating its guidance for the fiscal year ending October 31, 2005 of $1.3 to $1.35 billion in net sales and $1.40 to $1.47 in diluted earnings per share, reflecting the Company's three-for-two stock split.

- 51 -

***Take-Two is updating its third fiscal quarter guidance*** to reflect the movement of the following products from the third fiscal quarter to the fourth fiscal quarter: Grand Theft Auto: Liberty City Stories for the PSP™; Call of Cthulhu: Dark Corners of the Earth™ for PlayStation 2 and Xbox; and Top Spin for PlayStation 2. The Company now expects $205 to $215 million in net sales and a net loss per share of $(0.05) to $(0.10) for the third quarter ending July 31, 2005.

\* \* \*

Rockstar has a strong product lineup planned for the balance of fiscal 2005, beginning with ***Grand Theft Auto: San Andreas for Xbox and PC***, which will be in stores in North America on June 7th and in Europe on June 10th, followed by Midnight Club 3: DUB Edition for the PSP system, which will be in stores in North America on June 28th.

***In the fourth quarter, Rockstar is introducing an all new Grand Theft Auto title, Grand Theft Auto: Liberty City Stories***, exclusively for the PSP system. Returning to Liberty City, the setting of Grand Theft Auto 3, the title has an entirely original storyline with all new missions and the freedom, production value and depth of play comparable to other Grand Theft Auto titles.

\* \* \*

Management Comments

Paul Eibeler, President and Chief Executive Officer, stated, "We were pleased with the performance of our second quarter releases, as well as the ***continued success of Grand Theft Auto: San Andreas***. Additionally, having just returned from E3, we are excited about our future. Rockstar, 2K Games, 2K Sports and Global Star showcased a diverse assortment of over 25 games across all genres, platforms and demographic appeal to much critical and consumer acclaim."

119.    On June 7, 2005, the Individual Defendants caused or allowed the Company to announce that GTA: San Andreas for Xbox and for the PC were available in retail stores across the United States and expected to be in stores in Europe on or about June 10, 2005.

120.    Take-Two's financial results for 2Q:05, the period ended April 30, 2005, were repeated in the Company's quarterly report on Form 10-Q filed with the SEC on or about June 9, 2005. Take-Two's report also contained certifications submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Eibeler and Winters on June 9, 2005, using language that was virtually identical to the certifications filed in the previous quarter.

## THE "HOT COFFEE" SCANDAL

121.    On July 8, 2005, *GameSpot* published a news article entitled "ESRB Investigating San Andreas Sex Minigames." The Individual Defendants, however, failed to cause the Company to issue a press release announcing the investigation and conducted business as usual. When asked

about the investigation, the Individual Defendants caused or allowed the Company to respond that it

was confident that GTA: San Andreas' rating would remain unchanged and that the sexually explicit

content was the work of third parties and not Take-Two. The article stated in relevant part:

> Today, one of the most popular recent game industry rumors showed signs of turning into a very real scandal.
>
> Following a verbal lashing this week from California Assemblyman Leland Yee (D-San Francisco), *the Entertainment Software Ratings Board (ESRB) today said it was launching an investigation into Rockstar Games' best-seller Grand Theft Auto: San Andreas to determine whether the game contained sexually explicit minigames hidden in its code.*
>
> ESRB president Patricia Vance said her organization has "opened an investigation into the circumstances surrounding the 'Hot Coffee' modification." "Hot Coffee" refers to the mod that, when installed on a PC with San Andreas on it, unlocks several minigames that prompt players to have the game's hero engage in X-rated acts.
>
> The ESRB's investigation will examine whether the mod unlocks preexisting code, as appears to be the case, or is actually a purely third-party creation. Its ultimate purpose will be *to determine if Take-Two violated ESRB regulations requiring "full disclosure of pertinent content."*
>
> "The integrity of the ESRB rating system is founded on the trust of consumers who increasingly depend on it to provide complete and accurate information about what's in a game. If after a thorough and objective investigation of all the relevant facts surrounding this modification, we determine a violation of our rules has occurred, we will take appropriate action," Vance said in a statement released this morning.
>
> Vance also had some choice words for Assemblyman Yee, who, in the same statement accusing the board of "failing to appropriately rate" Grand Theft Auto: San Andreas, also accused it of a "conflict of interest in rating games."
>
> Yee implies the nonprofit ratings board, which was established in 1994 by the Entertainment Software Association (ESA), shies away from AO ratings, regardless of the content. Most major retailers refuse to sell AO-rated games, thereby denying such titles broad distribution.
>
> "Assemblyman Yee has been on a crusade for years to undermine the integrity of the ESRB, and in so doing, generate support for his legislative agenda. His latest attempt to win political points is to claim, without any legitimate basis, that a game rated for ages 17 and older, with explicit content descriptors prominently displayed on every box, has been inappropriately rated," Vance said.
>
> Stating the agenda of the board was above reproach and that contrary to Yee's comments that the ESRB has "failed our parents" with San Andreas' M rating, Vance claimed "research shows parents overwhelmingly find ESRB ratings to be effective."
>
> "We will do whatever it takes to maintain their confidence in them and the integrity of the system," Vance concluded.
>
> Rockstar alerted the press late in the day that it is aware of the investigation by the ESRB. *"We can confirm the ESRB is conducting an investigation and that*

- 53 -

*we will be complying fully with their enquiries*," the statement read.    "We thoroughly support the work of the ESRB, and believe that it has an exemplary record of rating games and promoting understanding of video game content. *We also feel confident that the investigation will uphold the original rating of the game, as the work of the mod community is beyond the scope of either publishers or the ESRB.*"

This afternoon, when asked if the "Hot Coffee" code was included in game discs manufactured by Rockstar or its agents, the company commented more fully than it had previously.  Specifically, a spokesperson for Rockstar told GameSpot News it was not.

122.    On July 15, 2005, *GameSpot* followed up their initial story with another article

entitled "Confirmed: Sex minigame in PS2 San Andreas." GameSpot confirmed the existence of the

"Hot Coffee" modification, but reported that a spokesperson for Take-Two had denied that the

Company was responsible for the sex scenes in GTA, rather the scenes were entirely the work of

third-party hackers. The article stated in relevant part:

This week saw a Grand Theft Auto game once again at the center of a nationwide controversy.  The point of contention this time was the so-called "Hot Coffee" mod for Grand Theft Auto: San Andreas, which had everyone from anti-game crusader Jack Thompson to US Senator Hillary Clinton (D-NY) percolating with outrage and/or calls for federal game regulation.

The Hot Coffee mod first surfaced last month, when the PC version of San Andreas was released.  The mod, which is available on numerous Web sites, adds a bonus sex minigame as a reward for the numerous "girlfriend" missions in San Andreas.

Previously, when game hero Carl "CJ" Johnson successfully wined and dined one of several girlfriends a certain number of times, she would ask him into her house for "coffee."  After entering, the game shows an external shot of the house with muffled sounds of a couple emitting moans *in flagrante delicto*.  PC versions of San Andreas with the "Hot Coffee" mod installed show what goes on inside the house, treating players to a sexually graphic minigame of CJ fornicating with his girlfriend.

*According to its creators, the Hot Coffee mod merely unlocks hidden, preexisting code inside San Andreas.  The game's publisher, Rockstar Games, appeared to vehemently--but carefully--deny that charge in a statement earlier this week.  "So far we have learned that the 'Hot Coffee' modification is the work of a determined group of hackers who have gone to significant trouble to alter scenes in the official version of the game," the company said.  "In violation of the software user agreement, hackers created the 'Hot Coffee' modification by disassembling and then combining, recompiling and altering the game's source code.*"

Rockstar's statement also claimed that the mod was the product of complex technical tampering.  "Since the 'Hot Coffee' scenes cannot be created without intentional and significant technical modifications and reverse-engineering of the game's source code, we are currently investigating ways that we can increase the security protection of the source code and prevent the game from being altered by the 'Hot Coffee' modification," read the statement.

*However, Rockstar Games' argument has been undermined by an increasing number of reports that claimed the sex minigame is in the PlayStation 2 version of San Andreas. Since the PS2 version comes on an unmoddable DVD, it cannot have any content added to it, although cheat codes--created either by the publisher or third parties--can unlock preexisting code on the disc.* While devices such as GameShark and Action Replay Max can tweak preexisting variables in system memory with cheats, they cannot inject new models, animations, and/or code into a game.

To prove or disprove rumors that the PS2 San Andreas contains a sexually graphic minigame, GameSpot decided to test the cheat codes circulating around the Web on a sealed, first-edition copy of San Andreas. After acquiring the "Uncensored Hot Coffee" codes from the respected tech-blog Kotaku, we entered them into an easily obtainable Action Replay Max cheat device. After entering the "Enable all Girlfriends" cheat, we began the game and then gave CJ maximum sex appeal, via a cheat from GameFAQs that requires no external code.

After saving, our test editor had Carl visit the house of his nearest girlfriend, Denise in Los Santos. Carl then took Denise on a series of dates to the nearest bar. After a few complications--including being busted for two-timing by another of CJ's girlfriends--we completed a fourth date with Denise, after which she invited us into her house for "coffee."

The *next screen proved that the PlayStation 2 edition of the game does indeed include a sexually graphic minigame, which plays almost exactly the same as the Hot Coffee mod.* It begins inside a bedroom with Denise, wearing only a pink thong and a cutoff T-shirt bearing the Rockstar logo, performing simulated fellatio on CJ, who is fully clothed in jeans and a "wife beater"-style tank top.

After a few seconds, the minigame proceeds to semi-explicit simulated copulation. Although players can change the camera angle with the circle button, as well as cycle though three sexual positions with the square button, no genitalia are ever seen. To win, players must maintain a steady rhythm with the left analog stick to build up an "excitement meter" on the right of the screen. Fill the meter and Denise becomes very excited, telling CJ he is "the man" before the game congratulates you with the words "Nice guys finish last!" Let the meter drop to empty and the game admonishes you with "Failure to satisfy a woman is a CRIME!"

Given that the minigame is about as raunchy as an episode of Sex and the City, cannot be accessed without entering a long string of cheat codes, and takes several hours of effort to access, charges that San Andreas is "pornographic" may seem extreme to some. However, *its existence does appear to contradict Rockstar Games' carefully worded statement blaming hacker mischief for the existence of the Hot Coffee mod.*

123.    On July 20, 2005, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Announces Conclusion of ESRB Investigation." In the press release the Company acknowledged that the ESRB had changed the rating of the GTA: San Andreas from Mature 17+ (M) to Adults Only 18+ (AO) due to the Hot Coffee modification. The press release stated in relevant part:

- 55 -

. Take-Two Interactive Software, Inc. announced today that the Entertainment Software Rating Board (ESRB) has changed the rating of Grand Theft Auto: San Andreas on all platforms from "Mature 17+" (M) to "Adults Only 18+" (AO) because of the so-called "hot coffee mod," an unauthorized third party modification that alters the retail version of the game. Take-Two cooperated fully with the ESRB's investigation.

*Rockstar Games has ceased manufacturing of the current version of the title and will begin working on a version of the game with enhanced security* to prevent the "hot coffee" modifications. This version will retain the original ESRB M-rating and is expected to be available during the Company's fourth fiscal quarter. Rockstar Games will be providing AO labels for retailers who wish to continue to sell the current version of the title.

As a result of the re-rating of the game, *Take-Two is lowering guidance for the third fiscal quarter ending July 31, 2005 to $160 to $170 million in net sales* and a net loss per share of $(0.40) to $(0.45) to provide reserves for the value of the title's current North American retail inventory. Accordingly, *guidance for the fiscal year ending October 31, 2005 is also being lowered* to $1.26 to $1.31 billion in net sales and $1.05 to $1.12 in diluted earnings per share.

