UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE TAKE-TWO INTERACTIVE                    Lead Case No. 1:06 Civ. 5279 (LTS)(DFE)
SOFTWARE, INC. DERIVATIVE
LITIGATION

_____

This Document Relates To:

    ALL ACTIONS.

-------------------------------------------------------x

## OPINION AND ORDER

APPEARANCES:

COUGHLIN STOIA GELLER RUDMAN &          DRINKER BIDDLE & REATH LLP
ROBBINS LLP                                 By:  Joseph Curtis Schoell, Esq.
  By:  Travis E. Downs, III, Esq.         1100 North Market Street, Suite 1000
      Benny C. Goodman, III, Esq.       Wilmington, Delaware 19801
655 West Broadway, Suite 1900
San Diego, CA 92101                         By:  Brian F. McDonough, Esq.
                                          140 Broadway, 39th Floor
  By:  Mario Alba, Jr., Esq.             New York, NY 10005
      Samuel Howard Rudman, Esq.
58 South Service Road, Suite 200
Melville, NY 11747

ROBBINS UMEDA LLP
  By:  Felipe J. Arroyo, Esq.
610 West Ash Street, Suite 1800
San Diego, CA 92101

*Attorneys for Plaintiffs*

                                          *Attorneys for Nominal Defendant the Special*
                                          *Litigation Committee of Take-Two Interactive*
                                          *Software, Inc.*

LAURA TAYLOR SWAIN, United States District Judge

In this consolidated securities action, Plaintiffs Richard Lasky and Raeda Karadsheh (collectively, "Plaintiffs"), derivatively on behalf of Take-Two Interactive Software, Inc. ("Take-Two"), a Delaware corporation, assert claims under Section 14(a), Section 10(b), and Section 20(a) of the Securities Exchange Act of 1934, and related state common law claims, against individuals who were directors and officers of Take-Two at various times, based on defendants' alleged involvement in backdating stock options without proper disclosure and trading on inside knowledge of the scheme.  Named as defendants are the following 23 individuals: Robert Flug ("Flug"), Paul Eibeler ("Eibeler"), Oliver R. Grace, Jr. ("Grace"), Todd Emmel ("Emmel"), Mark S. Lewis ("M. Lewis"), Steven Tisch ("Tisch"), Michael J. Malone ("Malone"), Grover C. Brown ("Brown"), John F. Levy ("Levy"), Ryan A. Brant ("Brant"), Barry S. Rutcofsky ("Rutcofsky"), Barbara Kaczynski ("Kaczynski"), Mark E. Seremet ("Seremet"), Larry Muller ("Muller"), Thomas Ptak ("Ptak"), Kelly G. Sumner ("Sumner"), James H. David, Jr. ("David"), Barbara A. Ras ("Ras"), Richard W. Roedel ("Roedel"), Jeffrey C. Lapin ("Lapin"), Anthony Williams ("Williams"), Gary Lewis ("G. Lewis") and Karl Winters ("Winters") (collectively, "Defendants").  The Court has jurisdiction of Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78a.  The Court has supplemental jurisdiction of Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

The Special Litigation Committee (the "SLC"), a committee formed by Take-Two's  board of directors to investigate allegations of stock options backdating practices and a nominal defendant in this action moves, after having completed its investigation, to dismiss Plaintiffs' claims as against all named Defendants except Brant, David, Muller and Sumner, and to assign the remaining claims to Take-Two.  Plaintiffs oppose the SLC's motion and, alleging

spoliation of evidence by the SLC, also move to strike the motion to dismiss and to exclude the SLC's reports from the Court's consideration.

The Court has considered thoroughly the parties' submissions, including the deposition transcripts and published reports.  For the reasons that follow, Plaintiffs' motion is denied in its entirety, and the SLC's motion is granted.


## BACKGROUND

The following general background facts are undisputed for purposes of the instant motion practice.  After the two actions filed separately by Plaintiffs were consolidated into the present action, Plaintiffs filed a Verified Consolidated Shareholders Derivative Complaint (the "complaint").  Broadly speaking, the complaint arises from the "backdating" of stock options granted to Take-Two directors and employees between approximately 1997 and 2006.  Stock options give the recipient the right to buy shares of a corporation's common stock at a set price, called the "strike" price, on a future date after the option vests.  The strike price of a stock option is typically set as the price of the stock on the day the option is issued.  A stock option is "backdated," however, when the strike price is set as the price of the stock on a day before the option is issued, usually (as is alleged in this case) when that price is lower than the price on the date of issuance, thereby making the option more valuable.

The complaint alleges that Take-Two regularly represented in proxy statements that the strike price of stock options issued throughout the relevant time period equaled the price of the stock on the date of issuance when, in reality, these stock options were regularly backdated.  Financial statements publicly filed by Take-Two were also allegedly misleading, as

they failed to account for the backdating even though certain accounting rules required them to do so.  The complaint also alleges that 15 Defendants -- Brant, David, Eibeler, Emmel, Flug, Grace, G. Lewis, M. Lewis, Muller, Ras, Rutcofsky, Seremet, Sumner, Tisch and Winters -- sold some of their own stock while in possession of inside information concerning the backdating scheme.  When the backdating practice came to light, Take-Two was forced to restate all of its financial information for the period from 1997 to 2006.

On March 8, 2006, Take-Two's board of directors created the SLC to investigate certain claims asserted in other derivative litigation involving Take-Two, St. Clair Shores General Employees Retirement System v. Eibeler, No. 06 Civ. 0688 (SWK).  On June 23, 2006, after allegations involving the stock option backdating surfaced in the media, the board authorized the SLC to investigate the backdating allegations as well.  Plaintiffs' initial complaints were filed shortly thereafter.