"*Take-Two and Rockstar Games have always worked to keep mature-themed video game content out of the hands of children and we will continue to work closely with the ESRB* and community leaders to improve and better promote a reliable rating system to help consumers make informed choices about which video games are appropriate for each individual," said Paul Eibeler, Take-Two's President and Chief Executive Officer. "The ESRB's decision to re-rate a game based on an *unauthorized third party modification* presents a new challenge for parents, the interactive entertainment industry and anyone who distributes or consumes digital content. Rockstar Games is pleased that the investigation is now settled and they look forward to returning their focus to making innovative and groundbreaking video games for a mature audience."

The scenes depicted in the "hot coffee" modification are not playable in the retail version of the game *unless* the user downloads and/or installs unauthorized software that alters the content of the original retail version of the title, representing a violation of Take-Two and Rockstar's end user license agreement (EULA) and intellectual property rights. "*We are deeply concerned that the publicity surrounding these unauthorized modifications has caused the game to be misrepresented to the public and has detracted from the creative merits of this award winning product*," said Mr. Eibeler. Take-Two is exploring its legal options as it relates to companies that profited from creating and distributing tools for altering the content of Grand Theft Auto: San Andreas.

Rockstar Games will be making available shortly a downloadable software patch to render Grand Theft Auto: San Andreas for PC impervious to the "hot coffee" modification. Rockstar encourages parent groups and political leaders to assist with distribution of the patch to prevent the content of the modification from spreading further.

124.    On July 20, 2005, *TheStreet.com* published an article entitled "Sex Scene Shelves Take-Two's 'Grand Theft.'" The article reported that Take-Two had agreed to either re-label all the

, copies of GTA: San Andreas for retailers, or exchange all unsold copies of the game for an updated

version that does not contain the hidden scenes. The article stated in relevant part:

> Take-Two Interactive is ceasing production of the latest version of its popular Grand Theft Auto game following public outcry about a software hack that allows players to see racy sex scenes.

> The video-game software publisher is setting up a reserve fund to cover the value of copies of the game still in its inventory. As a result, Take-Two is slashing its outlook for its fiscal third quarter and its full fiscal year.

> Investors frowned on the news, sending the company's stock down nearly 7% in after-hours trading.

> The move is in response to and follows the completion of an investigation by the Entertainment Software Rating Board, a regulatory body set up by the gaming industry. New York Sen. Hillary Rodham Clinton and other public officials have called for separate inquiries.

> ***The ESRB has advised retailers to stop selling GTA until the "corrective actions" have been taken.***

> ***According to the ESRB, Take-Two agreed as part of the settlement to either re-label for retailers the current version of GTA with an Adults Only rating or to exchange all unsold copies the retailers are holding for copies of the updated game.***

> Take-Two "is pleased that the [ESRB] investigation is now settled," the company said in a statement.

> The Grand Theft Auto series has long been controversial for its depictions of street gang violence. Sans modification, the games have included scenes that imply sex between some of the characters. But a third-party program called "hot coffee" that is available over the Internet allows players to see their character actually engage in sex.

> Some analysts have charged that the "hot coffee" modification simply allowed access to scenes that were already built into the game. ***Take-Two spokesman Jim Ankner acknowledged that the scenes were on the game discs, but said they were examples of "unused and unfinished" content that is often found on game discs when they ship***. Game players could not view the scenes without the hot coffee program, the installation of which constitutes a violation of the end-user agreement, Ankner said.

> "In the future, we will be more diligent to be sure that content like that is removed," he said.

> As part of the move, the ESRB is changing its rating on all versions of Grand Theft Auto: San Andreas from "Mature" to the more restrictive "Adults Only." Take-Two plans to issue a patch for the PC version of San Andreas that will block the "hot coffee" program. Ankner said the patch will be available in "a couple weeks." However, the ESRB has said the hot coffee version was also found on the PlayStation and Xbox versions.

> The ESRB advises that "Mature" games are for people 17 and older and recommends that "Adults Only" be played just by adults. However the ratings are

merely guidelines and retailers can choose whether or not to enforce them; according to the ESRB, most major U.S. retailers do.

Meanwhile, Take-Two plans to issue a new version of San Andreas in its fiscal fourth quarter that will also block the hot coffee modification. That version will carry the original "Mature" rating on the game and will likely be released in September or October, Ankner said.

*Take-Two now expects to lose 40 cents to 45 cents a share in its current quarter on sales ranging from $160 million to $170 million.* For the full year, the company expects to earn $1.05 to $1.12 a share on sales of $1.26 billion to $1.31 billion.

Previously, the company had predicted that it would lose 5 cents to 10 cents a share on sales ranging from $205 million to $215 million in the current quarter.

The reserve fund is an effort to protect the company against potential returns from retailers, Ankner said. Ankner declined to say how the controversy over the hot coffee scenes was affecting sales of San Andreas. But he did say that "there has been a lot of interest in the game" both before and after the hullabaloo arose.

San Andreas was the best-selling video game last year and the Grand Theft Auto series has been one of the best selling game franchises of all time.

In recent trading in the after-hours markets, Take-Two's stock was off $1.81, or 6.7%, to $25.26. The company's shares closed regular trading up 12 cents, or 0.5%, to $27.07.

Despite the public outcry, Ankner said the ESRB investigation was the only one of which he is aware concerning the hot coffee modification.

125. On July 26, 2005, a mere six days later, the Individual Defendants caused or allowed

the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Announces

Federal Trade Commission Inquiry." The press release stated in relevant part:

Take-Two Interactive Software, Inc. announced today that it has been notified that the staff of the Federal Trade Commission's (FTC) Division of Advertising Practices is *conducting an inquiry into advertising claims made for Grand Theft Auto: San Andreas*. The Company intends to fully cooperate with the FTC inquiry, and believes that it acted in accordance with all applicable laws and regulations. The Company cooperated with a recently concluded Entertainment Software Rating Board (ESRB) investigation into this matter and has taken decisive and immediate corrective action.

126. On July 22, 2005, *GamesIndustry.biz* published an article entitled "Take-Two May

Face Further Investigations over Hot Coffee; SEC and FTC May Choose to Look into Take-Two's

Actions over San Andreas Sex Scenes." The article stated in relevant part:

US analysts have warned that Take-Two may face investigations from the Federal Trade Commission and the Securities and Exchange Commission after the company reduced its Q3 revenue guidance by $40 million in the wake of the Hot Coffee scandal.

Commenting in a research note yesterday, Banc of America Securities analyst Gary Cooper said that *"regulatory risks remain for Take-Two" and described a class action lawsuit over the matter as "inevitable."*

*"Some political figures are agitating for an FTC investigation on the grounds of indecency and/or false advertising related to GTA San Andreas and the original product rating,"* he said, going on to note that the company has not created an exchange or return programme for the 12 million already sold copies of San Andreas, something which the FTC could push it to do.

It's not just the Federal Trade Commission which may look at Take-Two now, however; Cooper warned that *several stock transactions over the past few weeks could also come under scrutiny from the Securities and Exchange Commission.*

"Several TTWO insiders, including Chief Operating Officer Gary Lewis sold common shares recently," he noted. "Lewis sold 20,000 shares on July 13th and filed to sell 40,000 shares on July 19th. The SEC could choose to investigate these sales. It remains unclear as to when the ESRB investigation began."

It's not just these investigations which concern Banc of America Securities, however; in the firm's research note, Cooper also questions whether there could be more far-reaching effects for the GTA franchise as a whole.

"Lots of stakeholders are upset," he commented, "from retailers to 1st party platform providers to the game-rating agency to politicians and regulatory authorities. Rockstar and TTWO might now face a dilemma about the adult-content and risqué nature of GTA."

"Will the company soften GTA content?" he asks. "It seems unlikely to us that this will happen. Still, pressures will mount and scrutiny will intensify surrounding the next release of GTA, which is scheduled for October of 2006."

However, Wedbush Morgan Securities' Michael Pachter doesn't agree that the scandal will have a major impact on Grand Theft Auto going forward.

\* \* \*

Pachter believes that the whole affair does demonstrate that *Rockstar's management has been too "lax" in its handling of the incredibly valuable GTA franchise,* however.

\* \* \*

"We again, acknowledge that the decision to omit the content from the commercial version was a prudent one, *but question whether the company's management is too lax in its oversight,"* he concluded.

127.    On July 29, 2005, the Individual Defendants caused or allowed the Company to issue

a press release entitled "Take-Two Interactive Software, Inc. Announces that Australian Rating

Board Revokes Classification for Grand Theft Auto: San Andreas." The press release stated in

relevant part:

Take-Two Interactive Software, Inc. said today that Australia's Office of Film and Literature Classification (OFLC), the *Australian entity responsible for rating films and video games, has revoked the classification of Grand Theft Auto: San Andreas. As a result of this decision, the game is now unclassified in Australia, and cannot be sold, advertised or distributed in that country.*

The Company stated that the OFLC decision had been expected and *the financial impact will not alter the Company's recently announced guidance.*

In announcing its decision, the OFLC stated that, "the content unlocked by a third party 'hot coffee' modification contained material that could not be accommodated at the (prior) MA15+ classification."

## THE STOCK BUYBACK

128.  On September 7, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "Take-Two Interactive Software, Inc. Reports Third Quarter Fiscal

2005 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced financial results for its third quarter and nine months ended July 31, 2005.

Net sales in the third quarter increased 6% to $169.9 million, compared to $160.9 million in the third quarter of fiscal 2004. Net loss for the quarter was $28.8 million, compared to a net loss of $14.4 million last year, with a net loss of $(0.41) per share compared to a net loss per share of $(0.21) last year.

Net sales for the nine months ended July 31, 2005 increased 30% to $894.4 million, compared to $689.7 million for the same period a year ago. Net income for the first nine months increased to $18.3 million from net income of $2.7 million in the comparable period last year. Diluted earnings per share of $0.26 increased from $0.04 per diluted share in the prior year's first nine months.

Take-Two attributed its increased third quarter sales to the launch of Grand Theft Auto: San Andreas for Xbox and PC and Midnight Club 3: DUB Edition for the PSP™, along with the release of Charlie and the Chocolate Factory on multiple platforms and Sid Meier's Pirates! for Xbox.

*The Company initiated its stock repurchase program during the third quarter and completed the entire $25 million program shortly after the end of the quarter. Approximately 925,000 shares were purchased at an average price of $26.96 per share.*

Guidance

Take-Two is *updating its fiscal 2005 guidance* primarily to reflect the movement of Bully for PlayStation® 2 and Xbox out of the current fiscal year to provide additional development time for the title, the movement of the Japanese launch of Grand Theft Auto: San Andreas for PlayStation® 2 out of the current fiscal year, and the movement of Sid Meier's Civilization IV for PC from fiscal 2006 into fiscal 2005. The Company now expects $1.22 to $1.27 billion in net sales and $0.85 to $0.90 in diluted net income per share for the fiscal year ending October 31, 2005.

Take-Two is issuing initial guidance for fiscal 2006, excluding the estimated impact from adoption of FASB 123®:

- For the fiscal year ending October 31, 2006, $1.4 to $1.5 billion in net sales and $1.25 to $1.55 in diluted net income per share.

\* \* \*

Management Comments

Paul Eibeler, President and Chief Executive Officer, stated, "**_Take-Two is in an excellent competitive position as our industry enters its next cycle of growth_**. We have a high quality line-up that is the most diverse in our history—including the latest versions of established franchises, as well as newer titles that will become tomorrow's hits. Our Rockstar, 2K Games, 2K Sports and Global Star labels are building a product pipeline that will appeal to a broad range of consumers."