The SLC initially consisted of Malone, Levy and Brown.  Brown was appointed chairman of the SLC.  On July 7, 2006, the SLC hired the law firm of Kasowitz, Benson, Torres & Friedman LLP ("Kasowitz") and the accounting firm BDO Seidman LLP ("BDO") in connection with the investigation.  On January 17, 2007, Kasowitz issued a report to the board containing its factual findings and recommendations.  The report (hereinafter, the "Kasowitz Report"), inter alia, implicated Brant, Sumner, David, Muller and Patti Tay ("Tay") (who is not named as a Defendant in this action) as having participated in the backdating scheme and/or having willfully made questionable representations to Take-Two's auditors during the relevant time.  (See Decl. of Grover C. Brown dated Sept. 5, 2007, Ex. B-J.)

On January 30, 2007, the board adopted a resolution formally authorizing the SLC

to investigate and evaluate specifically Plaintiffs' filed complaints, to determine whether or not continued prosecution of the litigation was in the best interests of Take-Two and its shareholders, and to decide a course of action for Take-Two.  (See Brown Decl. Ex. B-E.)  The SLC hired the law firm of Wolf, Block, Schorr and Solis-Cohen LLP ("Wolf Block") to help it write the final report.  (See Brown Decl. A. at 16.)  On February 14, 2007, the SLC issued a Supplemental Report (hereinafter, the "SLC Supplemental Report"), wherein the SLC made specific recommendations to the board as to how much in proceeds obtained by backdated stock option recipients Take-Two ought to attempt to recover.  (See id. Ex. B-M.)

Malone did not seek re-election to the board and, as a result, his term as a board member ended on March 29, 2007, and he was no longer a member of the SLC.  Strauss Zelnick ("Zelnick"), who is not a named defendant in this action, was elected to the board on that day and, on or about May 21, 2007, Zelnick was appointed to the SLC.  (See Brown Decl. Ex. B-D.) On June 29, 2007, the Court stayed the action until September 4, 2007, to allow the SLC to finish its report.  (See Docket Entry No. 60.)

On September 5, 2007, the SLC issued its final report (hereinafter, the "SLC Final Report"), which, inter alia, detailed the investigatory processes followed by the SLC and its advisors, and recommended that Plaintiffs' claims against all Defendants except Brant, David, Muller and Sumner be dismissed, and that the remaining claims be assigned to Take-Two for prosecution or other disposition.  (See Brown Decl. Ex. A.)  The SLC filed the motion to dismiss on September 7, 2007.

DISCUSSION

*Governing Standards*

      The parties agree that Delaware law governs the SLC's motion to dismiss, <u>see</u> <u>Locals 302 & 612 of the Int'l Union of Operating Eng'rs v. Blanchard</u>, No. 03 Civ. 5954 (LAP), 2005 U.S. Dist. LEXIS 17679, *15 (S.D.N.Y. Aug. 25, 2005), and that the seminal case of <u>Zapata Corp. v. Maldonado</u>, 430 A.2d 779 (Del. 1981) provides the governing standard for deciding the motion.

      It is a long held principle of corporate law that directors manage the business of the corporation, <u>see</u> <u>Aronson v. Lewis</u>, 473 A.2d 805, 811 (Del. 1984), <u>overruled on other grounds by</u> <u>Brehm v. Eisner</u>, 746 A.2d 244 (Del. 2000), including decisions as to whether a corporation should pursue claims in litigation.  Under Delaware law, a special litigation committee may be created by a board of directors for this purpose, and the committee can also be given the power to determine whether a derivative suit ought to be dismissed.  <u>See</u> <u>Zapata</u>, 430 A.2d at 785.

      In <u>Zapata</u>, the Supreme Court of Delaware outlined a two-step process for resolving an SLC's motion to dismiss derivative claims brought by shareholders.  The first step requires an analysis akin to that conducted in response to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  <u>See</u> <u>Zapata</u>, 430 A.2d at 788.  The SLC has the burden of demonstrating that there are no genuine issues of material fact as to whether the SLC was independent and conducted a reasonable investigation in good faith, <u>see</u> <u>id.</u> at 788-89; independence, good faith and reasonableness are not presumed.  <u>See</u> <u>id.</u> at 788.  The SLC must also show reasonable bases for its conclusions.  <u>See</u> <u>id.</u> at 789; <u>Kaplan v. Wyatt</u>, 484

A.2d 501, 508 (Del. Ch. 1984) (examining whether the SLC made a reasonable investigation as well as, substantively, whether there were reasonable bases for its conclusions).  If the court concludes that there is no genuine issue of material fact as to whether the SLC was independent, conducted a reasonable investigation, and acted in good faith, and that its conclusions have reasonable bases, the court may, in its discretion, grant the dismissal motion or proceed to the second step.  See Zapata, 430 A.2d at 789.

If the court determines that the second step is appropriate, it must then "determine, applying its own independent business judgment, whether the motion should be granted." Zapata, 430 A.2d at 789.  "The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest." Id.  The court must, "when appropriate, give special consideration to matters of law and public policy in addition to the corporation's best interests." Id.

As noted above, Plaintiffs have moved to strike the SLC's motion to dismiss and/or to exclude the Kasowitz and SLC reports from consideration on the basis of spoliation of evidence.  Plaintiffs point to the undisputed fact that Brown destroyed his secretary's handwritten minutes of SLC meetings as well a handwritten draft of the SLC Supplemental Report and argue that he reasonably should have known that such materials would have been discoverable in impending litigation.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.  It

has long been the rule that spoliators should not benefit from their wrongdoing . . . ." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citations omitted).  "Even without a discovery order, a district court may impose sanctions for spoilation, exercising its inherent power to control litigation." Id. (citations omitted).[1]

> A district court has broad discretion in crafting a proper sanction for spoilation[, but] the applicable sanction should be . . . designed to: (1) deter parties from engaging in spoilation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

Id. (citations omitted).  Dismissal of a lawsuit is appropriate "if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. . . . [D]ismissal should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." Id. (citations omitted).