Mr. Eibeler continued, "We are particularly excited about the capabilities of the next generation hardware, which play to our strength—the ability to produce creative and engaging games that generate enthusiastic responses from gamers and reviewers alike. **_And, we have the financial and operational resources to capitalize on the opportunities presented by the current installed base and the millions of next generation console and handheld units that will be added in the coming months and years_**."

129.    Take-Two's stock price, however, had already begun to decline at the end of 3Q:05 and has since plummeted as low as $14.69. As a result, defendants' buyback has cost the Company over $876.5 million.

## FURTHER IMPROPER STATEMENTS

130.    Take-Two's financial results for 3Q:05, the period ended July 31, 2005, were repeated in the Company's quarterly report on Form 10-Q filed with the SEC on or about September 8, 2005. Take-Two's report also contained certifications submitted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, signed by defendants Eibeler and Winters on September 8, 2005, using language that was virtually identical to the certifications filed in the previous quarter.

131.    On January 5, 2006, the Individual Defendants caused or allowed the Company to issue a press release entitled "Take-Two Interactive Software, Inc. Announces Preliminary and Unaudited Fiscal 2005 Financial Results." The press release stated in relevant part:

Take-Two Interactive Software, Inc. today announced preliminary and unaudited financial results of $1.2 billion in net sales and diluted net income per share of $0.53 for its fiscal year ended October 31, 2005 and $308 million in net sales and $0.27 in diluted net income per share for its fiscal 2005 fourth quarter. These figures are considered preliminary due to the need for additional time to complete the Company's year-end results, including its assessments required for its first year of reporting under Section 404 of the Sarbanes-Oxley Act.

**_Take-Two expects to file its Form 10-K within the timeframe required by the Securities and Exchange Commission_**. The Company's diluted earnings per

share for the periods above do not include the impact of adopting FASB 123®, requiring the expensing of employee stock options beginning on November 1, 2005.

Guidance

*Take-Two is revising its fiscal 2006 first quarter guidance to reflect the continued retail weakness* for video game software during the holiday selling season in both North America and Europe, as well as the movement into the second quarter of Top Spin 2 for the Xbox 360™ video game and entertainment system from Microsoft, Nintendo DS™ and Game Boy® Advance and College Hoops 2K6 for the Xbox 360 to provide additional development time. The Company now expects $230 to $250 million in net sales and a net loss per share for the first quarter ending January 31, 2006.

Due to the continued uncertainties related to the retail environment and the timing and consumer acceptance of new video game hardware and software, as well as the timing of the Company's new product releases during 2006, *Take-Two is not providing financial guidance for the fiscal year ending October 31, 2006, but now expects net revenue and earnings per share for fiscal 2006 to be significantly below the financial guidance previously provided by the Company and current analyst consensus estimates.*

132.   Also on January 5, 2006, *Reuters* published an article entitled "Take-Two warns on

2006 Profit, Shares Tumble." The article stated in relevant part:

The results fell short of analysts' average forecast for a profit of 28 cents a share, but beat the consensus revenue target of $290.6 million, according to Reuters Estimates.

Citing continued weak holiday video game sales in both North America and Europe, as well as the delay into the second quarter of versions of its "Top Spin 2" and "College Hoops 2K6" games, Take-Two forecast $230 million to $250 million in net sales and a net loss for the first-quarter ending January 31.

On October 31, Take-Two had forecast first-quarter revenue of $300 million to $350 million and a profit of 4 cents to 10 cents per share.

\* \* \*

Take-Two declined to issue a forecast for fiscal 2006 due to continued uncertainty about retail appetite for new video game hardware and software, as well as the timing of its new product releases.

The company said it expected net revenue and earnings per share for its fiscal year ending October 2006 to be "significantly below the financial guidance previously provided by the company and current analyst consensus estimates."

Last summer, Take-Two was forced to pull "Grand Theft Auto: San Andreas" from store shelves following the discovery of sex scenes that could be unlocked and viewed with a program downloaded from the Web. The debacle was blamed for the company's third quarter net loss of $28.8 million, which was double the loss posted in the year-earlier period.

Shares of Take-Two fell to $16.95 in after-hours trading from their Nasdaq close of $18.47. *The stock is down 11 percent since the company issued a separate profit and revenue warning on October 31.*

133.   On January 6, 2006, the Individual Defendants caused or allowed the Company to file

a Form 8-K with the SEC, revealing that defendant G. Lewis had resigned from his position as

Global COO of the Company.

## MATERIAL ACCOUNTING WEAKNESSES

134.   On January 18, 2006, the Individual Defendants caused or allowed the Company to

file a Form 12b-25 with the SEC, indicating that the Company would be unable to timely file its

Form 10-K for FY:05 the Form 12b-25 stated in relevant part:

> Although the Registrant has dedicated significant resources to completing its Annual Report on Form 10-K for the fiscal year ended October 31, 2005 (the "Form 10-K"), it has not been able to complete the Form 10-K on a timely basis because management is currently finalizing its financial statements and other disclosures for inclusion in its Form 10-K and the required assessment of its internal control over financial reporting as of October 31, 2005, as required by Section 404 of the Sarbanes-Oxley Act of 2002 ("Section 404"). Although the Registrant has made substantial progress in completing its Form 10-K, there have been delays primarily attributable to the significant amount of work imposed by the new requirements under Section 404. The Registrant currently anticipates filing the Form 10-K on or before the end of the extended deadline.

> While management has not yet completed its assessment of the Registrant's internal control over financial reporting, the Registrant's management has concluded, as of the date of this filing that *the following material weaknesses existed as of October 31, 2005*. A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

> - *The Registrant did not maintain effective controls over the existence and valuation of its accounts payable related to inventory purchases*. Specifically, the Registrant did not maintain effective controls to identify, analyze and reconcile amounts related to inventory purchases included in accounts payable to underlying supporting documentation. *This control deficiency resulted in audit adjustments to the 2005 annual consolidated financial statements*. In addition, this control deficiency could result in a misstatement of the accounts payable, inventory or cost of goods accounts or related disclosures that would result in a material misstatement of the annual or interim financial statements that would not be prevented or detected. Accordingly, *management has determined that this control deficiency constitutes a material weakness*.

> - *The Registrant did not maintain effective controls over the accuracy of the amortization of its capitalized software development costs*. Specifically, the Registrant did not have effective controls to accurately prepare and review inputs to a spreadsheet application used to calculate amortization expense related to capitalized software development costs. *This control deficiency resulted in audit adjustments to the 2005 annual consolidated financial statements*. In addition, this control deficiency could result in a misstatement of the capitalized software development costs or amortization expense or related disclosures that

- 63 -

would result in a material misstatement of the annual or interim financial statements that would not be prevented or detected. Accordingly, *management has determined that this control deficiency constitutes a material weakness*.

135.    On January 25, 2006, the Individual Defendants caused or allowed the Company to file a Form 8-K with the SEC, stating that Kaczynski, a former Take-Two director, had resigned from her position as a member of the Board.  Included in the Company's Form 8-K was a letter written on behalf of Kaczynski, by her attorney, which included the following statements:

As you know, we have just been retained to represent Barbara Kaczynski.  I write in response to your email of Friday, January 20, 2006, to Ms. Kaczynski, regarding her resignation from the board of directors of Take-Two Interactive Software, Inc. ("Take-Two").

Your email seeks confirmation from Ms. Kaczynski that her resignation from Take-Two's board was not due to a disagreement with management of the type requiring disclosure under Item 5.02(a) of S.E.C. Form 8-K. Your email further asks Ms. Kaczynski to approve draft language describing the circumstances surrounding her resignation, which language the company intends to include in its upcoming Form 8-K disclosure.

Ms. Kaczynski does not know whether her resignation is of a type requiring disclosure under SEC rules and she does not feel able to express a view with respect to the language the Company intends to include in its Form 8-K disclosure about the resignation.

However, she is able to express to you directly the reasons why she resigned. *During Ms. Kaczynski's tenure as a board member and chair of the audit committee, several matters requiring the board's attention caused Ms. Kaczynski concern.  These matters included Take-Two's discovery of illicit images depicted in its "Grand Theft Auto" videogame, the Federal Trade Commission's investigation of Take-Two following that discovery, and various SEC inquiries directed at Take-Two and its employees.*

*More recently, in connection with preparation of the 10-K and its late filing, Ms. Kaczynski's concerns have risen significantly because of what she views as an increasingly unhealthy relationship between senior management and the board of directors.  In her experience, management's interactions with the board were characterized by a lack of cooperation and respect.  Moreover, Ms. Kaczynski felt that management failed to keep the board informed of important issues facing the company or failed to do so in a timely fashion.  In these circumstances, Ms. Kaczynski decided to resign her position as a member of the board.*

136.    Following Kaczynski's resignation from Take-Two's Board, on January 25, 2006, the Individual Defendants caused or allowed the Company to file a press release entitled "Take-Two Interactive Software, Inc. Announces Changes to its Board of Directors." The press release stated in relevant part:

Take-Two also is pleased to announce that Robert Flug, a director of the Company since 1998, has been named non-executive Chairman of the Board on an

interim basis. Mr. Flug has been the President and Chief Operating Officer of S.L. Danielle, a women's apparel company, since 1987.  The position of Chairman had been vacant.

\* \* \*

The size of the Take-Two board will remain at seven members, consisting of six independent directors as well as Take-Two's President and Chief Executive Officer, Paul Eibeler.

137.   On January 27, 2006, *Reuters* published an article entitled "Los Angeles Sues Over 'Grand Theft Auto' Game."  The article stated in relevant part:

The city of Los Angeles has sued Take-Two Interactive Software Inc. for selling pornographic video games to children with its best-selling game "Grand Theft Auto: San Andreas," which last year was found to have hidden sex scenes.

\* \* \*

*Los Angeles City Attorney Rockard Delgadillo, in the suit filed on Thursday, accused the game publisher of failing to disclose the pornographic content to get the game onto shelves of major retailers that do not carry games rated "Adults Only 18+."*

Delgadillo said the company further deceived consumers by first claiming that hackers had modified the original version of the games, then announcing a week later that the sex scenes were written into the original game code.

The lawsuit demands that Take-Two and Rockstar Games, the subsidiary behind "Grand Theft Auto," one of the best-selling in video game franchises history, stop marketing the games to children, pay fines and return $10 million in profits.

A Take-Two spokesman had no comment on Friday.

Last summer, the video game ratings board slapped a restrictive "adult" rating on "Grand Theft Auto: San Andreas" because of explicit sex scenes, known as "Hot Coffee," that allow players to engage in virtual sex acts.

The Entertainment Software Ratings Board launched an investigation and took the unusual step of changing the rating on the game to "Adults Only 18+" (AO) from "Mature 17+."

Take-Two had to pull the games off store shelves and repackage them with the new rating, which crimped game sales and disrupted company operations.

The lawsuit charged that Take-Two knowingly deceived the video game ratings board and flouted California law to market the game as suitable for teens, the lawsuit alleged.

The city also claims that Take-Two "marketed the 'Grand Theft Auto' series in a fashion that encourages the creation of (software modifications), which has added to the counter-culture image of the games, enhancing their popularity and hence their profitability."

The lawsuit asks that Take-Two be ordered to disgorge the profits from the estimated 200,000 copies of the game it sold for about $10 million in California, and that it disclose the sex scenes to customers who purchased "Grand Theft Auto: San Andreas" before the ratings change about the sex scenes.

It also demands a $2,500 fine for each untrue or misleading statement the company purportedly made about the games.

\* \* \*

Consumers in New York already have sued the company over the debacle and are seeking class action status. Take-Two also disclosed in July that the Federal Trade Commission was investigating advertising claims related to the controversial game.