The Court has also considered whether a sanction in the form of an adverse inference should be drawn within the context of the SLC's motion.  "A party that seeks an adverse inference instruction for destruction or late production of evidence must show that: (i) the party having control over the evidence had an obligation to preserve or timely produce it; (ii) the party that destroyed or failed to timely produce evidence had a culpable state of mind; and (iii) the missing or tardily produced evidence is relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." In re NTL, Inc.

---

[1]    Plaintiffs also invoke Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, but that provision appears to be inapposite because the documents at issue were destroyed before any court order was entered in this case concerning discovery, and Plaintiffs do not point to any order that they allege was violated.  See Fed. R. Civ. P. 37(b)(2)(A) ("If a party . . . fails to obey an order to provide or permit discovery, . . . .").

Secs. Litig., 244 F.R.D. 179, 192 (S.D.N.Y. 2007) (citations omitted).  With respect to the third

factor, the party seeking an inference in his favor must produce "some evidence suggesting that a

document or documents relevant to substantiating his claim would have been included among the

destroyed files."  Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998).

   The Court will address Plaintiffs' motion first, because, if granted, it would affect

the Court's evaluation of the evidentiary record or obviate entirely the need for consideration of

the merits of the SLC's motion.


*Motion to Strike*

   The parties do not dispute that Brown ordered his secretary to destroy her

handwritten notes of SLC meetings as well as his handwritten draft of the SLC Supplemental

Report.  However, even if Brown had an obligation not to destroy the documents at issue in light

of reasonably foreseeable litigation, Plaintiffs proffer no evidence whatsoever suggesting that the

destroyed documents contained anything that would have reflected unfavorably on the SLC's

independence, good faith or reasonableness.  See Kronisch, 150 F.3d at 127 ("no adverse

inference where party failed to provide any extrinsic evidence that the subject matter of the lost

or destroyed materials would have been unfavorable to the opposing party or would have been

relevant to the issues in this lawsuit") (citation and quotation omitted).  Plaintiffs do not dispute

Brown's testimony that his secretary converted her handwritten notes of SLC meetings into

typewritten draft minutes before destroying the handwritten notes (see Brown Dep. at 71:23-25)[2]

_____

[2]  Excerpts of the same deposition testimony of Brown, Levy and Zelnick, are found
in different portions of both parties' submissions.  For the sake of simplicity, the
Court cites directly to the deposition transcript rather than to exhibits of specific

and that this was a regular practice.  (See Brown Dep. at 71:24-25.)  There is no allegation that

the typewritten minutes were also destroyed, and Plaintiffs do not dispute Brown's testimony that

he primarily reviewed her typewritten drafts since it was difficult to read her handwritten notes.

(See Brown 71:2-5.)  There is no indication anywhere else in the record that a reasonable trier of

fact, considering all of the evidence, would suspect that such handwritten notes contained

information undermining the fact or appearance of the SLC's independence, good faith or

reasonableness.

Similarly, there is no suggestion that Brown's handwritten draft of the SLC

Supplemental Report contained some form of incriminating information.  Plaintiffs do not

dispute Brown's testimony that it was also his regular practice to destroy his handwritten drafts,

and Plaintiffs proffer nothing that would suggest that the practice of destroying handwritten

drafts was such an unusual practice that a reasonable fact-finder would conclude there was

something to hide, especially when there are no indicia in the record suggesting an unreasonable

investigation or bad faith.  Even if Plaintiffs actually identified some remotely negative inference

that could reasonably be raised in connection with that destroyed draft (and they do not), the fact

that it would only implicate the SLC Supplemental Report written in February 2007, months

before the far more important and dispositive SLC Final Report was drafted, only further

demonstrates the attenuated nature of Plaintiffs' arguments.  Plaintiffs' assertions concerning the

prejudicial impact of the destroyed documents are premised entirely on speculation.  Under the

circumstances, no adverse inference is warranted.  See Kronisch, 150 F.3d at 128 (the party

seeking an inference in his favor must produce "some evidence suggesting that a document or

declarations.

documents relevant to substantiating his claim would have been included among the destroyed files.")[3]

There is also no evidence that any of Brown's actions were taken in bad faith.  As explained more fully in connection with the SLC's dismissal motion, Plaintiffs' attempts to demonstrate a basis for striking the SLC's motion or precluding the SLC reports from consideration based on bad faith are, like their attempts to frame material fact issues as to the SLC's lack of independence, reasonableness, or good faith, largely based on speculation and mischaracterizations of the factual record.   Therefore, the extreme sanction of striking the SLC's entire motion to dismiss or excluding the reports upon which the motion relies is unwarranted and, accordingly, Plaintiffs' motion is denied in its entirety.

*The SLC's Motion to Dismiss - Step One*

The SLC has proffered its reports, which identify the members of the SLC and their backgrounds as relevant to their capability and their independence, describe the retention of

---

[3]     Plaintiffs argue that "relevance" in this context may be inferred where a party's conduct amounts to bad faith or gross negligence.  See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d Cir. 2002) ("bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party"); id. ("a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party").  However, Plaintiffs have failed to proffer any evidence that Brown's actions were in bad faith or grossly negligent.  See generally Kaplan, 484 A.2d at 517 ("As to the destruction by Brown, Wood of the original, handwritten interview notes of its attorneys in favor of a prepared summary of each interview, the [SLC] points out that such a procedure is routinely engaged in by law enforcement agencies and has been approved by the courts, an argument which plaintiff does not dispute.") (citation omitted).

competent and independent advisors, explain the investigatory process, and incorporate by reference the Kasowitz Report, which in turn details the document review and interview process and the factual findings and bases for those findings.  The SLC Final Report provides a legal analysis of Plaintiffs' claims, reviews the evidence, and draws its conclusions based on the legal analysis as applied to the facts.  This evidence is <u>prima facie</u> sufficient to satisfy the SLC's burden in demonstrating that the SLC's investigation was reasonable and conducted in good faith, that the SLC was independent, and that the SLC's conclusions were supported by reasonable bases.