138.    On January 27, 2006, *The Street.com* published an article entitled "Tough Times for Take-Two Interactive." The article stated in relevant part:

[Gary] Cooper [Banc of America analysts] cited a number of reasons for his downgrade, among them: *accounting and governance problems at the company, the potential for an investigation by the Securities and Exchange Commission and an accounting restatement*, the rapid rate at which the company is burning cash, and his expectation that the company's earnings will be lower than expected because of a delay in releasing the next major version of its Grand Theft Auto series.

"*TTWO is not well-run, overly dependent on one product and will likely have to raise additional capital*," said Cooper. Because of these factors, despite his downgrade, "*our new price target ... may still prove aggressive*," added Cooper, whose firm has done investment banking for Take-Two in the last year.

\* \* \*

"We are unable to determine who is actively at the helm of the company," Cooper said. "We believe the board of directors is weak as evidenced by a lack of managerial changes despite 13 pre-announcements, earnings estimate revisions or outright earnings [misses] in the past 10 quarters."

139.    By the end of January 2006, Take-Two was plagued by: (i) the likelihood of additional earnings restatements; (ii) SEC investigations; (iii) FTC investigations; (iv) a decrease in net income due to the delayed launch of GTA to the fall of 2007; and (v) several lawsuits regarding the Company's improper financial reports and GTA: San Andreas' "Hot Coffee" modification.

140.   On April 6, 2006, the Company announced that the Audit Committee had approved the dismissal of PWC as Take-Two's independent registered public accounting firm.  The Audit Committee further approved the appointment of Ernst & Young, LLP as the Company's new independent registered public accounting firm.

141.   On June 26, 2006, the Company announced that on June 19, 2006, the District Attorney of the County of New York had issued grand jury subpoenas requesting the production of documents relating to the "hot coffee" modification, the termination of PWC and compensation of former officers and directors.   The Company's value declined 15.7%   in reaction to this announcement.

## REASONS THE STATEMENTS WERE IMPROPER

142.   The statements referenced above were improper because they failed to disclose and/or misrepresented the following adverse facts, which were then known or should have been known by the Individual Defendants:

(a)   The Company's press releases and financial statements contained material weaknesses;

(b)   The Company misstated its accounts payable, inventory and cost of goods accounts;

(c)   The Company misstated capitalized software development costs and amortization expenses;

(d)   The Company had deficient internal controls and procedures and lacked any meaningful ability to accurately report its financial results;

(e)   The Individual Defendants knew or should have known that the imbedded programming in GTA: San Andreas was installed by the Company and that any and all advertising about the origination of the mod was required to be truthful and accurate under federal laws; and

(f)   Retail stores such as Best Buy, Target and Wal-Mart would refuse to sell GTA: San Andreas because of its AO rating, causing decreased profitability of the game.

143.   As a result of the Individual Defendants' actions, Take-Two's market capitalization has been damaged by over $1 billion, and the Company has incurred costs of over $876.5 million to

, purchase Take-Two stock at inflated values. At the same time that the defendants were causing Take-Two to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $31 million of their personally held stock.

## IMPROPER FINANCIAL REPORTING

144.    During the Relevant Period, the Individual Defendants knew or should have known that Take-Two's the improper accounting practices and recurring financial defects were a systematic problem that plagues the Company's financial statements. The Individual Defendants were put on notice several times during the relevant period that the Company had internal control problems and that the Company's accounting policies and procedures were resulting in numerous problems, thereby causing Take-Two to incur millions of dollars in costs and fees to fix their improper financial reporting.

145.    Beginning in 2000, the Individual Defendants were made aware that Take-Two's failed internal controls had resulted in improper revenue recognition. After the Company spent significant sums to hire outside counsel and conduct an internal investigation, the SEC launched a formal investigation into the Company's practices, which ultimately resorted in a restatement of over $20,000 in net income for Take-Two's FY:00 and the first three quarters of FY:01. At this point, the Individual Defendants, in their capacities as officers and directors of the Company, should have been aware that the Company's internal accounting structure and revenue recognition policies needed to be revised and that such issues required immediate attention.

146.    The Individual Defendants, however, failed to properly address the Company's internal financial weaknesses and the SEC was forced to take additional steps in order to regulate the Company's violations of regulatory law. On December 18, 2003, the Individual Defendants caused or allowed the Company to reveal that Take-Two and defendant Brant had both been served with Wells Notices from the SEC. The Wells Notices revealed that the SEC intended to bring a civil action against the Company and defendant Brant, seeking monetary sanctions for violations of the Securities Act of 1934. Again, the Individual Defendants appeared to ignore the SEC's inquiries and the pending civil suit by instead, focusing on the marketing of Take-Two's upcoming release of GTA: San Andreas.

- 68 -

147.   As a result of the SEC's Wells Notice, the Individual Defendants delayed the filing of the Company's for 10-K for FY:03 and announced that, yet again, the Company's financial results would have to be restated. Take-Two's restatement reflected a loss in net income for FY:02 and the first three quarters of FY:03. In addition, the Company was forced to revise its revenue recognition causing Take-Two to restate each of the Company's fiscal years ended October 31, 1999, 2000, 2001, 2002 and the first three quarters of FY:03, to reflect the changes.

148.   Following the Company's second restatement in less than 2 years, the Individual Defendants caused or allowed the Company to reduce its guidance in preparation for the payment of monetary sanctions to the SEC. The Individual Defendants conservative nature, however, did not last. For the Company's 2Q:04, financial guidance for FY:04 was reduced to net sales of $1.125 to $1.145 billion and net income of $1.60 to $1.65 per share. Immediately thereafter, the Company's financial report for 3Q:04, the Individual Defendants updated the Company's FY:04 guidance to net sales of $1.2 to $1.3 billion and net income of $2.00 to $2.20 per share. The large jump in net income of up to $0.55 per share was based solely on anticipated sales of GTA: San Andreas.

149.   In order to maintain the Company's overstated revenues, the Individual Defendants continued to vigorously market the release and sale of GTA: San Andreas. During this time, Take-Two paid out $7.5 million to the SEC in sanctions for improper accounting. Even after this stout payment and the inclusion of pornographic scenes in GTA: San Andreas, the Individual Defendants continued to update their financial guidance and went as far to say that the Company was "in an excellent competitive position as our industry enters its next cycle of growth." Finally, on January 18, 2006, the Individual Defendants were forced to reveal the truth about their internal financial controls and accounting practices when Take-Two filed a notice that it would be unable to timely file its Form 10-K for FY:05. In the Company's announcement, the Individual Defendants admitted that the Company had not maintained effective internal controls and that its financial deficiencies constituted material weaknesses. *For the third time in only four years, Take-Two is facing another restatement of its financials*.

150.   Clearly, the Individual Defendants were aware of the numerous Red Flags positioned within the Company's improper accounting policies and practices. Not only were the Individual

Defendants put on notice by the Company's numerous restatements, but also by costs associated with internal investigations, fees paid to outside counsel and $7.5 million in sanctions paid to the SEC for accounting errors.

151.    In order to overstate their revenues, the Individual Defendants caused Take-Two to violate GAAP and SEC rules by engaging in improper accounting. This accounting had the effect of dramatically overstating revenues and assets.

152.    During the Relevant Period, Take-Two's financial results and the statements released about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair representation of the Company's operations due to the Individual Defendant's improper accounting for its revenue in violation of GAAP and SEC rules.

153.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

154.    Statement of Financial Accounting Standards ("SFAS") No. 48 applies to revenue recognition for sales of a product when a right of return exists. SFAS No. 48 provides as follows:

> Revenue from those sales transactions shall be recognized at time of sale only if all of the conditions specified by the Statement are met. If those conditions are not met, revenue recognition is postponed; if they are met, sales revenue and cost of sales reported in the income statement shall be reduced to reflect estimated returns and expected costs or losses shall be accrued.

155.    The criteria for recognizing revenue under this standard, as set forth in SFAS No. 48, ¶6, are as follows:

(a)     The seller's price to the buyer is substantially fixed or determinable at the date of sale.

(b)     The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

(c)     The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

(d)     The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

(e)     The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

(f)     The amount of future returns can be reasonably estimated (paragraph 8).

156.    If all of the criteria are met, then the Company can recognize sales revenue under this statement. Additionally, upon the recognition of revenue under this standard, the Company must also provide for any estimated returns, expected costs or losses associated with these sales in accordance with SFAS No. 5. SFAS No. 48, ¶7. SFAS No. 5, ¶8, states:

> An estimated loss from a loss contingency ... shall be accrued by a charge to income if both of the following conditions are met:
>
> > a.     Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
> >
> > b.     The amount of loss can be reasonably estimated.

157.    The revenue reported in the income statement shall be reduced to reflect the estimated returns and allowances. SFAS No. 48, ¶7. For example, a company selling $100 million worth of a product during a period might only book $90 million as revenue, setting the other $10 million aside as a reserve to account for estimated returns, expected costs or losses associated with the sales.

158.    As discussed herein, Take-Two overstated its revenue both by recognizing sales revenue associated with certain sales transactions when all the conditions of SFAS No. 48 had not been met and by manipulating the amount of its reserves associated with its sales transactions.

159.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

,      (h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

160.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## SUBSTANTIVE ALLEGATIONS REGARDING DEFENDANTS' STOCK OPTION MANIPULATIONS

161.     Dating back to at least 1997, the Individual Defendants have caused or allowed Take-Two insiders to manipulate their stock option grant dates so as to illegally maximize their stock profits. Specifically, Company insiders, changed their respective stock option grant dates to take advantage of lower exercise prices than the price on the actual grant date. The price of Take-Two shares on the reported option-grant date, therefore, was lower than the share price on the actual day options were issued thus providing defendants with more favorably priced options. The Take-Two Board, in turn, approved the grants of the options to Take-Two's insiders even though those options were improperly backdated.

162.     Further, the backdating of options granted to corporate insiders brought an instant paper gain to these executives because the options were priced below the stock's fair market value when they were actually awarded. Under GAAP, this instant paper gain was equivalent to extra compensation and was thus a cost to Take-Two. Accordingly, since Take-Two failed to include the costs associated with this extra compensation in its financial results, its profits were overstated during the fiscal periods in which the options were granted. A restatement of Take-Two's past financial results will be necessary to correct for these improprieties.

163.     Specifically, since 1997, the Individual Defendants have caused or allowed Take-Two to report improper financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

- 73 -

| Fiscal Year | Reported Earnings (in thousands) | Reported Diluted EPS |
|---|---|---|
| 1997 | ($2,768) | ($0.25) |
| 1998 | $7,180 | $0.42 |
| 1999 | $15,871 | $0.76 |
| 2000 | $4,555 | $0.23 |
| 2001 | ($6,918) | ($0.13) |
| 2002 | $71,563 | $1.21 |
| 2003 | $98,118 | $1.51 |
| 2004 | $65,378 | $0.95 |
| 2005 | $37,475 | $0.53 |

## MANIPULATED STOCK OPTION GRANTS

164.    The following charts identify various instances between 1998 and 2003 in which options were dated at or very near the lowest share price for the months in which they were granted:















## THE TRUTH COMES TO LIGHT REGARDING DEFENDANTS' ILLEGAL BACKDATING PRACTICES

165.    On March 18, 2006, *The Wall Street Journal* published an article entitled "The Perfect Payday; Some CEOs reap millions by landing stock options when they are most valuable. Luck -- or something else?" The article stated in pertinent part:

> On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.
>
> His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.
>
> Just lucky? A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.
>
> Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.
>
> The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.
>
> The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.
>
> *  *  *
>
> Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.
>
> Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

166.     The Individual Defendants, as fiduciaries of the Company, knew or should have known that these illegal stock option backdating practices were ongoing since at least 1997. The Individual Defendants, however, failed to take action to correct these practices even in the face of public scrutiny of  stock option granting policies in the wake of the March 18, 2006 *Wall Street Journal* article and increasing public scrutiny.