Plaintiffs purport to proffer evidence that would create a genuine issue of material fact as to whether the SLC conducted a reasonable investigation in good faith and whether the SLC was independent, and assert various arguments that the SLC's conclusions were not supported by reasonable bases.  The Court addresses these arguments in turn.

### _Good Faith and Reasonable Investigation_

Plaintiffs argue that there are genuine issues as to whether the SLC conducted a reasonable investigation and whether that investigation was conducted in good faith because, Plaintiffs contend, the SLC completely abdicated its responsibilities to Kasowitz and essentially rubber-stamped Kasowitz's and Wolf Block's findings and recommendations without any independent assessment of the facts.

Plaintiffs' papers in opposition to the SLC's dismissal motion are replete with conclusory arguments based on speculation or unreasonable inferences drawn from out-of-

context portions of the deposition testimony of SLC members,[4] and with blatantly erroneous

---

[4]    For instance, Plaintiffs assert that SLC members "offered little, if any, guidance on what documents should be reviewed and refused to participate at all in the search for relevant documents." (Opp'n at 9.)  In the deposition testimony cited, Brown testified that "we had a firm that was very capable, qualified, Mr. Kasowitz, . . . and they had all the material, and it just wasn't something I needed to get into that.  We let them do it."  (Brown Dep. at 47:12-48:2.)  Immediately following that testimony, however, Brown testified that the SLC "rel[ied] on their [Kasowitz's] investigations.  Somebody has to do it, you know.  Somebody's got to dig out the documents and the 500,000 e-mails and see which ones were relevant, and that sort of thing.  And yes, we retained the Kasowitz and BDO Seidman firms together to do that, to look through that and <u>report back to us, which they did.</u>"  (Brown Dep. at 48:8-16) (emphasis added).  There is no requirement that SLC members physically participate in search activities.

Plaintiffs' more general contention -- that the SLC improperly distanced itself from the work -- finds no support in the cited testimony.  Brown specifically testified that Kasowitz reported back to the SLC on the document review process, and nothing in this testimony suggests that the SLC "refused to participate at all in the search for relevant documents."  Plaintiffs also cite Levy's testimony that "One of the first things they [Kasowitz] did was got all of the e-mails and identified a vast number of e-mails, millions of e-mails, came up with search terms and began to do that."  (Levy Dep. at 17:5-9.)  However, Levy continues, "In the meantime, they had hired the accounting firm of BDO Seidman to assist them in their investigation.  I met with BDO as well.  <u>We worked together to determine their approach to the engagement as well.</u>"  (Levy Dep. at 17:9-14) (emphasis added).  While the testimony is clear that Kasowitz performed the primary review of documents, the testimony in no way suggests that the SLC "refused to participate at all in the search."

Plaintiffs assert that "the SLC admittedly never attempted to verify the Kasowitz firm's conclusions or double-check the Kasowitz firm's work by, for example, requesting a sample of documents" (Opp'n at 9), and in support of that assertion cites Brown's testimony that "there certainly wasn't any need of any of us as committee members to try to go in and double-check on what the Kasowitz firm was doing."  (Brown Dep. at 56:14-17.)  The full testimony, however, reads:

A:  Well, I don't want to agree that I didn't do anything independently, but, basically, certainly we relied on the Kasowitz firm.  It's a complicated thing, it seemed to me, to go into -- I think I saw some place that there were, like, 1,300 option grants over the period of time they were looking at, and a lot of things were by e-mails, and it was a mess, and somebody

citations to the evidentiary record.[5]  The opposition papers do, however, identify the following

_____

> had to do it, and there certainly wasn't any need of any of us as committee
> members to try to go in and double-check on what the Kasowitz firm was
> doing.  They were a reputable firm.  We did meet with them.  They kept us
> up-to-date and they gave us materials to look at and gave us opinions and
> did what you'd expect them to do, to do a thorough job.  But if you're
> asking, did I also plow through e-mails and that sort of thing to see if they
> missed anything, no.
>
> Q: I think I got you.

(Brown Dep. at 56:4-57:1.)  The testimony is clear that Brown was referring only
to the fact that the SLC did not themselves do the document search and initial
review process, and nothing in the testimony can be reasonably interpreted as
"admitting" the broad assertion that SLC "never attempted to verify the Kasowitz
firm's conclusions, or double-check the Kasowitz firm's work."

[5]  For instance, Plaintiffs assert, "as the SLC members admit, the only documents
they ever even saw were those given to them by the Kasowitz firm."  However,
none of the testimony cited actually says this.  Brown's statement that "I certainly
didn't handle the documents" (Brown Dep. 48:22-23) does not at all indicate that
the only documents Brown ever saw were those given to him by Kasowitz, and it
was given in response to a question by Plaintiffs' counsel concerning specifically
the documents reviewed by Kasowitz, not any other "document" that was
involved in the investigation as a whole.  Plaintiffs also cite Levy's statement that
"I did not myself ever look at any personnel files.  I only reviewed the e-mails
[Kasowitz] identified," (Levy Dep. at 18:12-14), but not only does this statement
not indicate or suggest that Levy only looked at documents Kasowitz gave, in the
same paragraph, Levy indicates that he "read the plans," "reviewed the minutes of
both the board, and where available, the compensation minutes," "looked at at
least one stock option grant agreement," and "look[ed] at some of the materials
given to Pricewaterhouse Coopers by the company" (Levy Dep. at 18:8-16).
There is no indication whatsoever that all of these documents came solely from
Kasowitz.