167.     On July 10, 2006, the Company announced that it had received notice that the SEC was conducting an investigation into Take-Two's stock option grants from January 1997 to the present. The July 2006 press release also belatedly announced that the Company had initiated an internal investigation—on an unspecified date—into prior stock option grants.

### IMPROPER FINANICAL REPORTING RELATING TO DEFENDANTS' STOCK OPTION MANIPULATIONS

168.     Between 1997 and the present, the Individual Defendants caused or allowed Take-Two to file Form 10-Qs and Form 10-Ks that presented the Company's financial results in violation of GAAP, due to improper accounting for backdated or otherwise manipulated stock option grants. Specifically, Take-Two's compensation expenses were understated and its net earnings were overstated.

169.     The 1997 through 2006 Form 10-Qs and Form 10-Ks were reviewed, prepared and/or endorsed by the Individual Defendants. The following chart details the defendants and other individuals who signed and certified these filings under the Sarbanes-Oxley Act of 2002 ("SOX"):

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 06/16/97 | 10QSB | Ryan A. Brant (Chief Executive Officer) |
| 09/15/97 | 10-Q | Ryan A. Brant (Chief Executive Officer) |
| 02/06/98 | 10KSB | Ryan A. Brant (Chief Executive Officer and Director), Mark E. Seremet (President and Director), Thomas Ptak (Vice President), Barbara A. Ras (Controller), James W. Bartolomei, Jr. (Vice President), Oliver R. Grace, Jr. (Director), Neil S. Hirsch (Director), David P. Clark (Director), Kelly Sumner (Director) |
| 02/25/98 | 10QSB | Ryan A. Brant (Chief Executive Officer) |
| 06/15/98 | 10QSB | Ryan A. Brant (Chief Executive Officer) |
| 09/14/98 | 10QSB | Ryan A. Brant (Chief Executive Officer) |

| | | |
|---|---|---|
| 01/29/99 | 10-K | Ryan A. Brant (Chief Executive Officer and Director), Larry Muller (Chief Financial Officer), Anthony R. Williams (Chief Operating Officer), Barbara A. Ras (Chief Accounting Officer and Secretary), Oliver R. Grace, Jr. (Director), Neil S. Hirsch (Director), Kelly Sumner (Director), Robert Flug (Director), Robert Alexander (Director) |
| 02/26/99 | 10KSB/A | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 03/17/99 | 10-Q | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 06/14/99 | 10-Q | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 09/07/99 | 10-Q | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 01/27/00 | 10-K | Ryan A. Brant (Chief Executive Officer and Director), Barry Rutcofsky (President), Larry Muller (Chief Financial Officer), Anthony R. Williams (Co−Chairman and Director), Barbara A. Ras (Chief Accounting Officer and Secretary), Oliver R. Grace, Jr. (Director), Neil S. Hirsch (Director), Kelly Sumner (Director), Robert Flug (Director) |
| 03/16/00 | 10-Q | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 06/14/00 | 10-Q | Ryan A. Brant (Chief Executive Officer), Larry Muller (Chief Financial Officer) |
| 09/14/00 | 10-Q | Ryan A. Brant (Chief Executive Officer), Chip David (Chief Financial Officer) |
| 01/29/01 | 10-K | Ryan A. Brant (Chief Executive Officer and Director), James H. David, Jr. (Chief Financial Officer), Barry Rutcofsky (Co−Chairman and Director), Paul Eibeler (President and Director), Kelly Sumner (Director), Oliver R. Grace, Jr. (Director), Don Leeds (Director), Robert Flug (Director) |
| 03/19/01 | 10-Q | Ryan A. Brant (Chairman), James H. David Jr. (Chief Financial Officer) |
| 06/08/01 | 10-Q | Kelly Sumner (Chief Executive Officer), James H. David Jr. (Chief Financial Officer) |
| 09/14/01 | 10-Q | Kelly Sumner (Chief Executive Officer), James H. David Jr. (Chief Financial Officer) |
| 02/12/02 | 10-K | Kelly Sumner (Chief Executive Officer and Director), Ryan A. Brant (Chairman and Director), Paul Eibeler (President and Director), Patti Tay (Chief Accounting Officer), Mark Lewis (Director), Oliver R. Grace, Jr. (Director), Don Leeds (Director), Robert Flug (Director) |
| 03/18/02 | 10-Q | Kelly Sumner (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 06/14/02 | 10-Q | Kelly Sumner (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 09/16/02 | 10-Q | Kelly Sumner (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Kelly Sumner (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 12/23/02 | 10-K | Ryan A. Brant (Chairman of the Board), Kelly Sumner (Chief Executive Officer), Paul Eibeler (President and Director), Karl H. Winters (Chief Financial Officer), Robert Flug (Director), Steven Tisch (Director), Oliver R. Grace, Jr. (Director), Todd Emmel (Director), Mark Lewis (Director), Richard Roedel (Director), Jeffrey C. Lapin (Director) **SOX Certificate** Kelly Sumner (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |

| 03/14/03 | 10-Q | Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
|---|---|---|
| 06/06/03 | 10-Q | Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 09/12/03 | 10-Q | Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 02/12/04 | 10-K | Ryan A. Brant (Chairman of the Board), Jeffrey C. Lapin (Chief Executive Officer and Director), Karl H. Winters (Chief Financial Officer), Robert Flug (Director), Steven Tisch (Director), Oliver R. Grace, Jr. (Director), Todd Emmel (Director), Mark Lewis (Director), Richard Roedel (Director) **SOX Certificate** Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 03/16/04 | 10-Q | Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Jeffrey C. Lapin (Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 06/14/04 | 10-Q | Richard W. Roedel (Chairman and Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Richard W. Roedel (Chairman and Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 09/14/04 | 10-Q | Richard W. Roedel (Chairman and Chief Executive Officer), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Richard W. Roedel (Chairman and Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 12/22/04 | 10-K | Richard W. Roedel (Chief Executive Officer), Karl H. Winters (Chief Financial Officer), Robert Flug (Director), Steven Tisch (Director), Oliver R. Grace, Jr. (Director), Todd Emmel (Director), Mark Lewis (Director), Paul Eibeler (President and Director), Barbara A. Kaczynski (Director) **SOX Certificate** Richard W. Roedel (Chairman and Chief Executive Officer), Karl H. Winters (Chief Financial Officer) |
| 03/10/05 | 10-Q | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) |
| 06/09/05 | 10-Q | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) |
| 09/08/05 | 10-Q | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) |
| 01/31/06 | 10-K | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer), Robert Flug (Director), Steven Tisch (Director), Oliver R. Grace, Jr. (Director), Todd Emmel (Director), Mark Lewis (Director), Michael J. Malone (Director) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) |
| 03/13/06 | 10-Q | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) |

| | | Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief Financial Officer) **SOX Certificate** Paul Eibeler (Chief Executive Officer and President), Karl H. Winters (Chief |
|---|---|---|
| 06/09/06 | 10-Q | Financial Officer) |

170.    The SOX certifications signed in conjunction with the filing of Take-Two's Form 10-

Ks and 10-Qs contained language that was substantially similar or identical to the following

certification attached to Take-Two's FY:02 Form 10-K that was signed by defendants Sumner and

Winters:

I, [Kelly Sumner/ Karl H. Winters], [Chief Executive Officer/Chief Financial Officer], certify that:

1. I have reviewed this annual report on Form 10-K of Take-Two Interactive Software, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

## ILLEGAL INSIDER SELLING

171.    While in possession of the undisclosed material adverse information, the Insider

Selling Defendants sold the following shares of Take-Two stock that they had obtained, often by

cashing in backdated stock options:

| Defendant | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Ryan A. Brant | 12/1/2003 | 10,000 | $33.34 | $333,400.00 |
| | 11/07/2003 | 69,195 | $40.05 | $2,771,259.75 |
| | 11/03/2003 | 10,000 | $38.09 | $380,900.00 |
| | 10/08/2003 | 20,000 | $39.86 | $797,200.00 |
| | 10/08/2003 | 2,800 | $39.59 | $110,852.00 |
| | 09/16/2003 | 20,000 | $35.12 | $702,400.00 |
| | 09/04/2003 | 20,000 | $35.78 | $715,600.00 |
| | 09/03/2003 | 20,000 | $35.73 | $714,600.00 |
| | 08/01/2003 | 37,500 | $26.62 | $998,250.00 |
| | 6/30/2003 | 20,000 | $28.43 | $568,500.00 |
| | | **229,495** | | **$8,092,961.75** |
| Todd Emmel | 03/21/2005 | 1,645 | $41.00 | $222,425.00 |
| | 03/18/2005 | 5,425 | $41.00 | $67,445.00 |
| | 09/05/2003 | 15,150 | $36.28 | $549,642.00 |
| | | **22,220** | | **$839,512.00** |
| Robert Flug | 09/23/2005 | 6,324 | $22.24 | $140,645.76 |
| | 07/12/2005 | 6,000 | $27.73 | $166,380.00 |
| | 06/17/2005 | 12,324 | $28.20 | $347,499.83 |
| | 04/05/2005 | 10,000 | $39.25 | $392,463.00 |
| | 6/27/2003 | 10,000 | $29.33 | $293,300.00 |
| | 6/18/2003 | 10,000 | $30.18 | $301,765.00 |
| | | **54,648** | | **$1,642,053.59** |
| Oliver R. Grace, Jr. | 06/23/2005 | 5,797 | $27.91 | $5,199,210.00 |
| | 06/22/2005 | 4,303 | $27.91 | $2,264,465.00 |
| | 06/21/2005 | 24,900 | $27.88 | $694,212.00 |
| | 06/20/2005 | 80,500 | $28.13 | $120,096.73 |
| | 06/17/2005 | 184,500 | $28.18 | $161,794.27 |
| | 09/08/2003 | 9,456 | $37.41 | $1,456,400.00 |
| | 09/08/2003 | 22,426 | $37.45 | $364,100.00 |
| | 09/08/2003 | 18,118 | $37.40 | $353,748.96 |
| | 09/05/2003 | 40,000 | $36.41 | $839,853.70 |
| | 09/05/2003 | 10,000 | $36.41 | $677,613.20 |

| | | 400,000 | | $12,131,493.86 |
|---|---|---|---|---|
| Gary Lewis | 07/13/2005 | 20,000 | $27.75 | $606,900.00 |
| | 06/20/2005 | 10,000 | $28.19 | $160,960.00 |
| | 03/11/2005 | 4,000 | $40.24 | $281,920.00 |
| | 03/11/2005 | 15,000 | $40.46 | $555,000.00 |
| | | **49,000** | | **$1,604,780.00** |
| Steven Tisch | 06/16/2005 | 25,000 | $28.39 | $57,036.00 |
| | 06/15/2005 | 2,000 | $28.52 | $709,750.00 |
| | | **27,000** | | **$766,786.00** |
| Karl H. Winters | 09/26/2005 | 7,500 | $21.98 | $164,850.00 |
| | 06/14/2005 | 50,000 | $28.77 | $4,549,440.00 |
| | 03/11/2005 | 112,000 | $40.62 | $1,438,500.00 |
| | 10/12/2004 | 5,000 | $34.12 | $170,600.00 |
| | 09/05/2003 | 10,000 | $36.50 | $365,000.00 |
| | | **184,500** | | **$6,688,390.00** |
| **TOTAL** | | **966,863** | | **$31,765,977.20** |

## DERIVATIVE ALLEGATIONS REGARDING DEFENDANTS' IMPROPER FINANCIAL REPORTING

172.     Plaintiff brings this action derivatively in the right and for the benefit of Take-Two to redress injuries suffered, and to be suffered, by Take-Two as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Take-Two is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

173.     Plaintiff will adequately and fairly represent the interests of Take-Two in enforcing and prosecuting its rights.