Plaintiffs assert, "While the Kasowitz presentation made on December 7, 2006
and its report are replete with evidence that Brant was intimately involved in the
backdating of stock options, they ignore entirely the evidence that the
Compensation Committee had full knowledge of and approved the backdating."
(Opp'n at 13.)  In support of this assertion, Plaintiffs cite to slides of Kasowitz's
PowerPoint presentation to the Take-Two board, which indicate that Brant
repeatedly asserted that the Compensation Committee knew of and approved the

undisputed facts or inferences that may be reasonably drawn from the testimony in favor of

Plaintiffs: that the SLC members relied on Kasowitz to conduct all 13 interviews and did not

conduct any interview directly themselves, that no SLC member received or ever asked for any

written interview summaries or sat in on any interview, that Muller, David and Tay were not

interviewed, that the SLC members did not conduct the document review directly, that Kasowitz

(rather than the SLC members) made a presentation directly to the Take-Two board in December

2006, that Wolf Block drafted the initial version of the SLC Final Report, and that Zelnick was

only involved in the latter stages of the SLC Final Report's creation.[6]

     None of these undisputed facts or reasonable inferences drawn in favor of

---

backdating of options.  But one of the slides also states, "Regarding grants to himself, Mr. Brant said the Board and the Compensation Committee were fully informed of and approved such grants.  However, we were unable to uncover documentation to support that assertion." (Goodman Decl. Ex. 11 at SLC-00486.) Therefore, rather than indicating that Kasowitz "ignore[d] entirely" evidence in the form of Brant's testimony concerning the Compensation Committee; the slides indicate the precise opposite: that Kasowitz investigated Brant's claim but was unable to corroborate it.

[6]    Plaintiffs argue that "Levy . . . indicated a complete lack of involvement in the report's recommendations when he testified that he could not recall making any changes or comments on any draft of the SLC Report." (Opp'n at 12.)  However, in the deposition cited, Levy was specifically responding to a question about only the SLC Supplemental Report filed in February 2007, not the SLC Final Report, and he answered "I don't recall" in response to a question about whether he had any "revisions or additions" to the draft SLC Supplemental Report, not whether he made any "comments" on the draft SLC Supplemental Report. (Levy Dep. at 27:12-15.)  Even if it would be reasonable to infer, based on his inability to remember whether he suggested any "revisions or additions" to the SLC Supplemental Report, that he in fact did not suggest any "revisions or additions" to the SLC Supplemental Report, Plaintiffs point to no testimony suggesting that Levy was not involved with the far more important SLC Final Report.  Moreover, it is unreasonable to infer a "complete lack of involvement" even with the SLC Supplemental Report from the mere fact that Levy did not suggest any "revisions or additions" to it.

Plaintiffs, nor any of Plaintiffs' fanciful interpretations of the evidentiary record, however,

creates a genuine issue material to the determination of whether the investigation was reasonable

or conducted in good faith.  Plaintiffs do not dispute that Kasowitz was an independent law firm

qualified to conduct the investigation, nor do Plaintiffs proffer evidence that Kasowitz conducted

the interviews in an unreasonable manner.  It was therefore not unreasonable, as a matter of law,

for the SLC to rely on competent counsel as its agent in conducting the interviews.  See Katell v.

Morgan Stanley Group, Inc., Civil Action No. 12343, 1995 Del. Ch. LEXIS 76, *28 (Del. Ch.

June 15, 1995) ("[the SLC] selected capable counsel to assist their investigation and relied

heavily on that counsel.  I find nothing unreasonable about [the SLC's] reliance on counsel. . . .

[The SLC] can select any agent to perform its duties as Special Committee, as long as the agents

can perform their assigned tasks competently.  Plaintiffs have not asserted that . . . counsel had an

improper conflict of interest or incompetently conducted the interviews.  [The SLC's] heavy

reliance on its competent attorneys does not render its investigation unreasonable."); Peller v.

The Southern Company, 707 F. Supp. 525 (N.D. Ga. 1988) ("The court acknowledges that an

[SLC's] reliance on counsel is an accepted practice").[7]  With respect to the document review

process, Plaintiffs do not dispute Brown's testimony that hundreds of thousands of e-mails and

over a thousand option grants needed to be reviewed (see, e.g., Brown Dep. at 48:8-12

---

[7]     To the extent that Peller may be read to hold that personal participation by SLC
members in interviews and other investigative activities is essential to a process
that is reasonable or in good faith within the meaning of Zapata, the Court
respectfully disagrees.  Moreover, the Peller court seemed generally skeptical of
the integrity of the process at issue there, at least in part based on facts that are not
present here.  See Peller, 707 F. Supp. at 529-30 (SLC issued its report before
waiting for the impending issuance of a critical report); id. at 530 (SLC
erroneously attributed senior management status to individuals with middle
management responsibilities).

("Somebody has to do it, you know.  Somebody's got to dig out the documents and the 500,000

e-mails and see which ones were relevant, and that sort of thing")), and therefore it was entirely

reasonable for the SLC to hire and rely on Kasowitz to provide the many pairs of eyes necessary

to sift through the voluminous record.  Plaintiffs point to no evidence or reasonable inference

drawn from the testimony that is sufficient to raise any genuine factual issue as to whether SLC

members failed to provide appropriate oversight of this review process.  (See, e.g., Brown Dep.

at 48:13-16 ("And, yes, we retained the Kasowitz and BDO Seidman firms together to do that, to

look through that and report back to us, which they did."); Levy Dep. at 16:22-17:4 ("The work

product that [Kasowitz] did?  I mean, first of all, we got the list.  We tried to identify it.  Again,

because of my involvement and my knowledge, I worked with them.  We got the list of the

database.  We tried to determine the universe.").)