174.     Plaintiff is and was an owner of the stock of Take-Two during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

175.     On March 28, 2006, plaintiff made a demand upon Take-Two's Board to commence legal action on behalf of Take-Two against those responsible for disabling the Company through accounting improprieties and for destroying its reputation and goodwill. Plaintiff also demanded that the Company commence legal action against each Take-Two Board member and senior officer

who served during the Relevant Period for their breaches of fiduciary duty in connection with their abuse of their controlling positions at and gross mismanagement of Take-Two.

176.    As grounds for the demand, plaintiff detailed how the Individual Defendants had breached their fiduciary duties of loyalty, due care, and good faith by causing and/or permitting Take-Two to engage in unlawful conduct, by failing to properly oversee the Company to prevent such misconduct, and for causing the Company to issue false statements. Specifically, plaintiff detailed the improper accounting procedures, restatements and improprieties in connection with the "Hot Coffee" modification as alleged more fully herein. Moreover, plaintiff's demand detailed how the Individual Defendants exposed the Company to staggering potential liability for the foregoing violations. A true and correct copy of plaintiff's demand is attached hereto as Exhibit A.

177.    Over ninety days have passed since plaintiff issued his demand to the Board. During this time, the Board has not made any response to plaintiff's demand. Accordingly, plaintiff alleges on information and belief that the Board refused plaintiff's demand without making a reasonable investigation.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS REGARDING DEFENDANTS' STOCK OPTION MANIPULATIONS

178.    The current Board of Take-Two consists of the following nine individuals: defendants Eibeler, Flug, Tisch, Grace, Emmel and M. Lewis and Michael J. Malone ("Malone"), Grover Brown ("Brown") and John F. Levy ("Levy"). Plaintiff has not made any demand on the present Board of Take-Two to institute this action in connection with defendants' stock option manipulations because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

179.    The Board is responsible for approving the compensation awarded to Take-Two's executive officers. This compensation includes the stock options that were secretly backdated by Take-Two insiders. Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Take-Two in approving the option grants as dated. The Board should have properly informed itself of the circumstances surrounding the options granted to Take-Two's insiders before approving them. Indeed, these options were routinely approved by the Board when they were dated at the Company's lowest closing price for the respective month in which the options were granted establishing that these decisions were not informed. Accordingly, there is reason to doubt that defendants Eibeler,

Flug, Tisch, Grace, Emmel and M. Lewis are disinterested because they face liability for their breaches of fiduciary duty to Take-Two. The Board's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants Eibeler, Flug, Tisch, Grace, Emmel and M. Lewis.

180.    The Compensation Committee of the Board is specifically responsible for granting stock options or other equity awards to Take-Two insiders. This responsibility, although held by the Board, is delegated to the Compensation Committee. The Compensation Committee is comprised of defendants Flug, Grace, M. Lewis and Tisch. Defendants Flug, Grace, M. Lewis and Tisch have been members of the Compensation Committee for over eight, nine, five and four years, respectively. These defendants were responsible as members of the Compensation Committee to review and grant stock options granted to Take-Two insiders during their respective tenures on the committee. Clearly, these defendants did not fulfill this duty because they did not act to inform themselves of the circumstances surrounding these option grants, thereby, causing or allowing the Company's insiders to obtain unreasonable and unreported compensation via the backdating of stock option grants. Accordingly, there is a reasonable doubt that defendants Flug, Grace, M. Lewis and Tisch are disinterested because they face liability for their breaches of fiduciary duty to Take-Two. The Compensation Committee's decision to approve the options was not the product of valid business judgment. Thus, demand is futile as to defendants Flug, Grace, M. Lewis and Tisch.

181.    The Audit Committee of the Board is responsible by its charter for: (i) reviewing and discussing with management and the independent auditor the Company's annual and quarterly financial statements, prior to the public release of such information; (ii) reviewing reports prepared by management or by the independent auditor relating to significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; (iii) discussing earnings press releases with management, as well as financial information and earnings guidance provided to analysts; and (iv) discussing with the CEO and the CFO the processes involved in and any material required as a result of the Form 10-K and 10-Q certification process concerning deficiencies in design or operation of internal controls or any fraud involving management or employees with a significant role in the Company's internal controls. The Audit Committee at times

- 86 -

relevant hereto was comprised of defendants Emmel, Flug and Grace. Defendants Emmel, Flug and Grace have been members of the Audit Committee for over four, eight and nine years, respectively. These defendants were responsible as members of the Audit Committee for insuring that Take-Two's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. Take-Two's internal controls, however, were deficient as evidenced by its insiders' improper backdating of stock option grants. As a result of the improper option backdating, the Company's financials were rendered inaccurate because those financial did not account for the true amount of compensation being granted to Take-Two's insiders. Accordingly, there is a reasonable doubt that defendants Emmel, Flug and Grace are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Take-Two. Thus, demand is futile as to defendants Emmel, Flug and Grace.

182.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting. While in possession of this material adverse non-public information regarding the Company, the following current members of the Take-Two Board participated in the illegal insider selling:

(i)     During the Relevant Period, Grace sold 400,000 shares of Take-Two stock for proceeds of $12,131,493.86;

(ii)     During the Relevant Period, Flug sold 54,648 shares of Take-Two stock for proceeds of $1,642,053;

(iii)     During the Relevant Period, Tisch sold 27,000 shares of Take-Two stock for proceeds of $766,786; and

(iv)     During the Relevant Period, Emmel sold 22,220 shares of Take-Two stock for proceeds of $839,512. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested. Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

183.    The principal professional occupation of defendant Eibeler is his employment with Take-Two, pursuant to which he received and continues to receive substantial monetary compensation and other benefits. Specifically, for FY:05, Eibeler's employment agreement provides that he will receive $750,000 in compensation and is eligible to receive a performance-based bonus equal to 100% of his salary. For FY:04 and FY:03, Take-Two paid defendant Eibeler $630,000 and $946,153, respectively, in salary, bonus and other compensation, and granted him 450,000 and 75,000 options to purchase Take-Two stock, respectively. Accordingly, defendant Eibeler lacks independence from defendants Flug, Grace, M. Lewis and Tisch, defendants who are not disinterested and/or independent and who exert influence over defendant Eibeler's compensation by virtue of their positions as Chairman of the Board and the entire Compensation Committee. This lack of independence renders defendant Eibeler incapable of impartially considering a demand to commence and vigorously prosecute this action.

184.    In clear recognition of defendants' breaches of fiduciary duties, director Kaczynski expressed concerns regarding a lack of cooperation between the Board and management. Unfortunately, Kaczynski was unable to cure these issues and was forced to resign. Kaczynski's disclosure regarding the ineffectiveness of the Board demonstrated that the Board would not have been able to consider a demand.

185.    The futility of demand is also demonstrated by the Board's refusal to consider plaintiff's demand in connection with defendants' improper financial reporting. In effect, the Board has already demonstrated that it would be unwilling to consider any further demands.

186.    The entire Take-Two Board and senior management participated in the wrongs complained of herein. Take-Two's directors are not disinterested or independent due to the following: defendants Eibeler, Flug, Tisch, Grace, Emmel and M. Lewis served on the Take-Two Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Take-Two and its shareholders in that they failed to prevent and correct the improper financials. Thus, the Take-Two Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to

vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Take-Two to millions of dollars in liability for violations of applicable securities laws.

187.    The defendant directors of Take-Two, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Take-Two's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

188.    In order to bring this suit, all of the directors of Take-Two would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

189.    The acts complained of constitute violations of the fiduciary duties owed by Take-Two's officers and directors and these acts are incapable of ratification.

190.    Each of the defendant directors of Take-Two authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

191.    Any suit by the current directors of Take-Two to remedy these wrongs would likely expose the Individual Defendants and Take-Two to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

192.    Take-Two has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Take-Two any part of the damages Take-Two suffered and will suffer thereby.

- 89 -

193.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

194.    If Take-Two's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Take-Two. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Take-Two against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Take-Two, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Take-Two to sue them, since they will face a large uninsured liability.

195.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Take-Two for any of the wrongdoing alleged by plaintiff herein.

196.    Plaintiff has not made any demand on shareholders of Take-Two to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Take-Two is a publicly held company with over 72.5 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants Eibeler, Lapin, Sumner, Roedel and Winters for Disgorgement Under the Sarbanes-Oxley Act of 2002

197.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.    Take-Two has restated its financial results for FY:03 and has announced intent to restate its financials for FY:04 based on an investigation that relates to transactions and other matters which occurred during the Company's fiscal year 2004.  Take-Two recorded adjustments totaling $31 million in its financial statement FY:03.  Pursuant to the Sarbanes-Oxley Act of 2002, §304, defendants Eibeler, Lapin, Roedel, Sumner and Winters as Take-Two's CEOs and CFO, for their respective employment periods, are required to reimburse Take-Two for all bonuses or other incentive-based or equity-based compensation received by them from Take-Two during the period restated.  Furthermore, these restated financials as well as other financials will have to be further restated to correct for the Company's overstated earnings and understated compensation expenses in connection with the illegally manipulated stock option grants.

199.    Defendants Eibeler, Lapin, Roedel, Sumner and Winters are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Take-Two.

## COUNT II

### Derivatively Against All Defendants for Violation of §10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    During the Relevant Period, the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that

. they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

202.    The Insider Selling Defendants also sold over 966,000 shares of Take-Two's common stock at inflated prices during the Relevant Period, receiving over $31 million in proceeds, while in possession of material non-public information. These defendants misappropriated Take-Two's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Take-Two stock without disclosing the information alleged to have been concealed herein.

203.    At the same time the price of the Company's common stock was inflated by the Individual Defendants' misstatements and the Insider Selling Defendants were selling stock into the market, the Individual Defendants were causing Take-Two repurchase $876.5 million dollars worth of its own stock on the open market at inflated prices.

204.    As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Take-Two and others in connection with their purchases of Take-Two common stock during the Relevant Period.

205.    As a result of the Individual Defendants' misconduct, Take-Two has and will suffer damages in that it paid artificially inflated prices for Take-Two common stock purchased on the open market. Take-Two would not have purchased Take-Two common stock at the prices it paid, had the market been aware that the market price of Take-Two's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Take-Two suffered damages in connection with its purchases of Take-Two

. common stock during the Relevant Period. By reason of such conduct, the Individual Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT III

### Against Defendants Brant, Sumner, Flug, Tisch, Emmel and M. Lewis for Violation of Section 14(a) of the Exchange Act

206.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.     The Individual Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's proxy statements issued on April 3, 1998, April 8, 1999, October 30, 2000, June 6, 2001 and May 10, 2002. The April 3, 1998 – June 6, 2001 proxy statements each contained proposals to increase the number of shares reserved for issuance under Take-Two's 1997 Stock Option plan from 400,000 to 6,500,000 shares. The May 10, 2002 proxy contained a proposal to adopt the Company's 2002 Stock Option Plan. Each of these proxy statements, however, falsely represented and failed to disclose that the Company's executives were engaged in the improper backdating or manipulation of stock options and that the Board was approving those options as dated. By reasons of the conduct alleged herein, defendants Brant, Sumner, Flug, Tisch, Emmel and M. Lewis, who were directors that caused or allowed the issuance of these proxy statements, violated §14(a) of the Exchange Act. As a direct and proximate result of defendants Brant, Sumner, Flug, Tisch, Emmel and M. Lewis wrongful conduct, Take-Two misled and/or deceived its shareholders by falsely portraying how the 1997 Stock Option Plan and 2002 Stock Option Plan would be administrated.

208.     This information would have been material to Take-Two's shareholders in determining whether or not to approve the 2002 Stock Option Plan and the amendments to the 1997 Stock Option Plan.