        For similar reasons, no inference of unreasonableness or bad faith is properly

drawn from the mere fact that Kasowitz made a presentation of its factual findings directly to the

Take-Two board in December 2006, as it is not at all unusual to expect that an entity hired to

conduct an independent, competent investigation would provide presentations on the matters that

it investigated.  Plaintiffs proffer no facts tending to show that Kasowitz performed its duties

inadequately,[8] or that the SLC did not work appropriately with Kasowitz prior to its presentation

---

[8]        Plaintiffs assert that Kasowitz failed to investigate the fact that Take-Two board
        members "blatantly slated time to 'ratify options'" at a 2002 board meeting, citing
        as evidence an agenda containing the words "Ratify options."  (Goodman Decl.
        Ex. 11 at SLC-00539.)  However, nothing in this document can reasonably be
        read to suggest that the board was knowingly ratifying the issuance of backdated
        stock options.  Furthermore, Plaintiffs do not dispute the Kasowitz Report's
        finding that "the majority of options granted lack documented approval by the . . .
        Board." (Kasowitz Report at 10.)

to the board.  (See, e.g., Brown Dep. at 50:16-23 ("the Kasowitz firm made, in effect, a

presentation to the committee of what they had found, and we spent several hours going through

that when they had overheads and things and copies of documents that were relevant and had a

bearing on it which went up on the screen, and we talked about it and we spent a lot of time on

it.").)  See Johnson v. Hui, 811 F. Supp. 479, 489 (N.D. Cal. 1991) ("The issue before the Court

now is not whether the SLC's reliance on counsel was substantial, but whether the SLC's

reliance on counsel amounts to an abdication by the SLC of its investigative role, or renders the

SLC's conclusions unreasonable or unreliable").  In sum, Plaintiffs identify no fact or reasonable

inference suggesting that reliance on Kasowitz in the various aforementioned ways amounted to

an "abdication" by the SLC of its role.

   The mere fact that Tay, Muller and David were not interviewed is of no moment,

as Plaintiffs proffer nothing disputing the Kasowitz Report's assertion that all of these

individuals declined to appear.  (Kasowitz Report at 4.)  While it would certainly have been

preferable for these critical players to have been interviewed, Plaintiffs proffer nothing to

demonstrate that the SLC could or should have done more to obtain interviews with these

individuals.  Moreover, there is no allegation that the SLC rewarded these individuals for

refusing to be interviewed, as the SLC Final Report identifies all of these individuals as central

players in the backdating scheme.  Indeed, the SLC's instant motion practice contemplates the

continued pursuit of claims against Muller, David and others.

   Plaintiffs' contentions concerning the drafting process of the SLC Final Report are

also without merit.  As with the SLC's reliance on the Kasowitz firm, no inference of

unreasonableness or bad faith is appropriately drawn from the SLC's reliance on Wolf Block to

write the initial draft of the SLC Final Report, as there is no proffer that Wolf Block itself was not independent or qualified.  No genuine issues of unreasonableness or bad faith are raised by Zelnick's involvement with only the latter stages of the drafting process, since Zelnick did not join the SLC until May 2007 and would not have been as familiar with all of the facts that were gathered in an investigation that had long been completed.

The Court has considered thoroughly all of Plaintiffs' remaining arguments as to the reasonableness and good faith of the SLC and finds them to be without merit.  For the foregoing reasons, the SLC has met its burden of demonstrating that there are no genuine issues of material fact with respect to the reasonableness of the SLC's investigation and the SLC's good faith.  Nor is there any genuine issue of reasonableness or good faith with respect to the Take Two board's adoption of the SLC's recommendations.

### *Independence*

A member of the SLC is independent when "he is in a position to base his decision on the merits of the issue rather than being governed by extraneous considerations or influences. . . . [I]t is the care, attention and sense of individual responsibility to the performance of one's duties that touch on independence." Kaplan v. Wyatt, 499 A.2d 1184, 1189 (Del. 1985) (quoting and applying Aronson v. Lewis, 473 A.2d 805, 816 (Del. 1984), to SLC context). Plaintiffs repeat and rely on all of their arguments as to reasonableness and good faith in an attempt to demonstrate that there is also a genuine issue as to the SLC's independence.  For substantially the reasons explained above, those arguments are rejected.

Plaintiffs also argue that there is a genuine issue as to the SLC's independence

because the SLC did not have full authority to decide how Take-Two ought to handle the
derivative suit, but was only vested with the power to make recommendations to the Take-Two
board.  Plaintiffs do not cite any binding authority, nor do they cite any authority that persuades
the Court that the mere fact that an SLC has only the power to make recommendations is, in and
of itself, relevant to the independence analysis.[9]  Independence might be called into question if,
in addition to the fact that the SLC has only recommendation power, the independence of the
board members themselves were at issue, since the board members would ultimately be the ones
deciding whether to adopt the recommendations.[10]  However, even if an issue as to independence
could properly be raised in this manner under Delaware law, Plaintiffs proffer no evidence that a
majority of the board or, for that matter, any member of the board, sitting at the time the SLC

---

[9]     It is not at all clear that the Supreme Court of Delaware has held, or would hold,
that the fact that an SLC empowered only to make recommendations rather than to
decide directly whether the corporation should litigate can raise a reasonable
inference that the SLC is not independent, as the cases do not appear to consider
relevant whether an SLC only has recommendation power.  See Zapata, 430 A.2d
at 789 ("If, however, the Court is satisfied under Rule 56 standards that the
committee was independent and showed reasonable bases for good faith findings
and recommendations, the court may proceed, in its discretion, to the next step.")
(emphasis added); see also Kaplan v. Wyatt, 484 A.2d 501, 505 (Del. Ch. 1984),
aff'd, 499 A.2d 1184 (Del. 1985) (granting SLC motion to dismiss where SLC
only had power to make recommendations).