209.     Plaintiff, on behalf of Take-Two, thereby seeks relief for damages inflicted upon the Company in connection with the improper approval the 2002 Stock Option Plan and the amendments to the 1997 Stock Option Plan based upon the misleading and incomplete proxy

materials. Plaintiff, on behalf of Take-Two, also seeks a disgorgement of the compensation paid to the Individual Defendants in connection with these plans.

## COUNT IV

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

210. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211. At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Take-Two common stock on the basis of such information.

212. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Take-Two common stock.

213. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Take-Two common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

214. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty

215. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

216. The Individual Defendants owed and owe Take-Two fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Take-Two the highest obligation of good faith, fair dealing, loyalty and due care.

217. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

218.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

219.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Take-Two has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

220.    Plaintiff on behalf of Take-Two has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Breach of Fiduciary Duty for Approving Improperly Dated Stock Option Grants to Take-Two's Executive Officers

221.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

222.    The Individual Defendants owed and owe Take-Two fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Take-Two the highest obligation of good faith, fair dealing, loyalty and due care.

223.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

224.    Each of the Individual Defendants had actual or constructive knowledge that they had approved the improper backdating of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Take-Two has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.    Plaintiff on behalf of Take-Two has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

227.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Take-Two.  These wrongful acts included the approval of improperly backdated stock options by the Director Defendants as well as the receipt of underserved compensation in connection with those options by the Officer Defendants

229.    Plaintiff, as a shareholder and representative of Take-Two, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VIII

### Against All Defendants for Abuse of Control

230.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

231.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Take-Two, for which they are legally responsible.

232.    As a direct and proximate result of the Individual Defendants' abuse of control, Take-Two has sustained significant damages.

233.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234.    Plaintiff on behalf of Take-Two has no adequate remedy at law.

## COUNT IX

### Against All Defendants for Gross Mismanagement

235.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

236.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Take-Two in a manner consistent with the operations of a publicly held corporation.

237.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Take-Two has sustained significant damages in excess of hundreds of millions of dollars.

238.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

239.    Plaintiff on behalf of Take-Two has no adequate remedy at law.

## COUNT X

### Against All Defendants for Waste of Corporate Assets

240.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

241.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Take-Two to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

242.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

243.    Plaintiff on behalf of Take-Two has no adequate remedy at law.

- 97 -

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment and violations of the Securities and Exchange Act of 1934;

B.      Declaring that defendants Eibeler, Lapin, Roedel, Sumner and Winters are liable under §302 of the Sarbanes-Oxley Act of 2002, and requiring them to reimburse Take-Two for all bonuses or other incentive based or equity based compensation received by them during Take-Two's FY:03;

C.      Declaring and decreeing that all defendants are liable to the Company for violating §10(b) of the Securities Exchange Act of 1934;

D.      Declaring and decreeing that defendants Brant, Sumner, Flug, Tisch, Emmel and M. Lewis caused the Company to act in violation of §14(a) of the Securities Exchange Act of 1934;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Take-Two has an effective remedy;

F.      Awarding to Take-Two restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

G.      Directing Take-Two to take all necessary actions to reform and improve their corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

                (ii)     a provision to permit the shareholders of Take-Two to nominate at least three candidates for election to the Board;

                (iii)    a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

                (iv)    appropriately test and then strengthen the internal audit and control functions;

                (v)     control and limit insider stock selling; and

                (vi)    reform executive compensation.

H.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  July 12, 2006

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON (TGA-1515)

500 Fifth Avenue, Suite 1650
New York, N.Y. 10110
Telephone: 212/810-2431
Facsimile: 212/810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
JEFFREY P. FINK
KELLY M. MCINTYRE
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\Cases\Take Two\Complaints\Derivative\NY der cptFINAL.doc

**EXHIBIT A**

# ROBBINS UMEDA & FINK, LLP

### ATTORNEYS AT LAW

BRIAN J. ROBBINS
MARC M. UMEDA
JEFFREY P. FINK

OF COUNSEL
BENJAMIN ROZWOOD

610 WEST ASH STREET, SUITE 1800
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 525-3990
FACSIMILE (619) 525-3991

CAROLINE A. SCHNURER
KELLY M. McINTYRE
LOUIS A. KERKHOFF
STEVEN R. WEDEKING
GEOFFREY H. MATRANGA
SHANE P. SANDERS
D. SCOTT CARLTON
STEVEN J. SIMERLEIN

March 28, 2006

## VIA CERTIFIED MAIL

Robert Flug
c/o Board of Directors
Take-Two Interactive Software, Inc.
622 Broadway
New York, New York 10012

#### Re:    *Take-Two Interactive Software, Inc. Shareholder Demand*

Dear Take-Two Interactive Software, Inc. Board of Directors:

We represent Mr. Richard Lasky, a shareholder of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"). Mr. Lasky is very concerned about the damage done to Take-Two as a result of gross mismanagement of the Company by Take-Two's Board of Directors (the "Board") and senior officers ("Officers") that occurred between January 2000 and the present (the "Relevant Period"). This gross mismanagement resulted in the dissemination of false statements concerning the Company's financials, business prospects and the content of the latest installment of the Company's most valuable video game series, Grand Theft Auto: San Andreas ("GTA: San Andreas"). Mr. Lasky now demands that the Board take steps to address and remedy the harm inflicted on Take-Two by its participation in numerous recent corporate scandals described below including: (i) the Company's previous restatements of its financials; (ii) misrepresentation of the Company's financial net income and net sales; (iii) the inclusion of the "Hot Coffee" modification in Take-Two's hit game GTA: San Andreas; and (iv) constant corporate turnover that has resulted in five separate Chief Executive Officers ("CEOs") operating the business of Take-Two in a five year period and the appointment of three Chairpersons of the Board in the last three years.

The false statements resulted in unwarranted market optimism which, in turn, caused Take-Two's stock to trade at prices much higher than its true value until the truth regarding Take-Two's financials, business, prospects and GTA: San Andreas was revealed on July 20, 2005. On that day, the public learned that GTA: San Andreas was being pulled from the shelves of retail outlets such as Best Buy, Target and Wal-Mart, because hidden pornographic scenes in the game directly caused the Entertainment Software Rating Board ("ESRB") to change the rating of GTA: San Andreas from "Mature 17+" to "Adults Only 18+." Following this revelation, the Securities and Exchange Commission ("SEC") and the Federal Trade Commission ("FTC") launched investigations into Take-

Two's internal controls and activities. This investigation, however, is not the first instance wherein the Company has been placed under investigation by the SEC. Prior to 2005, Take-Two has been forced to restate its financial results for FY:99, FY:00, FY:01, FY:02, and the first three quarters of FY:03. Recently, Take-Two announced that material weaknesses in the Company's internal financial controls policies and practices still plague the Company causing Take-Two to report material weaknesses in its internal controls.

There can be no doubt that Take-Two's Board has been delinquent in its management and oversight of the Company by condoning accounting improprieties, misrepresentation of Take-Two's financials, business, prospects and the inclusion of sexually graphic material in GTA: San Andreas and causing Take-Two to communicate false and misleading information to the public. Mr. Lasky now demands that the Board take steps to address and remedy the harm inflicted on Take-Two as a result of the Board's misconduct.

On March 16, 2000, the Board and Officers caused or allowed the Company to issue a press release stating an increase in net sales and net income for the first quarter of 2000. Thereafter, Take-Two continued to claim that the Company's net sales and net income were consistently increasing throughout FY:00 and FY:01.

On January 30, 2002, the Board and Officers caused or allowed the Company to issue a press release announcing that Take-Two would be unable to timely file its Form 10-K for FY:01. Take-Two stated that "the registrant intends to restate its financial statements for the fiscal year ended October 31, 2000 and the quarters ended January 31, April 30 and July 31, 2001. The restatement of Fiscal 2000 financial statements is expected to result in a decrease in net sales and net income from previously reported amounts."

On February 12, 2002, the Board and Officers caused or allowed the Company to issue a press release stating that the Company had "engaged counsel to conduct an investigation into [the] accounting treatment of certain transactions in fiscal 2000 and 2001," and that Take-Two "restated [its] previously issued consolidated financial statements for fiscal 2000 to eliminate $15,367,000 of net sales made to certain independent third-party distributors and related cost of sales of $8,702,000, which were improperly recognized as revenue and later returned or repurchased by [Take-Two]." Take-Two also disclosed that the SEC had issued a formal order of investigation into the Company's accounting practices and internal controls.

Following the Company's initial restatement, the Board and Officers caused or allowed Take-Two to continue to issue earnings releases announcing that net sales and net income were increasing over each quarter of FY:02. On January 23, 2003, Take-Two's Chief Financial Officer Karl Winters ("Winters") announced that the Company's Board had authorized a stock buyback program for up to $25 million of the Company's common stock. Winters stated "[a]t current market levels, we believe our stock represents an attractive investment opportunity. The plan to repurchase Take-Two stock reflects our ongoing commitment to enhance shareholder value."

On February 27, 2003, the Board and Officers caused or allowed the Company to report increased net sales and net income and increased its guidance for FY:03. Winters stated the Company had "record levels of cash, no debt, and earnings per share projected to grow 25% in fiscal 2003, our financial position is solid."

On May 29, 2003, and again on September 3, 2003, the Board and Officers caused or allowed Take-Two to announce record financial results and raise the Company's financial guidance for FY:03.

On December 18, 2003, the Board and Officers caused or allowed the Company to report record financial results for the fourth quarter of 2003. Take-Two also announced that "[t]he Company has received a Wells Notice from the staff of the SEC stating the staff's intention to recommend that the SEC bring a civil action seeking an injunction and monetary damages against the Company alleging that the Company violated certain provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. The proposed allegations stem from the Company's previously disclosed SEC investigation into, among other things, certain accounting matters related to the Company's financial statements, periodic reporting and internal accounting control provisions. The Company's Chairman, an employee and two former officers of the Company also received Wells Notices."

On January 30, 2004, the Board and Officers caused or allowed the Company to report that it would be unable to timely file its Form 10-K for FY:03 due to issues disclosed by the SEC during its investigation into Take-Two's financial statements. Further, the Company announced that it would be forced to revise Take-Two's revenue recognition policies resulting in yet another restatement of the Company's previously issued financial results. In a follow-up article issued on February 2, 2004, the Company announced that the restatement would include "the Company's financial results for each of the fiscal years ended October 31, 1999, 2000, 2001, the four quarters of fiscal 2002 and the first three quarters of fiscal 2003."

On April 14, 2004, the Board and Officers caused or allowed Take-Two announced that it was reducing its financial guidance for FY:04 to $1.17 billion in net sales and $2.00 in net income per share, compared to prior guidance of $1.22 billion in net sales and $2.45 in net income per share. Richard W. Roedel ("Roedel") stated "[c]learly, we are disappointed with our current performance. However, we believe the senior management additions we announced today are a significant step forward in strengthening our operational focus, which should lead to improved financial results going forward."

On June 8, 2004, the Board and Officers caused or allowed Take-Two to report reduced revenues of $153.4 million, compared to the previous $193 million for the second quarter of 2003 and reduced the Company's financial guidance for FY:04 to a range of $1.125 to $1.145 billion in net sales and a range of $1.60 to $1.65 in net income per share.

On September 9, 2004, the Board and Officers caused or allowed the Company to report its financial results for the third quarter of 2004 and increased financial guidance for FY:05 to a range of $1.2 to $1.3 billion in net sales and a range of $2.00 to $2.20 in net income per share.

On October 25, 2004, the Board and Officers caused or allowed the Company to announce that GTA: San Andreas had been "shipped to retail stores in North America." Take-Two also stated "Grand Theft Auto: San Andreas is the next installment in the gaming franchise that has sold over 32 million units to date, including over 13 million units of Grand Theft Auto: Vice City and over 11 million units of Grand Theft Auto 3."