[10]    Plaintiffs rely upon dicta in Biondi v. Scrushy, 820 A.2d 1148 (Del. Ch. 2003),
that the SLC's "ability to instill confidence is, at best, compromised and, at worst,
inutile" "if the [special litigation] committee is not fully empowered to act for the
company without approval by the full board."  Id. at 1157.  Biondi, however, cites
no authority for this proposition and, as explained above, this statement could be
persuasive to the Court only to the extent that it presumes that there is a question
also as to the board members' independence, which is often the impetus for a
board's creation of a separate, independent SLC in the first place.

made its recommendations in September 2007, was not independent.[11]

    Lastly, the mere fact that two SLC members, Brown and Levy, are named as defendants in the complaint does not raise a genuine issue as to their independence.  The SLC Final Report explains that the only reference in the complaint to Brown and Levy is the conclusory allegation that they benefitted from the backdating scheme, that the alleged wrongdoing occurred before Brown and Levy joined the board, and that therefore, the members of the SLC were independent.  (SLC Final Report at 3.)  The Court concurs with the SLC's analysis of the significance of the fact that Brown and Levy were named as Defendants. Plaintiffs do not dispute this analysis in their opposition papers and, more importantly, proffer no evidence that Brown or Levy faced a substantial threat of liability such that their independence would be reasonably questioned.  See Johnson, 811 F. Supp. at 486 ("where liability may be direct and substantial the SLC's independence may be questioned. . . . [T]he participation and/or approval must be substantial, and not the result of innocent or pro forma involvement or affiliations.") (citing cases).  Nor is such evidence proffered with respect to Malone.

---

[11]   For instance, Plaintiffs proffer nothing to rebut the following statement in the SLC Final Report:

> In submitting this Report, the Committee takes no position on whether the use of a committee to take action with respect to the Litigation is legally required, or remains governed by Zapata, Kaplan, and similar cases, in light of the distinguishing fact that, here, the Company's Board has substantially changed since the Complaint was filed. . . .  Six members of Take-Two's current eight-member Board are not named as defendants, and no member of the Board is alleged to have been awarded backdated options or to have caused the award of such options.  In fact, no present member of the Board had any involvement with the Company whatsoever during the time that the challenged options were granted or exercised.

(SLC Final Report at 3.)

For the above reasons, the SLC has successfully demonstrated that there are no genuine issues of material fact as to whether the SLC acted independently.

### Reasonable Bases

The Court has considered thoroughly the SLC Final Report and the other reports on which the SLC Final Report relies, and concludes that the SLC has sufficiently shown that its conclusions are supported by reasonable bases in both law and fact.  See Katell, 1995 Del. Ch. LEXIS 76, at *33-*34 ("In reviewing the [SLC's] conclusions, the Court does not take an independent look at the merits of lawsuit, but must find that the [SLC's] consideration of the merits of the claims was reasonable.").  Kasowitz conducted a thorough investigation and found significant evidence of culpable knowledge at the relevant times on the part of Brant, David, Muller and Sumner, the individuals to whom the SLC recommended that Take-Two take responsibility for pursuing claims.  Although Flug and Grace, who were members of the Compensation Committee, were found to have been less than vigilant, the SLC noted that there was no evidence of bad faith and reasonably concluded that pursuing claims against them would not be worth the cost.  The SLC was unable to find any evidence implicating the remaining Defendants and, as a result, reasonably concluded that Take-Two ought not to pursue claims against them.

Much of Plaintiffs' argument in opposition to the SLC's motion consists of recitations of broad principles of law (see, e.g., Opp'n at 18 ("It is well-settled that individuals who receive, conceal, or are responsible for backdated options are liable under federal securities

laws and for breach of fiduciary duty under state law")),[12] coupled with reiterations of the

conclusory allegations in its complaint that all of the defendants are at least "responsible" for the

backdated options.  (See, e.g., Opp'n at 17 ("The SLC's recommendations are contrary to law, as

all of these defendants received, concealed, or were responsible for backdated options at Take-

Two.  [Compl.] ¶¶ 20-42.").)  Plaintiffs' proffers are plainly insufficient to frame genuine issues

of material fact as to the reasonableness of the SLC's conclusions, the legal and factual bases for

which are explained in detail in the SLC's submissions.  The SLC Final Report amply

demonstrates that the allegations of the complaint were reasonably investigated, and none of

Plaintiffs' assertions in opposition to the SLC's motion would support a rational determination

that the SLC's processes or conclusions are so contrary to law or otherwise defective as to be

unreasonable.

            Plaintiffs argue that the SLC unreasonably "ignore[d] the well-settled fact that

defendants' backdating scheme violates defendants' duties of good faith and loyalty" and instead

focused on the law concerning the breach of duty of care, which Plaintiffs assert is more difficult

for a plaintiff to prove.  (Opp'n at 18.)  The SLC Final Report, however, explicitly cites to

Delaware case law tying participation in a backdating scheme to a breach of the duty of good

faith and loyalty.  (See SLC Final Report at 30-33 citing, i.e., Ryan v. Gifford, 918 A.2d 341, 358

(Del. Ch. 2007) ("I am unable to fathom a situation where the deliberate violation of a

shareholder approved stock option plan and false disclosures, obviously intended to mislead

shareholders into thinking that the directors complied honestly with the shareholder approved

_____

[12]        Plaintiffs cite no authority in support of the proposition that the mere receipt of
backdated stock options renders an individual liable under federal securities laws
and for breach of fiduciary duty.

option plan, is anything but an act of bad faith.  It certainly cannot be said to amount to the faithful and devoted conduct of a loyal fiduciary.").)  The SLC reasonably interpreted Delaware case law as requiring some form of knowledge and culpability to trigger a breach of the duty of loyalty or good faith (see, e.g., SLC Final Report at 31 ("The [Delaware] Court stressed that . . . a director's consciously causing the corporation to undertake some illegal act would clearly violate the duty of loyalty")) and, as already discussed, the SLC could not find enough evidence implicating 19 of the 23 named Defendants with sufficient culpability in the backdating scheme. Therefore, the SLC's recommendation that claims premised on the breach of the duty of good faith or loyalty, as well as the other claims, ought not to be pursued against the 19 named Defendants, did not lack a reasonable basis.