On December 16, 2004, the Board and Officers caused or allowed Take-Two to announce that the Company had agreed to pay out $7.5 million to the SEC in response to investigations into accounting matters related to the Company's financial statements, periodic reporting and internal accounting controls. The fee, paid in June 2005, was part of settlement agreement for charges brought by the SEC that the Company had engaged in fraudulent accounting practices, which resulted in inflated revenues and increased bonuses for the Officers of Take-Two.

In addition, on that same day, the Board and Officers caused or allowed the Company to report net sales for FY:04 as $1.13 billion and $1.43 in net income per share. Take-Two also increased its financial guidance for FY:05 to a range of $1.2 to $1.25 billion in net sales and a range of $2.00 to $2.20 in net income per share. Roedel stated "[f]iscal 2004 was a rebuilding year for us, as we made key management additions and improved certain areas of our distribution and publishing businesses. We achieved a number of important accomplishments in 2004 which make Take-Two a much stronger company going into 2005. Grand Theft Auto: San Andreas was the largest video game launch in Take-Two's history, further strengthening both our Rockstar label and the Company's financial position." Paul Eibeler ("Eibeler") stated "[w]e are entering fiscal 2005 in a strong, competitive position. With the tremendous success of Grand Theft Auto: San Andreas, Rockstar Games has magnified the power of the Grand Theft Auto brand, and they will continue to build on the franchise with the launch of Xbox and PC versions of Grand Theft Auto: San Andreas in June."

On February 1, 2005, the Board and Officers caused or allowed the Company to announce that Eibeler had been appointed CEO of the Company. This was the fifth time Take-Two had seen a new CEO appointed to head the Company. No explanation was provided for the sudden change in control.

On March 3, 2005, the Board and Officers caused or allowed the Company to report a sharp increase in net sales, which Take-Two attributed solely to consumer demand for GTA: San Andreas. In addition, the Company increased its financial guidance for FY:05 to a range of $1.3 to $1.35 billion in net sales and a range of $2.10 to $2.20 in net income per share. Eibeler stated "[w]e are extremely pleased with the continued success of Grand Theft Auto: San Andreas and Rockstar's

plans to extend the reach of this blockbuster title to multiple platforms and the Asian market later this year." Eibeler also stated "Take-Two is positioned for significant annual growth."

On June 2, 2005, the Board and Officers caused or allowed the Company to reiterate its financial guidance for FY:05.

On July 8, 2005, the public, as well as Take-Two's shareholders learned that the ESRB had launched an investigation into illicit sex minigames hidden in the programming code of GTA: San Andreas. Patricia Vance, president of ESRB stated that her organization had "opened an investigation into the circumstances surrounding the 'Hot Coffee' modification." "Hot Coffee" refers to the modification that, when installed on a PC or PlayStation2 with San Andreas on it, unlocks minigames that prompt players to have the game's hero engage in X-rated acts. The ESRB's investigation was set to examine whether the modification unlocks preexisting code, or is actually a purely third-party creation. "Its ultimate purpose will be to determine if Take-Two violated ESRB regulations requiring 'full disclosure of pertinent content.'" Take-Two failed to comment on the investigation, although a spokesperson for Rockstar Games, a subsidiary of Take-Two and the developer of Grand Theft Auto, confirmed the ESRB investigation and stated "[w]e also feel confident that the investigation will uphold the original rating of the game, as the work of the mod[ification] community is beyond the scope of either publishers or the ESRB."

On July 20, 2005, the Board and Officers caused or allowed Take-Two to issue a press release announcing that the ESRB had concluded its investigation into GTA: San Andreas' sex minigame and, that as a result, the ESRB changed the rating of the game from "Mature 17+" to "Adults Only 18+." Eibeler stated "[t]he ESRB's decision to re-rate a game based on an unauthorized third party modification presents a new challenge for parents, the interactive entertainment industry and anyone who distributes or consumes digital content. Rockstar Games is pleased that the investigation is now settled and they look forward to returning their focus to making innovative and groundbreaking video games for a mature audience." As a result of the announcement, Take-Two lowered its guidance for FY:05 to a range of $1.26 to $1.31 in net sales and a range of $1.05 to $1.12 in net income per share.

Following this announcement retail stores such as Best Buy, Target and Wal-Mart pulled GTA: San Andreas from their shelves in support of their policy to refrain from selling video games with a rating of "Adults Only 18+."

On July 26, 2005, the Board and Officers caused or allowed Take-Two to reveal that the FTC had notified the Company that its Division of Advertising Practices would be conducting an inquiry into advertising claims made by Take-Two concerning GTA: San Andreas. No comments were released to the media by Take-Two.

Case 1:06-cv-05279-LTS Document 1 Filed 07/12/06 Page 107 of 110

In addition, on July 29, 2005, the Board and Officers caused or allowed Take-Two to state that Australia's Office of Film and Literature Classification had revoked its classification of GTA: San Andreas, resulting in a complete halt on all sales of the game in Australia.

On September 7, 2005, following the Company's financial devastation, a drop in stock value and reduced financial guidance, the Board and Officers caused or allowed Take-Two to announce that the Company had initiated its stock buyback program, completing the purchase of the entire $25 million allotment provided in a single quarter. The Company purchased approximately 925,000 shares at an average price of $26.96 per share. This, in turn, cost the Company over $876.5 million as Take-Two's stock price plummeted to a low of $14.69. Eibeler commented "Take-Two is in an excellent competitive position as our industry enters its next cycle of growth."

On January 18, 2006, the Board and Officers caused or allowed the Company to announce that it would be unable to timely file its Form 10-K for FY:05 with the SEC. Take-Two revealed that the Company had several material weaknesses that could result in a material misstatement of financial statements. The material weaknesses include: (i) Take-Two did not maintain effective controls over the existence and valuation of its accounts payable related to inventory purchases; and (ii) that Take-Two did not maintain effective controls over the accuracy of the amortization of its capitalized software development costs.

Then, on January 25, 2006, the Individual Defendants caused or allowed the Company to file a Form 8-K with the SEC, stating that defendant Kaczynski had resigned from her position as a member of the Board. Included in the Company's Form 8-K was a letter written on behalf of defendant Kaczynski, by her attorney, which included the following statements:

As you know, we have just been retained to represent Barbara Kaczynski. I write in response to your email of Friday, January 20, 2006, to Ms. Kaczynski, regarding her resignation from the board of directors of Take-Two Interactive Software, Inc. ("Take-Two").

\* \* \*

However, she is able to express to you directly the reasons why she resigned. During Ms. Kaczynski's tenure as a board member and chair of the audit committee, several matters requiring the board's attention caused Ms. Kaczynski concern. These matters included Take Two's discovery of illicit images depicted in its "Grand Theft Auto" videogame, the Federal Trade Commission's investigation of Take-Two following that discovery, and various SEC inquiries directed at Take-Two and its employees.

More recently, in connection with preparation of the 10-K and its late filing, Ms. Kaczynski's concerns have risen significantly because of what she views as an

increasingly unhealthy relationship between senior management and the board of directors. In her experience, management's interactions with the board were characterized by a lack of cooperation and respect. Moreover, Ms. Kaczynski felt that management failed to keep the board informed of important issues facing the company or failed to do so in a timely fashion. In these circumstances, Ms. Kaczynski decided to resign her position as a member of the board.

These true facts, which were known or should have been known by the Board and Officers, were concealed from the investing public and the Company's shareholders during the Relevant Period. Specifically, the Board and Officers knew or should have known that: (i) Take-Two was materially overstating its financial results by engaging in improper accounting practices, yet the Board failed to disclose the true financial condition of the Company's financials; (ii) the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition, yet the Board failed to disclose this information; (iii) the values of the Company's revenues and net income were materially overstated at all relevant times, yet this information was withheld from investors and; (iv) as a result of the foregoing, there was no reasonable basis for the Company's revenue and earnings guidance.

As a result of the misconduct described herein, Take-Two has been named in large and costly class action securities fraud lawsuits. These actions have collectively exposed the Company to millions of dollars in potential liability. In addition, Take-Two has been named in consumer fraud actions and is the subject of a claim filed by the City of Los Angeles. Take-Two's demise is directly traceable at least to the Company's Board and Officers, who failed to fulfill their fiduciary duties to properly oversee and govern the Company's operations. As a proximate cause of the Boards' and Officers' misconduct, greed and avarice, Take-Two's once valuable enterprise and reputation has been irreparably tarnished by the refusal of Take-Two's Board and Officers to keep the Company in compliance with applicable state and federal laws and to abstain from looting the Company. Our analysis indicates that Take-Two has suffered millions of dollars worth of damage and that the self-dealing behavior engaged in by Take-Two's Board and Officers in response to this crisis have only compounded these problems. The Board's unwillingness to remedy the source of these problems, in fact, threatens to destroy this once valuable franchise.

It is time for Take-Two to be made whole and liberate itself from the selfish, imprudent governing to which it has been subjected. Mr. Lasky demands that the Company commence legal proceedings against each Board member and Officer for their breaches of fiduciary duty to the Company including the duty of loyalty and due care for: (i) causing the Company to engage in unlawful conduct or failing to properly oversee the Company's accounting and internal controls to prevent such misconduct; (ii) causing the Company to issue false and misleading statements; and (iii) exposing the Company to staggering potential liability for the foregoing violations. The legal proceedings should seek recovery of illegal insider sales proceeds as well as millions of dollars in salaries, bonuses, retirement benefits and long term compensation paid to directors and officers for a job not well done. Compliance with Section 304 of the Sarbanes-Oxley Act of 2002 compels no

*Take-Two Interactive Software, Inc. Derivative Litigation*
March 28, 2006
Page 8

less. Such an action should also seek to recover the Company's damages—past, ongoing, and anticipated—and the millions paid in salary, bonuses and other benefits to Take-Two's officers and directors in connection with their wrongdoing. In making the foregoing demand, our client does not concede that the Board, or any member thereof, is independent or disinterested with respect to these claims.

Mr. Lasky also demands that the Board commence an investigation of the: (i) failure to remedy the Company's improper accounting practices and internal controls, which resulted in continual Securities and Exchange Commission violations for improper financial reporting; (ii) Company's overstatement of net sales and net income by improperly valuing product returns; (iii) Company's improper accounting of products that have not been shipped during a reported time period; (iv) sales of the Company's stock by Take-Two executive officers and directors during the Relevant Period; (v) frequent turnover in executive management, specifically the CEO, and the Chairman of the Board; (vi) Company's violations of the Securities Act of 1933 and the Securities Exchange Act of 1934 as alleged in the securities class actions filed against the Company; (vii) advertising practices and policies related to the Company's products; (viii) disclosure of information concerning the Company's video game products, specifically, GTA: San Andreas; and (ix) internal controls over the material programmed and included in the Company's video game releases. Further, Mr. Lasky demands that the Board implement sound corporate governance policies to prevent the recurrence of the acts complained of in this letter.

Our client, as a Take-Two shareholder, thanks you and the rest of the Board for your prompt attention to this serious matter. It is incumbent on Take-Two's Board to do the right thing and hold accountable all those responsible for the harm done to Take-Two and to ensure a prosperous future for the Company by restoring its reputation.

Should you have any requests, questions or concerns, please do not hesitate to contact us.

Very truly yours,

JEFFREY P. FINK

JPF/cd

## VERIFICATION

I, LOUIS A. KERKHOFF, hereby declare as follows:

1.      I am a member of the law firm of Robbins Umeda & Fink, LLP, counsel for plaintiff in the above entitled action. I have read the foregoing complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 12 day of July, 2006, at San Diego, California

LOUIS A. KERKHOFF