According to Plaintiffs, the SLC erred in its legal analysis that Section 10(b) claims for representations made prior to a certain date were barred by the statute of limitations, citing non-binding authority for the proposition that the statute of limitations period does not start running until the last representation in a series of similar fraudulent misrepresentations was made.  The SLC's mere reliance on one persuasive authority to the exclusion of another does not, however, amount to unreasonable legal analysis.  Compare In re Zoran Corp. Derivative Litig., 511 F. Supp. 2d 986, 1014 (N.D. Cal. 2007) ("the statute of limitations [for a Section 10(b) claim] accrues as of when the violation itself occurs, not when the last violation in a series of alleged violations occur"); with In re Dynex Capital Sec. Litig., No. 05 Civ. 1897 (HB), 2006 WL 314524, at *5 (S.D.N.Y. Feb. 10, 2006) ("in which a series of fraudulent misrepresentations in alleged, this period of repose [discussed in 28 U.S.C. § 1658(b), the statute of limitations provision for Section 10(b) claims], begins when the last alleged misrepresentation was made"),

rev'd on other grounds by Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,

531 F.3d 190 (2d Cir. 2008).  Nor is there any indication that the SLC gave unreasonable weight

to its statute of limitations analysis in forming its recommendations.  Plaintiffs also fault the SLC

for concluding that the statute of limitations bars aspects of Plaintiffs' Section 14(a) and state law

claims, but the report does not unequivocally state that the statute of limitations would definitely

bar parts of those claims (see SLC Final Report at 29 ("such [Section 14(a)] claims are likely to

be cut off to the extent they challenge conduct occurring prior to July 12, 2003, . . . and may be

barred to the extent they challenge conduct occurring prior to July 12, 2005"), 31

(acknowledging that tolling of statute of limitations for state law claims could apply)), and

Plaintiffs cite no binding authority clearly contradicting the analyses actually contained in the

report.  Therefore, the SLC's analyses of the various statute of limitations defenses were

reasonable.

> Plaintiffs assert that "the SLC failed to investigate or even address defendants'

insider trading and therefore has no basis on which to move to terminate these claims."  (Opp'n

at 19.)  The SLC Final Report, however, did address Plaintiffs' insider trading claims.  (See, e.g.,

SLC Final Report at 14, 39.)  The SLC's conclusion that the litigation should not be pursued

against the 11 defendants whom Plaintiffs accuse of insider trading is amply supported by its

findings, explained in the SLC Final Report, that each such defendant possessed no knowledge of

the backdating scheme, or that there are facts from which it may be reasonably inferred that the

defendant possessed no knowledge of the backdating scheme at the relevant times.  (See SLC

Final Report at 38-39, 43, 44 n.14, 44-46, 50, 51.)  Therefore, the SLC's conclusion as to those

insider trading claims was supported by reasonable bases.  Plaintiffs' different perspective on the

cost versus potential benefits of further litigation against such defendants, even if reasonable, does not raise a genuine issue as to whether the SLC's conclusions were reasonable ones.

The Court has considered thoroughly all the remaining arguments raised by Plaintiffs in an attempt to demonstrate that the SLC's recommendations were not supported by reasonable bases and finds them to be without merit.  For the above reasons, the SLC has sufficiently met its burden of demonstrating that its recommendations were supported by reasonable bases.

*The SLC's Motion to Dismiss - Step Two*

The Court has considered carefully the evidentiary record as a whole and declines to apply step two of the Zapata analysis.  There is no indication that the Kasowitz investigation was anything but thorough, Plaintiffs fail to point to any evidence that the SLC overlooked, and the legal analysis in the SLC Final Report was sound.  There is no indication of any stockholder grievance against any other defendant deserving of further consideration, nor does the Court find that granting SLC's motion would somehow violate the spirit of the step one analysis.  The SLC's inducement of individuals who received backdated options to voluntarily disgorge substantial stock trading profits was a sensible approach, and the cost-benefit analysis and strategic conclusions with respect to the continuation of this litigation were also sensible. The makeup of the current board is quite different from that of the board that was sitting at the time the individual complaints were filed.  Accordingly, the Court declines to apply its own independent business judgment as to whether and to what extent Take-Two should pursue the claims Plaintiffs have asserted here.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion to strike is denied and the SLC's motion is granted. Action 06 Civ. 5279 is dismissed as against all defendants except Ryan A. Brant, Larry Mullen, Kelly G. Sumner and James H. David, Jr., and Action 06 Civ. 5378 is dismissed. The claims asserted in Action 06 Civ. 5279 against Defendants Brant, Mullen, Sumner and David are hereby assigned to Take-Two Interactive Software, Inc. ("Take-Two"), Plaintiffs Lasky and Karadsheh are hereby terminated as parties to this action, and Take-Two is substituted as the sole party plaintiff. Take-Two is directed to file and serve an amended complaint in Action 06 Civ. 5279, with courtesy copies to the chambers of the undersigned and of Magistrate Judge Eaton, by **May 15, 2009.** This case remains referred to Judge Eaton for general pre-trial management.

The Clerk of Court is respectfully requested to terminate Docket Entry Nos. 67 and 97.

SO ORDERED.

Dated: New York, New York
April 21, 2009

LAURA TAYLOR SWAIN
United States District Judge